No. 26-1891

---

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FOURTH CIRCUIT**

---

ADEN W. SCOTT, III; MARK C. DAVIS; EDWARD A. LANE; JEREMY M. POPE; CASEY BARDEN; JOHN HUDNALL; AMY L. HUTCHESON, Executrix of the Estate of James S. Hutcheson, deceased,

*Plaintiffs-Appellees*,

v.

3M COMPANY,
f/k/a Minnesota Mining & Manufacturing Company,

*Defendant-Appellant*,

AGC CHEMICALS AMERICAS, INC.; ARCHROMA U.S., INC.; ARKEMA, INC.; BLUE RIDGE RESCUE SUPPLIERS, INC.; BRADSDEN SOLUTIONS, INC.; DAIKIN AMERICA, INC.; E.I. DUPONT DE NEMOURS & COMPANY, a/k/a EDIP, INC.; GLOBE MANUFACTURING COMPANY, LLC; HONEYWELL INTERNATIONAL, INC.; HONEYWELL SAFETY PRODUCTS USA, INC.; LION GROUP, INC.; MALLORY SAFETY & SUPPLY LLC; MSA SAFETY SALES, LLC; MSA SAFETY, INC.; MUNICIPAL EMERGENCY SERVICES, INC.; PBI PERFORMANCE PRODUCTS, INC.; STEDFAST USA INC.; TENCATE PROTECTIVE FABRICS USA, d/b/a Southern Mills, INC.; THE CHEMOURS COMPANY, LLC; W.L. GORE & ASSOCIATES, INC.,

*Defendants*.

---

On Appeal from the United States District Court
for the Eastern District of Virginia, No. 2:25-cv-00617-AWA-LRL

---

# OPENING BRIEF OF DEFENDANT-APPELLANT 3M COMPANY

---

Paul D. Clement
Joseph J. DeMott
Nicholas A. Aquart
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com
joseph.demott@clementmurphy.com
nicholas.aquart@clementmurphy.com

Lauren R. Goldman
Justine Goeke
S. Stephanie Hahn
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
(212) 351-2375
LGoldman@gibsondunn.com
JGoeke@gibsondunn.com
SHahn@gibsondunn.com

Elizabeth A. Kiernan
Jed Greenberg
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, TX 75201
(214) 698-3100
EKiernan@gibsondunn.com
JTGreenberg@gibsondunn.com

Branton J. Nestor
Minsoo Kim
GIBSON, DUNN & CRUTCHER LLP
3161 Michelson Drive, Suite 1200
Irvine, CA 92612
(949) 451-3800
BNestor@gibsondunn.com
MKim@gibsondunn.com

Adam I. Steene
Riley K. Segars
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036
(202) 955-8500
ASteene@gibsondunn.com
RSegars@gibsondunn.com

Matthew J. Hundley
BUTLER SNOW LLP
919 East Main Street, Suite 600
Richmond, VA 23219
(804) 762-6028
Matthew.Hundley@butlersnow.com

*Counsel for Defendant-Appellant 3M Company*

## DISCLOSURE STATEMENT

In accordance with Federal Rule of Appellate Procedure 26.1 and Local Rule 26.1, Defendant-Appellant 3M Company states that it is a publicly traded corporation that does not have any parent corporation. No publicly held corporation owns 10% or more of 3M Company's stock. 3M Company is not a trade association, and no other publicly held corporation or publicly held entity has a direct financial interest in the outcome of this litigation.

## TABLE OF CONTENTS

Page

INTRODUCTION .......... 1

STATEMENT OF JURISDICTION .......... 6

STATEMENT OF THE ISSUE .......... 6

STATEMENT OF THE CASE .......... 6

A. PFAS And MilSpec AFFF .......... 6

B. The AFFF Multidistrict Litigation .......... 8

C. Plaintiffs' Complaint And 3M's Removal .......... 10

D. The Decision Below .......... 13

SUMMARY OF ARGUMENT .......... 14

STANDARD OF REVIEW .......... 19

ARGUMENT .......... 19

I. 3M Acted Under Federal Authority. .......... 21

II. This Suit "Relates To" Actions 3M Took Pursuant To Its Authority As A Federal Contractor. .......... 24

A. 3M Has Satisfied The "Relating To" Requirement. .......... 25

1. 3M Plausibly Alleged That Any PFAS Harms Plaintiffs Have Incurred Derived At Least In Part From MilSpec AFFF. .......... 25

2. A Factfinder Will Need To Determine Whether And To What Extent MilSpec AFFF Caused The Alleged Harms. .......... 29

B. The District Court Erroneously Granted The Motion To Remand. .......... 32

1. The District Court Failed To Credit 3M's Theory Of The Case. ....................................................33

2. The District Court Erroneously Held That The Charged Conduct Was Insufficiently Connected To 3M's Federal Work. ..................................................43

III. 3M Asserted A Colorable Federal Defense. .......................................47

CONCLUSION ..........................................................................................49

STATEMENT REGARDING ORAL ARGUMENT .............................................51

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Aqueous Film-Forming Foams Prods. Liab. Litig.*,
2019 WL 2807266 (D.S.C. May 24, 2019) ....................................................22

*In re Aqueous Film-Forming Foams Prods. Liab. Litig.*,
357 F. Supp. 3d 1391 (J.P.M.L. 2018) ..............................................................9

*Ayo v. 3M Co.*,
2018 WL 4781145 (E.D.N.Y. Sept. 30, 2018) ................................................22

*Baker v. Atl. Richfield Co.*,
962 F.3d 937 (7th Cir. 2020) .......................................................31, 39, 40, 44

*Boyle v. United Techs. Corp.*,
487 U.S. 500 (1988)..........................................................................................47

*California v. CaremarkPCS Health LLC*,
2024 WL 3770326 (9th Cir. Aug. 13, 2024) ....................................................41

*Chevron USA Inc. v. Plaquemines Parish*,
146 S. Ct. 1052 (2026)................................... 1, 3, 14, 15, 18, 20, 23, 24, 32, 44

*Cnty. Bd. of Arlington Cnty. v. Express Scripts Pharmacy, Inc.*,
996 F.3d 243 (4th Cir. 2021) .........................................................15, 21, 22, 47

*Cnty. of Westchester v. Express Scripts, Inc.*,
191 F.4th 82 (2d Cir. 2026) .............................................................................41

*Colorado v. Symes*,
286 U.S. 510 (1932)..........................................................................................20

*Czerno v. Gen. Elec. Co.*,
182 F.4th 15 (1st Cir. 2026)..............................................................................29

*In re Firefighter Turnout Gea*
*Mktg., Sales Pracs., & Prods. Liab. Litig.*,
2026 WL 2409388 (J.P.M.L. Aug. 18, 2026).....................................................9

*Gov't of Puerto Rico v. Express Scripts, Inc.*,
119 F.4th 174 (1st Cir. 2024).................................................................29, 30, 41

*Griffin v. Optum, Inc.*,
175 F.4th 897 (8th Cir. 2026) ...........................................................................41

*Isaacson v. Dow Chem. Co.*,
517 F.3d 129 (2d Cir. 2008) .............................................................................38

*Jefferson Cnty. v. Acker*,
527 U.S. 423 (1999)..........................................................................................21

## TABLE OF AUTHORITIES

**Page(s)**

*Magnin v. Teledyne Cont'l Motors*,
91 F.3d 1424 (11th Cir. 1996) .......... 47

*Maine v. 3M Co.*,
159 F.4th 129 (1st Cir. 2025) .......... 29, 31, 46, 47

*Maryland v. 3M Co.*,
130 F.4th 380 (4th Cir. 2025) .......... *passim*

*Mayor of Baltimore v. BP P.L.C.*,
31 F.4th 178 (4th Cir. 2022) .......... 42

*Mesa v. California*,
489 U.S. 121 (1989) .......... 47

*Ohio ex rel. Yost v. Ascent Health Servs., LLC*,
165 F.4th 999 (6th Cir. 2026) .......... 41

*Osborn v. Haley*,
549 U.S. 225 (2007) .......... 20, 37

*Sawyer v. Foster Wheeler LLC*,
860 F.3d 249 (4th Cir. 2017) .......... 38

*Town of Pine Hill v. 3M Co.*,
190 F.4th 1314 (11th Cir. 2026) .......... 28, 31, 32, 41, 42

*Watson v. Philip Morris Cos.*,
551 U.S. 142 (2007) .......... 19, 20, 22

*West Virginia ex rel. Hunt v. CaremarkPCS Health, L.L.C.*,
140 F.4th 188 (4th Cir. 2025) .......... 5, 6, 18, 40, 41

*Willingham v. Morgan*,
395 U.S. 402 (1969) .......... 18, 19, 20, 30, 33, 37, 45, 46

### Statutes

28 U.S.C. § 1442 .......... 1, 6, 11, 15, 19, 24, 25, 30, 43

28 U.S.C. § 1447 .......... 6

### Regulations

14 C.F.R. § 139.1. .......... 8

## INTRODUCTION

In this case, the plaintiffs are attempting to succeed where the States of Maryland and South Carolina failed: They seek to evade federal-officer jurisdiction through artful pleading. Plaintiffs purport to carve out all claims for relief stemming from any harm caused by defendant 3M Company's federally directed conduct, while seeking to recover for the indistinguishable results of commingled conduct that was not directed by the government. This Court recently rejected a similar gambit, *see Maryland v. 3M Co.*, 130 F.4th 380 (4th Cir. 2025), and should likewise reverse the decision below.

Like *Maryland*, this case implicates 3M products made with per- and polyfluoroalkyl substances ("PFAS"). One such product is aqueous film-forming foam ("AFFF"), a fire suppressant 3M supplied to the U.S. military and others pursuant to precise military specifications ("MilSpec"). 3M has removed cases involving MilSpec AFFF to federal court under the federal-officer removal statute, 28 U.S.C. § 1442(a)(1), which permits "a person 'acting under' a federal officer" to remove any suit "'for or relating to'" that federally directed conduct, so long as the defendant "assert[s] 'a colorable federal defense.'" *Chevron USA Inc. v. Plaquemines Parish*, 146 S. Ct. 1052, 1057–58 (2026). Preferring a state-court forum, however, some plaintiffs have "attempt[ed]"—without much success—"to

immunize their complaints from federal officer removal." *Maryland*, 130 F.4th at 389.

In *Maryland*, for example, two States attempted to keep some of their suits out of federal court by splitting their claims. 130 F.4th at 385–86. One set of complaints was directed to "3M's PFAS production through AFFF products." *Id.* The remaining complaints—those at issue in *Maryland*—were directed to "3M's non-AFFF PFAS production" and expressly "exclud[ed] AFFF" as a basis for relief. *Id.* That tactic, this Court held, did not prevent 3M from removing the non-AFFF complaints. Federal courts must "credit a removing defendant's theory of the case" as well as that defendant's "plausibl[e] alleg[ations]," this Court explained. *Id.* at 388–89. The States' "artful pleading" therefore could not "trump 3M's theory" and "plausible . . . allegations" that at least "some" of the harm at issue—"even in [plaintiffs'] non-AFFF complaints"—"c[a]me from [3M's] Military AFFF production" and "indistinguishably commingled with the [non-AFFF] PFAS" mentioned in those complaints. *Id.* at 386, 390.

Plaintiffs here tried a slightly different approach: omitting any mention of AFFF at all. Plaintiff Jeremy Pope, along with other current or former firefighters (and the spouse of a deceased firefighter), sued 3M in state court, claiming injury stemming from alleged PFAS exposure. As the complaint concedes, Mr. Pope worked at fire departments responsible for so-called Part 139 airports—large civilian

airports where, for decades, the federal government required the use of AFFF meeting MilSpec standards. But instead of tying any alleged injuries to AFFF, plaintiffs contend that their exposure to PFAS resulted from the use of protective turnout gear they wore while working; this turnout gear allegedly contained commercially produced PFAS to make the gear fire-resistant. Plaintiffs' hope, it seems, was that omitting any mention of MilSpec AFFF from their complaint would strip 3M of its government-contractor defense and prevent 3M from removing to federal court.

This Court should reject plaintiffs' jurisdictional maneuvering. 3M's notice of removal plausibly alleges that at least one source of plaintiffs' PFAS exposure was MilSpec AFFF—including from Mr. Pope's work at airports that were required to use MilSpec AFFF during the relevant time period. And, the notice of removal adds, there is no ready way to tell whether the PFAS that allegedly caused plaintiffs' medical conditions stemmed from AFFF or non-AFFF sources. The notice also alleges facts supporting each element of 3M's federal government-contractor defense. Under the recently reaffirmed rule that courts must "credit plausible factual allegations by the removing party," *Plaquemines*, 146 S. Ct. at 1061, nothing more was required of 3M—and the district court should have had "no trouble considering as plausible 3M's allegations that some of the PFAS" exposure "at issue . . . may come from [3M's] Military AFFF production," *Maryland*, 130 F.4th at 390.

The district court nevertheless granted plaintiffs' motion to remand, on precisely the grounds this Court had already rejected in *Maryland*. *First*, when determining whether the lawsuit was related to 3M's work for the federal government, the court gave "dispositive effect" to the complaint's omission of AFFF. *Maryland*, 130 F.4th at 386. The court simply chose not to credit either (1) 3M's factual allegations that PFAS from MilSpec AFFF were a plausible cause of plaintiffs' alleged PFAS-related injuries, or (2) 3M's "theory of the case" that "PFAS from 3M's non-AFFF products indistinguishably commingled with the PFAS from 3M's [MilSpec] AFFF." *Id.* at 386, 389. As this Court has already held, that approach "ignores the unique lens through which [courts] consider federal officer removal": They must "look to a *defendant's* well-pleaded facts of removal" and must credit the "removing defendant's theory of the case"—rather than "blindly accept [the plaintiff's] theory of [the] charged conduct." *Id.* at 389 (emphasis added).

*Second*, the district court held that "alternative causation"—*i.e.*, 3M's allegation that some of the PFAS exposure came from MilSpec AFFF—was a merits defense that should be litigated in state court. But *Maryland* addressed the same issue and made clear that the source of the PFAS that caused the plaintiffs' alleged harm raised "merits questions that a *federal* court should decide." *Maryland*, 130 F.4th at 391 (emphasis altered). Just like in *Maryland*, a factfinder will need to

(1) determine "whether certain PFAS [exposure] came from 3M's Military AFFF or from its non-AFFF products," and (2) decide "how much" of the exposure to "apportion" to PFAS "from Military AFFF compared to non-AFFF products." *Id.* And, just like in *Maryland*, the federal-officer removal statute guarantees 3M "the opportunity" to have a factfinder resolve these "difficult factual questions" in "a federal, not a state, court." *Id.*

The district court grounded its refusal to follow *Maryland* on the theory that this Court's decision was somehow specific to the environmental contamination context. This Court, however, has already rejected that cramped reading, explaining that "th[e] principles in *Maryland v. 3M Co.*" are those "the Supreme Court has recognized" as applicable throughout "the § 1442(a)(1) removal context." *West Virginia ex rel. Hunt v. CaremarkPCS Health, L.L.C.*, 140 F.4th 188, 195 (4th Cir. 2025). The obligation to "credit a removing defendant's theory of the case" governs *every* "federal officer removal" case. *Id.* And under that rule, it does not matter whether "a complaint includes some explicit federal connection." *Id.* Nor does it matter whether the defendant's theory involves an indivisible environmental "contaminant," *Maryland*, 130 F.4th at 390, "indivisible rebate negotiations," *CaremarkPCS*, 140 F.4th at 196, or—as here—indivisible personal injury from commingled PFAS; a court must credit the theory all the same.

"[T]he district court's decision to" depart from *Maryland* and "credit" plaintiffs' artful pleading "over [3M's] theory of removal stained its analysis." *CaremarkPCS*, 140 F.4th at 197. This Court should reverse.

## STATEMENT OF JURISDICTION

This appeal arises from 3M's removal of a case from state court to federal court. The district court had jurisdiction under 28 U.S.C. § 1442(a)(1). This Court has "jurisdiction under 28 U.S.C. § 1447(d)," *Maryland*, 130 F.4th at 387, which provides that "an order remanding a case to the State court from which it was removed" pursuant to § 1442(a)(1) "shall be reviewable by appeal." The district court's remand order was entered on July 7, 2026, and 3M timely noticed its appeal that same day.

## STATEMENT OF THE ISSUE

Whether the district court erred by refusing to credit 3M's theory of the case and the notice of removal's plausible allegations in support of federal-officer jurisdiction.

## STATEMENT OF THE CASE

### A. PFAS And MilSpec AFFF

PFAS are a class of chemicals used in a wide variety of manufactured products to resist or repel oil, stains, heat, and water. PFAS are also a key ingredient in AFFF, a firefighting foam widely used by the U.S. military on bases, airfields, and Navy ships to extinguish life-threatening, fuel-based fires. JA36. In settings where "fuel

fires are inevitable and potentially devastating," AFFF is a "mission critical product that saves lives and protects assets." JA36, JA49.

Although the military developed AFFF, it enlisted private chemical manufacturers (including 3M) to maintain a sufficient supply. The military developed detailed specifications that it requires AFFF manufacturers to follow. JA36–37, JA42–43. Manufacturers must adhere to strict inspection and testing procedures to ensure their supplies conform to the military's prescribed requirements. JA37, JA43. All MilSpec AFFF products must be examined, tested, and approved for inclusion on the applicable Qualified Products List before they may be procured by the military. JA37, JA43.

Until relatively recently, the AFFF MilSpec expressly required MilSpec AFFF to contain "fluorocarbon surfactants," which are a category of PFAS. JA37. Within this category are perfluorooctanoic acid ("PFOA") and perfluorooctane sulfonate ("PFOS"), compounds plaintiffs also address in their complaint. JA37; *see* JA73–74, JA77. Although the relevant MilSpec no longer mentions fluorocarbon surfactants by name, it continues to impose performance requirements that cannot be satisfied without those substances. JA37–38. Indeed, the current MilSpec recognizes that it is not yet technically feasible for manufacturers to completely eliminate PFOA and PFOS "while still meeting all other military specification requirements." JA38.

3M manufactured and sold PFAS-containing MilSpec AFFF to the United States military for over three decades pursuant to federal contracts. JA38. One or more of 3M's AFFF products appeared on the Navy's Qualified Products List from 1970 until 2010. JA38. Over time, 3M's MilSpec AFFF products have been used by firefighters at military facilities and airports throughout the country, including in and around Virginia. JA31, JA38.

3M has also manufactured and sold PFAS-containing MilSpec AFFF to "Part 139" airports—certain large airports regulated under 14 C.F.R. § 139.1. JA38. Part 139 airports have historically used MilSpec AFFF, including 3M's MilSpec AFFF products. JA38. Both Ronald Reagan Washington National and Washington Dulles International Airports are Part 139 airports with a long history of MilSpec AFFF use. JA31, JA39. 3M sales records reflect multiple sales of MilSpec AFFF products to each airport. JA39. By 2006, the federal government required Part 139 airports to use AFFF meeting MilSpec standards. JA38.

### B. The AFFF Multidistrict Litigation

In recent years, claimants across the country—including States, public water providers, and private individuals—have brought an array of suits against AFFF manufacturers alleging that AFFF used at airports, military bases, and industrial locations caused the release of PFAS into groundwater and drinking water supplies. The Judicial Panel on Multidistrict Litigation centralized these AFFF actions into a

single multidistrict litigation ("MDL") in the U.S. District Court for the District of South Carolina. *In re Aqueous Film-Forming Foams Prods. Liab. Litig.*, 357 F. Supp. 3d 1391, 1394, 1396 (J.P.M.L. 2018). Manufacturers in the MDL, 3M included, have asserted the federal government-contractor defense based on their production of MilSpec AFFF for the U.S. Department of Defense. *Id.* at 1394.

Today, the AFFF MDL contains thousands of personal-injury cases brought by firefighters and others exposed to AFFF. *See In re Firefighter Turnout Gear Mktg., Sales Pracs., & Prods. Liab. Litig.*, 2026 WL 2409388, at *2 (J.P.M.L. Aug. 18, 2026). Some plaintiffs in the AFFF MDL also contend that they were exposed to PFAS through their turnout gear, the fire-protective outfits worn by firefighters.

In August 2025, the MDL court entered Case Management Order No. 36 ("CMO 36"), which recognized that efforts to "avoid the MDL and/or federal jurisdiction by denying, disclaiming, or omitting allegations concerning exposure to AFFF" are "contrary to law," including where a plaintiff alleges exposure from "firefighter turnout gear." CMO 36 at 1, *In re Aqueous Film-Forming Foams Prods. Liab. Litig.*, No. 2:18-mn-02873 (D.S.C. Aug. 22, 2025), ECF No. 7891 (citing *Maryland*, 130 F.4th 380). The MDL court concluded that, given the various potential AFFF and non-AFFF sources of PFAS and the inability of a plaintiff to isolate personal injuries caused by one source or the other, "there exists, at the very

least, a plausible basis for alleging federal jurisdiction sufficient to satisfy [a defendant's] initial burden on a notice of removal." *Id.* at 1–2.

### C. Plaintiffs' Complaint And 3M's Removal

On April 15, 2025, seven plaintiffs—six current or retired firefighters and one spouse of a deceased firefighter—filed a complaint in the Circuit Court for the City of Virginia Beach, Virginia. JA54–57. As firefighters, plaintiffs worked at various fire stations. JA68. Plaintiff Jeremy Pope is a firefighter for the Metropolitan Washington Airports Authority Fire and EMS Department ("Airports Authority"). JA60. The Airports Authority serves Ronald Reagan Washington National Airport and Washington Dulles International Airport, JA69, both of which are Part 139 airports, JA39.

Plaintiffs were first responders to fire and hazardous-material incidents. JA68. To prepare for that work, they received "extensive and ongoing training in fire suppression." JA68. "[D]uring firefighting training and when responding to fires and performing extinguishment, firefighters wear turnouts," including "a helmet, hood, jacket, pants, boots, and gloves." JA71. According to the complaint, this turnout gear contains PFAS, to which firefighters are exposed "through normal workplace activities." JA71–72. Plaintiffs maintain that "repeated and extensive exposure to PFAS resulted in the Firefighter Plaintiffs and Decedents developing various forms of cancer." JA58. The focus of the complaint is the health risk

allegedly associated with exposure to PFOS and PFOA, two kinds of PFAS plaintiffs believe to have been in their turnout gear. JA72–75, JA77–80, JA84–90.

Based on those allegations, plaintiffs assert four causes of action under Virginia law against 3M and other defendants: (1) breach of implied warranties; (2) breach of express warranties; (3) negligence, gross negligence, recklessness, and willful and wanton misconduct; and (4) violations of the Virginia Consumer Protection Act. JA92–106. As to the negligence count, plaintiffs allege that defendants owed "a duty of care to ensure the PFAS did not infiltrate, persist in, accumulate in the blood and/or body of [plaintiffs]," JA101–102, and that defendants breached it through the "designing, researching, testing, manufacturing, formulating, marketing, . . . promotion, supply, sale, and/or distribution of their PFAS chemicals and PFAS-containing turnouts," JA102.

On September 26, 2025, 3M removed the action to the Eastern District of Virginia, asserting jurisdiction under the federal-officer removal statute, 28 U.S.C. § 1442(a)(1). JA30. The notice of removal alleges that PFAS from MilSpec AFFF is "one plausible source of at least some of Plaintiffs' alleged PFAS exposure," given that 3M's MilSpec AFFF "products have been used by firefighters . . . in and around Virginia." JA30–31. As it relates to Mr. Pope, the notice explains that he was plausibly exposed to MilSpec AFFF through his work as a firefighter at both Reagan

Airport and Dulles Airport—both Part 139 airports that were required by law to use MilSpec AFFF. JA39–40.

The notice adds that plaintiffs claim exposure to PFAS, including PFOS and PFOA, which are "some of the same chemicals that are (or were) contained in MilSpec AFFF." JA40. And it alleges that plaintiffs are unable "at the pleading stage to distinguish" "personal injuries caused by AFFF"—including "MilSpec AFFF"—from "personal injuries allegedly caused by non-AFFF PFAS." JA40–41. That is because PFAS compounds in MilSpec AFFF "are chemically indistinguishable from the same PFAS compounds allegedly present in turnout gear (including PFOS and PFOA)." JA147. Because it is at least plausible that exposure to MilSpec AFFF caused some or all of Mr. Pope's alleged injuries, 3M explained that it would invoke the federal government-contractor defense. JA32, JA45–50. Accordingly, all requirements for federal-officer removal were satisfied. JA34–35, JA41–50.

Plaintiffs moved to remand to state court. They argued that they had sued 3M for the act of manufacturing and distributing PFAS-containing turnout gear—not MilSpec AFFF. JA124. In plaintiffs' view, the omission of AFFF or MilSpec AFFF from the complaint was dispositive. JA124–126.

### D. The Decision Below

The district court granted plaintiffs' motion to remand. JA1. The court concluded that 3M had not shown a sufficient "nexus" between the charged conduct and 3M's federally directed work producing MilSpec AFFF. JA9.

The court took two steps to reach that conclusion. *First*, focusing on "Plaintiffs' allegations in the Complaint," the court determined that the "charged conduct" was "Defendants' alleged design, manufacture, marketing, sale, supply, distribution, labeling, and failure to warn concerning PFAS-containing firefighter turnout gear"—"not 3M's design, manufacture, sale, or warnings concerning MilSpec AFFF." JA10.

*Second*, the court reasoned that there was an insufficient connection between turnout gear and 3M's production of MilSpec AFFF at the direction of the federal government. JA13. The court added that, although it "credit[ed]" 3M's allegations about exposure to MilSpec AFFF at Part 139 airports, those allegations were "only a possible alternative exposure pathway," not a relevant connection for federal-officer purposes. JA14.

With respect to Mr. Pope specifically, the court said it credited 3M's allegations that Mr. Pope worked for the Airports Authority and that the airports it serves used MilSpec AFFF. JA14. But the court held that "even crediting those allegations, they still identify only a possible alternative exposure pathway" and "do

not connect the charged turnout-gear conduct to 3M's federally directed AFFF work." JA14. "A defendant may raise alternative causation in state court," the district court reasoned. JA14.

The district court did not reach the other requirements for federal-officer removal. The court "[n]onetheless" recognized that "3M's MilSpec AFFF allegations may plausibly describe conduct undertaken while acting under federal officers," since "[g]overnment contractors are often treated as acting under federal officers when they manufacture products needed by the government pursuant to detailed federal specifications." JA18.

The district court denied plaintiffs' request for fees and costs, acknowledging that 3M's position was "not objectively unreasonable given *Maryland*, *Chevron*, CMO No. 36, and 3M's plaintiff-specific allegations concerning Mr. Pope." JA19.

3M timely appealed. JA189.

## SUMMARY OF ARGUMENT

3M plausibly alleged every element necessary to satisfy the federal-officer removal statute. When assessing federal-officer jurisdiction, courts must "credit plausible factual allegations by the removing party," *Plaquemines*, 146 S. Ct. at 1061, and must "credit *Defendants'* theory of the case," *Maryland*, 130 F.4th at 389, including "as to whether the conduct with which [defendants have] been charged is

related to [their] federal work," *id.* Applying those principles, this case belongs in federal court.

**I.** 3M "act[ed] under" federal authority when it manufactured and supplied MilSpec AFFF pursuant to the federal government's rigorous specifications. 28 U.S.C. § 1442(a)(1). A government contractor like 3M is the quintessential example of a person acting under a federal officer. *Cnty. Bd. of Arlington Cnty. v. Express Scripts Pharmacy, Inc.*, 996 F.3d 243, 251–52 (4th Cir. 2021). Plaintiffs do not dispute that 3M acted under the federal government when it manufactured AFFF, arguing instead that 3M did not have an acting-under relationship when it manufactured *turnout gear*. But, as the Supreme Court recently held, that kind of argument "impermissibly conflates the 'distinct' 'acting under' and 'connected or associated with' elements" of federal-officer removal. *Plaquemines*, 146 S. Ct. at 1063.

**II.** This suit is "for or relating to" 3M's federal work. 28 U.S.C. § 1442(a)(1). That phrase "sweeps broadly," reaching indirect connections and requiring only "some relation" that is not "tenuous, remote, or peripheral." *Plaquemines*, 146 S. Ct. at 1060–61. It is enough that a "portion of the[] [charged] conduct" relates to the defendant's federal work. *Maryland*, 130 F.4th at 391.

**A.** 3M satisfies the relatedness requirement for two independent reasons.

**1.** 3M's notice of removal plausibly alleges that any injuries allegedly caused by exposure to 3M PFAS—the charged conduct—came at least in part from MilSpec AFFF. Mr. Pope, for example, worked at airports that federal regulations required to use MilSpec AFFF and that had long histories of using it. He and other plaintiffs also allege extensive training in fire suppression, for which AFFF is used. And 3M's theory of the case—which the Court must credit—is that PFAS from different sources are chemically indistinguishable, so injuries from MilSpec AFFF cannot be separated from injuries from non-AFFF PFAS, such as PFAS in turnout gear. That makes plaintiffs' decision to omit any mention of AFFF irrelevant: As in *Maryland*, where the States expressly excluded AFFF from their complaints, this Court should have "no trouble" concluding that the relatedness requirement is satisfied. 130 F.4th at 390.

**2.** Even if the charged conduct is limited to PFAS exposure from turnout gear, 3M's federal work remains related to the lawsuit. Both when assessing plaintiffs' affirmative case and when considering 3M's federal-contractor defense, a factfinder will eventually have to decide whether, and to what extent, PFAS compounds from turnout gear (on the one hand) or the identical PFAS compounds from MilSpec AFFF (on the other) caused plaintiffs' alleged injuries. These "challenging questions" of causation and apportionment "establish[] that 3M's federal work is inextricably related to the charged conduct," however that conduct

is defined. *Maryland*, 130 F.4th at 391. And, under both the federal-officer removal statute and this Court's binding precedent, they are "questions that a *federal* court should decide." *Id.* (emphasis altered).

**B.** The district court's contrary conclusion runs afoul of *Maryland* and settled rules regarding federal-officer removal.

**1.** When identifying the charged conduct, the court failed to credit 3M's theory of the case: that exposure to 3M PFAS is the conduct at issue. Instead, the court defined that conduct based exclusively on "Plaintiffs' allegations in the Complaint," JA10, which is exactly the approach this Court rejected in *Maryland*. This erroneous framing led the court to conclude that the challenged conduct was not sufficiently related to 3M's federally directed conduct. The district court treated *Maryland* as inapplicable. The district court believed that the States themselves had alleged contamination involving "indistinguishable PFAS from AFFF and non-AFFF sources." JA16. And the court maintained that *Maryland*'s reasoning was unique to environmental-contamination cases. JA16. But the States in *Maryland* excluded AFFF sources from the complaints at issue, in a far clearer manner than plaintiffs here; AFFF was implicated in *Maryland* only because this Court credited 3M's plausible allegations and theory of the case—the same steps the district court failed to take in this case. And, far from being unique to *Maryland* or environmental-contamination suits, the rule that "artful pleading" may not be employed to "trump"

a defendant's "theory for removal" is one courts have applied time and again in innumerable contexts. *Maryland*, 130 F.4th at 390; *see CaremarkPCS*, 140 F.4th at 195 (confirming that the "principles in *Maryland v. 3M Co.*" are applicable throughout "the § 1442(a)(1) removal context").

**2.** Even accepting the district court's narrow framing of the charged conduct as limited to PFAS exposure from turnout gear, a sufficient connection remains. By the court's own account, the relationship between MilSpec AFFF and plaintiffs' claims is so close that proof that plaintiffs' injuries were "caused by AFFF exposure rather than turnout-gear exposure" would defeat plaintiffs' claims. JA14. That connection easily falls within section 1442's "broad[]" "sweep[]." *Plaquemines*, 146 S. Ct. at 1060.

Disagreeing, the district court held that 3M's allegations established nothing more than an "alternative" theory of "causation," which may be "raise[d] . . . in state court." JA14. But the Supreme Court held decades ago that an essentially identical argument "turns the removal statute on its head." *Willingham v. Morgan*, 395 U.S. 402, 405 (1969). And while the district court treated 3M's allegations about MilSpec AFFF as an alternative-causation theory that the state court could decide, this Court has held that materially identical allegations raise "challenging questions" that a "factfinder" in "a federal, not a state, court" should decide. *Maryland*, 130 F.4th at 391.

**III.** 3M asserted a colorable federal defense in this case. A "colorable" defense is all that is required, *Maryland*, 130 F.4th at 388, and 3M's government-contractor defense readily clears that low bar. The notice of removal plausibly alleges each element of that defense: the government approved reasonably precise specifications that required PFAS; 3M's products conformed to those specifications; and the government knew of any PFAS-related risks of which 3M was aware. Plaintiffs "*agree[d]* that the federal contractor defense is a colorable federal defense." JA132 (emphasis added). Their real objection was to relatedness, and that objection fails for the reasons above.

## STANDARD OF REVIEW

This Court "review[s] the district court['s] decision[] on whether to sustain federal officer removal de novo." *Maryland*, 130 F.4th at 387.

## ARGUMENT

The federal-officer removal statute authorizes any officer of the United States, "or any person acting under that officer," to remove a civil action if the action is "for or relating to any act under color of such office." 28 U.S.C. § 1442(a)(1). "One of the primary purposes of the removal statute," *Willingham*, 395 U.S. at 407, is to supply "a federal forum in which to assert federal immunity" and similar "defenses," *Watson v. Philip Morris Cos.*, 551 U.S. 142, 150 (2007).

Because these defenses are so important to the federal government, "[g]eneral removal principles are . . . inverted when § 1442(a)(1) is at issue." *Maryland*, 130 F.4th at 388. For one, the Supreme Court has directed that section 1442(a)(1) "must be 'liberally construed'" in favor of removal. *Watson*, 551 U.S. at 147 (quoting *Colorado v. Symes*, 286 U.S. 510, 517 (1932)). The strong federal policy in favor of federal-officer removal "should not be frustrated by a narrow, grudging interpretation of § 1442(a)(1)." *Willingham*, 395 U.S. at 407. And, this Court has held, "the ordinary presumption against removal does not apply to federal officer removal." *Maryland*, 130 F.4th at 388 (internal quotation marks omitted).

For another, "the federal officer removal statute is an exception to the well-pleaded complaint rule," which usually allows a plaintiff to avoid a federal forum "by writing his complaint a certain way." *Maryland*, 130 F.4th at 388 (internal quotation marks omitted). Otherwise, plaintiffs could "stymy the federal government's operations" through artful pleading. *Id.* at 387. So, when assessing removal under section 1442, courts and defendants are "not required to accept the truth of the plaintiff's allegations." *Osborn v. Haley*, 549 U.S. 225, 250 (2007). Instead, courts "credit plausible factual allegations by the removing party." *Plaquemines*, 146 S. Ct. at 1061.

To remove under section 1442(a)(1), this Court requires a private defendant to "plausibly allege[]" three elements: "(1) that it acted under a federal officer, (2)

that it has a colorable federal defense, and (3) that the charged conduct was carried out for or in relation to the asserted official authority." *Maryland*, 130 F.4th at 388. Courts "credit *Defendants'* theory of the case," *id.* at 389, "for purposes of [these] elements," *Jefferson Cnty. v. Acker*, 527 U.S. 423, 432 (1999)—including "as to whether the conduct with which [defendants have] been charged is related to [their] federal work," *Maryland*, 130 F.4th at 389.

3M satisfies each element. *First*, it "act[ed] under" federal officers when it manufactured MilSpec AFFF to the military's rigorous specifications. *Second*, this suit "relat[es] to" that federal work: Plaintiffs' suit seeks relief for exposure to 3M PFAS, and 3M plausibly alleged that MilSpec AFFF contributed to the alleged PFAS exposure—including at the two Part 139 airports where Mr. Pope served. *Third*, 3M asserted a colorable government-contractor defense. 3M is therefore "entitled to a federal forum" in which to litigate its defense—and the district court's contrary conclusion was "erroneous." *Maryland*, 130 F.4th at 389.

## I. 3M Acted Under Federal Authority.

"The statutory phrase 'acting under' describes the triggering relationship between a private entity and a federal officer." *Arlington Cnty.*, 996 F.3d at 251 (internal quotation marks omitted). A private person acts under the federal government when the person "assist[s]" the government "in fulfilling basic governmental tasks that the Government itself would [otherwise] have had to

perform," while under "at least . . . some" degree of government "subjection, guidance, or control." *Id.* at 251, 253 (internal quotation marks omitted). A government contractor is a quintessential example of a person "acting under" a federal officer. *See Watson*, 551 U.S. at 153; *Arlington Cnty.*, 996 F.3d at 251–52.

It is undisputed that 3M acted under federal authority when it manufactured and supplied AFFF pursuant to rigorous government specifications. *See* JA42–43. As the district court "recognize[d]," JA18, 3M produced AFFF pursuant to detailed military specifications, including for Part 139 airports required by federal regulations to use MilSpec AFFF, *see* JA36–39. Courts across the country have repeatedly held that MilSpec AFFF manufacturers—including 3M—were "acting under" officers of the United States in producing MilSpec AFFF that the United States would otherwise have had to produce itself. *See, e.g.*, *In re Aqueous Film-Forming Foams Prods. Liab. Litig.*, 2019 WL 2807266, at *2 (D.S.C. May 24, 2019); *Ayo v. 3M Co.*, 2018 WL 4781145, at *8–9 (E.D.N.Y. Sept. 30, 2018). Plaintiffs, too, acknowledged in the district court that 3M's "production of MilSpec AFFF might satisfy the 'acting under' prong." JA135.

Plaintiffs' concession, however, was qualified. Plaintiffs argued that the production of MilSpec AFFF satisfies the "acting under" prong only if the defendant "was being sued for such production." JA135 (emphasis omitted). And, plaintiffs

continued, 3M "has not shown how [its] production of *turnout gear* was a task delegated to [it] by a federal authority." JA135.

Plaintiffs make the same error the State of Louisiana made in *Plaquemines*: "conflating the distinct 'acting under' and 'connected or associated with' elements" of the test for federal-officer removal. 146 S. Ct. at 1063 (cleaned up). There, plaintiff "Louisiana d[id] not dispute that [defendant] Chevron acted under a federal officer while engaged in avgas refining." *Id.* at 1062–63. But Louisiana asserted that the case was about "crude oil," not avgas refining. *Id.* at 1062. So, on the theory that a defendant must have been "'acting under' a federal officer in taking the specific actions challenged in the suit," Louisiana argued that Chevron could not satisfy the acting-under requirement, noting that the company "did not produce *crude oil* pursuant to a federal contract." *Id.* at 1063 (emphasis added). Rejecting this argument as "[in]consistent with the statutory text," the Supreme Court explained that section 1442 "contemplates removal of suits against officers or their agents for acts that were not done under color of their offices, so long as the suits 'relat[e] to' such acts." *Id.* (alteration in original). In other words, whatever the outcome of the relatedness analysis, the acting-under analysis serves an "independent function." *Id.*

Plaintiffs' acting-under argument is therefore misguided. Assuming plaintiffs are correct to cabin the charged conduct to the "production of turnout gear," JA135

(emphasis omitted)—and they are not, *see* Part II, *infra*—their relatedness objection goes to the relatedness requirement, not to the acting-under requirement.

## II. This Suit "Relates To" Actions 3M Took Pursuant To Its Authority As A Federal Contractor.

"To satisfy th[is] element" of federal-officer removal, which is "often referred to as the nexus or connection requirement," *Maryland*, 130 F.4th at 389, a defendant must plausibly allege that the "civil action" is "for or relating to" an act done under federal authority, 28 U.S.C. § 1442(a)(1). "The phrase 'relating to' sweeps broadly." *Plaquemines*, 146 S. Ct. at 1060. "One thing can relate to another even if it was not specifically designed to affect it," and "even if the connection is indirect." *Id.* (internal quotation marks omitted). "Accordingly, a removing defendant need not show that his federal duties specifically required or strictly caused the challenged conduct." *Id.* Instead, the defendant need only identify "some relation" to the alleged harm that is not "tenuous, remote, or peripheral." *Id.* at 1060–61. It is enough for a "portion of the[] [charged] conduct" to relate to the defendant's work for the federal government. *Maryland*, 130 F.4th at 391.

Again, courts "credit a removing defendant's theory of the case" and "look to [that] defendant's well-pleaded facts of removal" when determining "whether the conduct with which it has been charged is related to its federal work." *Maryland*, 130 F.4th at 389 (internal quotation marks omitted). This necessarily means that

courts do not "credit how [*plaintiffs*] defined the charged conduct" in "their complaints." *Id.*

Under that standard, 3M's plausible allegations satisfy the "relating to" requirement. And the district court erred in concluding otherwise.

### A. 3M Has Satisfied The "Relating To" Requirement.

Plaintiffs' own allegations, coupled with the well-pleaded facts in 3M's notice of removal, establish that at least a "portion" of "the charged conduct," *Maryland*, 130 F.4th at 391, is "for or relating to" 3M's production of MilSpec AFFF, 28 U.S.C. § 1442(a)(1).

#### 1. 3M Plausibly Alleged That Any PFAS Harms Plaintiffs Have Incurred Derived At Least In Part From MilSpec AFFF.

This Court's decision in *Maryland* demonstrates the relatedness inquiry at work. There, Maryland and South Carolina sued 3M for alleged PFAS contamination of state waterways. But, to avoid federal-officer removal, their complaints "expressly exclude[d]" AFFF from their definition of PFAS. *Maryland*, 130 F.4th at 386. The Court, however, refused to "blindly accept the States' theory of charged conduct and the connection to 3M's federal work." *Id.* at 389. Instead, the Court credited 3M's "theory" that "PFAS from different sources commingle to the point that it is impossible to identify the precise source of a contaminant once those chemicals seep into the relevant waterways." *Id.* at 390. The Court credited 3M's plausible allegations that it had sold MilSpec AFFF to military bases within

the States. *Id.* And the Court noted that "both States [had] plead[ed] general PFAS contamination near [those] military bases." *Id.* So, the Court had "no trouble considering as plausible 3M's allegations" that "[s]ome of the PFAS contamination charged by the States came from Military AFFF," "even in the [explicitly] non-AFFF complaints." *Id.* The result was that "any remediation would necessarily implicate work that 3M did for the federal government," and "3M ha[d] satisfied the nexus requirement." *Id.* at 390–91.

That same analysis here leads to the same result. Plaintiffs have sued 3M for personal injuries from alleged exposure to PFAS, including PFOS and PFOA—substances allegedly found in turnout gear as well as MilSpec AFFF. *See supra* pp.7, 10–11; JA37–38, JA40. Plaintiffs purport to focus on turnout gear, just as the States expressly excluded AFFF from their allegations. But *plaintiffs'* "theory of charged conduct" is of no moment. *Maryland*, 130 F.4th at 389. *3M's* theory, which controls, is that because PFAS—"including PFOS and PFOA"—from different sources commingle and are "indistinguishable," JA147, "personal injuries caused by AFFF" cannot readily be distinguished from "personal injuries allegedly caused by non-AFFF PFAS," including in turnout gear, JA40–41. That is, just as the AFFF and non-AFFF PFAS in *Maryland* commingled in bodies of water and allegedly caused the States an "indivisible injury" (contamination), *Maryland*, 130 F.4th at 390, so too have AFFF and non-AFFF PFAS commingled in the bodies of the

plaintiffs here and allegedly caused them an indivisible injury (the illness each plaintiff alleges).

Further, 3M has plausibly alleged that MilSpec AFFF was used by firefighters (including plaintiffs) at Part 139 airports within Virginia. *See supra* pp.8, 10. And, like the States' allegations about contamination near military bases in *Maryland*, the complaint here contains numerous allegations confirming that it is at least "plausible" that "some of the PFAS [exposure] at issue," "even in" plaintiffs' turnout-gear-focused, "non-AFFF complaint[]," "may come from . . . Military AFFF" at those airports. *Maryland*, 130 F.4th at 390.

Consider just a few of those allegations. The complaint confirms that Mr. Pope, for example, worked as a firefighter for the Airports Authority at Reagan Airport and Dulles Airport, *see* JA60, JA69—two airports that bought MilSpec AFFF during the relevant timeframe, were required to use MilSpec AFFF by federal regulations, and had long histories of using MilSpec AFFF, JA38–39. Plaintiffs allege that they had "extensive and ongoing training in fire suppression," JA68, which is what MilSpec AFFF is used for, *see* JA36, JA38, JA48–50. And plaintiffs allege that they came to be exposed to PFAS when, during training and work, they "inhaled, ingested and/or absorbed dermally hazardous PFAS contaminants," JA103, the same exposure pathway they allege for *all* PFAS, not just for PFAS in turnout gear, JA57.

The allegations in support of plaintiffs' negligence claim similarly implicate MilSpec AFFF. Plaintiffs assert, generally, that 3M had "a duty of care to ensure the PFAS did not infiltrate, persist in, accumulate in the blood and/or body of [plaintiffs] and including a duty to assure their products would not cause users to suffer unreasonable, dangerous side effects." JA102. And they assert that 3M breached this duty by "fail[ing] to exercise ordinary care in the designing, researching, testing, manufacturing, . . . supply, sale, and/or distribution of their PFAS chemicals." JA102.

"3M has [therefore] satisfied the nexus requirement." *Maryland*, 130 F.4th at 391. Plaintiffs charge 3M with negligently designing, manufacturing, and selling PFAS, including PFOS and PFOA, in a manner that caused them to be exposed to and harmed by those PFAS. "[A]t least a portion of th[is] conduct" plausibly concerns MilSpec AFFF that 3M manufactured when acting under the federal government. *Id.* (internal quotation marks omitted). As a result, an award of relief for, say, the negligence claim, "would necessarily implicate work that 3M did for the federal government." *Id.* at 390.

Given 3M's indistinguishable-commingling theory, plaintiffs' efforts to write around MilSpec AFFF do not alter the outcome—as court after court has concluded. *Maryland*, 130 F.4th at 391; *see*, *e.g.*, *Town of Pine Hill v. 3M Co.*, 190 F.4th 1314, 1322 (11th Cir. 2026) (even without "explicit[] alleg[ations]" about AFFF, "the

gravamen of [the] complaint" suggested AFFF was "a possible source of PFAS contamination"); *Maine v. 3M Co.*, 159 F.4th 129, 138 (1st Cir. 2025) ("credit[ing] 3M's theory that PFAS contamination from sources for which 3M admittedly has a federal contractor defense has commingled with and so has become in[di]visible with the PFAS contamination . . . broadly alleged in [the] Complaint"); *cf. Czerno v. Gen. Elec. Co.*, 182 F.4th 15, 27 (1st Cir. 2026) (nexus requirement satisfied in personal-injury case where "several" allegations "relat[ed]" to defendant's "manufacture" of products for federal government).

### 2. A Factfinder Will Need To Determine Whether And To What Extent MilSpec AFFF Caused The Alleged Harms.

At a minimum, "[t]he need to unravel . . . challenging questions" about causation and apportionment in this case "establishes that 3M's federal work is inextricably related to the charged conduct," however that conduct is defined. *Maryland*, 130 F.4th at 391.

"[T]he federal officer removal statute's purpose is to provide a federal forum 'when particular litigation implicates a cognizable federal interest.'" *Maryland*, 130 F.4th at 391 (quoting *Gov't of Puerto Rico v. Express Scripts, Inc.*, 119 F.4th 174, 185 (1st Cir. 2024)). One such interest is the liability of "a government contractor . . . for producing products for, and in line with the specifications, of the United States military." *Id.* So, "[w]here the parties dispute difficult factual questions about that federal interest"—such as the degree to which that interest is implicated—"a

contractor acting at the government's direction 'should have the opportunity to present their version of the facts to'" the ultimate "factfinder" in "'a federal, not a state, court.'" *Id.* (quoting *Willingham*, 395 U.S. at 409); *see Gov't of Puerto Rico*, 119 F.4th at 189 ("To the extent the parties raise factual disputes about the scope of a defendant's federal obligations, Congress gave federal officers 'the protection of a federal forum' in which to resolve those disputes." (quoting *Willingham*, 395 U.S. at 407)).

Put differently, any lawsuit that requires the factfinder to answer questions about the applicability of a colorable defense attributable to a defendant's federal-officer status necessarily "relat[es] to" the exercise of federal authority. 28 U.S.C. § 1442(a)(1). Indeed, federal-officer removal was designed for the "primary purpose[]" of allowing such defenses to be "litigated in the federal courts." *Willingham*, 395 U.S. at 407.

Just as in *Maryland*, this case presents two "challenging questions" about 3M's federal defense for the "factfinder [that] ultimately decides liability" to "disentangle." *Maryland*, 130 F.4th at 391. *First*, "deciding whether certain PFAS [exposure] came from 3M's Military AFFF or from its non-AFFF products presents a challenging causation question—one that 3M [has] argue[d] is impossible to bifurcate—that will ultimately fall to a factfinder." *Id.* *Second*, even "assuming that causation question can be answered, the same factfinder must then apportion *how*

*much*" exposure "came from Military AFFF compared to non-AFFF products." *Id.* (emphasis added). And, just as in *Maryland*, these are "*merits questions* that a federal court should decide." *Id.* (quoting *Baker v. Atl. Richfield Co.*, 962 F.3d 937, 944 (7th Cir. 2020)); *accord*, *e.g.*, *Maine*, 159 F.4th at 138–39 (sufficient relatedness because "[r]esolution of Maine's Complaint requires addressing whether and to what extent [PFAS] contamination from AFFF sources has commingled with non-AFFF").

The need to resolve these questions is unavoidable, "no matter how [plaintiffs' complaint] is conceptualized." *Pine Hill*, 190 F.4th at 1326 (Newsom, J., concurring in judgment). "[P]roduct liability doesn't exist in the air." *Id.* "Rather, to prevail on (for instance) [their] negligence claim," plaintiffs "will have to prove, among other elements, that 3M's conduct . . . caused an injury." *Id.* "And to do so, [they] will necessarily have to prove what portion of [their] alleged [harms are] attributable to which of 3M's activities." *Id.*; *see Maine*, 159 F.4th at 139 (similar). 3M, in turn, "will necessarily raise its federal contractor defense" whenever it appears that any PFAS-related injuries were "caused in whole or in part by MilSpec AFFF." *Maine*, 159 F.4th at 139. The factfinder's resolution of causation and allocation will therefore decide both whether plaintiffs have made their case and the extent to which 3M's government-contractor defense is applicable. That is, "[t]he need to allocate causation and harm among [3M's] activities means that liability for the one

necessarily implicates liability for the other." *Pine Hill*, 190 F.4th at 1326 (Newsom, J., concurring in judgment).

The bottom line is this: Even if the charged conduct is limited to "PFAS-containing turnouts," JA12, that conduct "is still inescapably 'relate[d] to' 3M's AFFF" production and sales when acting under the federal government, *Pine Hill*, 190 F.4th at 1326 (Newsom, J., concurring in judgment) (alteration in original). 3M has therefore satisfied the relatedness requirement.

**B. The District Court Erroneously Granted The Motion To Remand.**

The district court's contrary conclusions flout *Plaquemines* and *Maryland*, undermining the federal-officer removal statute. *First*, *Plaquemines* and *Maryland* instruct courts to "credit [the] removing defendant's theory of the case" and not "how [a plaintiff] define[s] the charged conduct." *Maryland*, 130 F.4th at 389; *see Plaquemines*, 146 S. Ct. at 1061. But the district court determined the charged conduct based exclusively on "Plaintiffs' allegations in the Complaint." JA10. By focusing solely on those allegations, the district court held that the charged conduct involved PFAS injuries from turnout gear alone, excluding exposure to PFAS from MilSpec AFFF. In doing so, it improperly failed to credit 3M's theory that the commingling of PFAS means that a distinction of this kind is simply not feasible at this stage of the case.

*Second*, *Maryland* holds that "difficult factual questions" about the viability of a federal defense must be decided by "a factfinder" in "'a federal, not a state, court.'" 130 F.4th at 391 (quoting *Willingham*, 395 U.S. at 409). But the district court re-characterized 3M's indistinguishable-commingling theory—the same theory alleged in *Maryland*—as an irrelevant theory of "alternative causation" that 3M should "raise . . . in state court." JA14. It was enough for the district court that, in the complaint, "Plaintiffs are not seeking recovery for MilSpec AFFF exposure." JA14. But that was true in *Maryland*, too, and this Court had no trouble concluding there that federal-officer removal was appropriate.

*Maryland* is on all fours and supported by the Supreme Court's latest word on federal-officer removal. The district court's decision to depart from these precedents—purporting to distinguish *Maryland* by suggesting it contained some environmental-contamination-only rule for federal-officer removal—is reversible error.

### 1. The District Court Failed To Credit 3M's Theory Of The Case.

**a.** The district court approached the charged-conduct issue precisely the way this Court said not to: by "credit[ing] how [plaintiffs] defined the charged conduct" in their complaint. *Maryland*, 130 F.4th at 389. That is, the district court defined the "charged conduct" as 3M's "alleged design, manufacture, . . . [and] sale" of "PFAS-containing firefighter turnout gear" because, in the court's view, "*Plaintiffs'*

*allegations in the Complaint* ma[d]e the appropriate charged conduct clear." JA10 (emphasis added).

"*According to the Complaint*," the district court explained, 3M manufactured PFAS-containing turnout gear, and that gear was what exposed plaintiffs to PFAS and "caused them to develop cancer." JA11 (emphasis added). The "Complaint d[id] not allege" AFFF exposure. JA11. The "causes of action," the district court continued, were "tied to turnout gear." JA11. And the extensive use of "broader language in the Complaint referring to PFAS chemicals and PFAS-containing products"—the same language that helped trigger federal-officer removal in *Maryland*, *see* 130 F.4th at 389–92—was, in the district court's view, merely "part of Plaintiffs' broader factual narrative" about turnout gear. JA12. "Having identified the charged conduct" based solely on plaintiffs' "artful crafting of their complaint[]," *Maryland*, 130 F.4th at 393—over and against 3M's plausible, contrary theory of the "charged conduct" (exposure to 3M PFAS)—the district court held that 3M failed to satisfy the "relating to" prong of the federal-officer removal test. JA13–15. "Milspec AFFF," the court reasoned, "is not a source of liability in this action." JA16.

There is no daylight between the district court's approach and the approach this Court rejected in *Maryland*. There, too, the States "purported to establish that they were not charging 3M with conduct that was related to its production and sale

of Military AFFF." 130 F.4th at 388–89. In fact, South Carolina took even greater pains than plaintiffs here did to carve out AFFF, alleging that "PFAS as defined in this Complaint expressly excludes AFFF." *Id.* at 386 (alteration adopted). So unlike the broader references to PFAS exposure in *plaintiffs'* complaint that plausibly encompass AFFF, South Carolina's references to "general PFAS contamination near military bases" necessarily—"by definition"—"*exclude[d]* 3M's production . . . of Military AFFF." *Id.* at 389–90 (emphasis added). Accordingly, the district courts in *Maryland*, just like the district court here, held that 3M failed the relatedness requirement, reasoning that 3M "cannot be held liable . . . for PFAS contamination originating from AFFF." *Id.* at 387.

As this Court explained when rejecting that reasoning, the district courts' "theory ignores the unique lens through which [courts] consider federal officer removal." *Maryland*, 130 F.4th at 389. When assessing federal-officer jurisdiction, courts "cannot blindly accept the States' theory of charged conduct and the connection to 3M's federal work." *Id.* Instead, the Court "look[ed] to" 3M's "well-pleaded facts of removal" and "credit[ed]" 3M's "theory of the case." *Id.* And, under those well-pleaded facts and that theory, the Court had "no trouble" concluding that the relatedness requirement was satisfied. *Id.* at 390; *see supra* p.25.

By taking the opposite course here—that is, by "giv[ing] dispositive effect to" plaintiffs' allegations and failing to credit 3M's theory—the district court impermissibly deviated from binding precedent. *Maryland*, 130 F.4th at 389.

**b.** The district court's justification for departing from *Maryland* is untenable. According to the district court, *Maryland* is distinguishable because plaintiffs here "allege personal injuries caused by a specific product"—"PFAS-containing firefighter turnout gear"—and "do not allege a common contaminated environmental medium containing indistinguishable PFAS from AFFF and non-AFFF sources." JA16. But the States in *Maryland* did not allege "indistinguishable PFAS from AFFF and non-AFFF sources" either. JA16. Again, they were crystal clear in their complaints that they were alleging contamination from non-AFFF sources only; the allegation that the sources were indistinguishable came from 3M's notice of removal, which this Court correctly credited—and which the district court here should likewise have credited. *See supra* pp.25–26.

Nor, as the district court appeared to believe, does it matter that *Maryland* involved an "environmental medium." JA16; *see* JA15–16 (similarly giving weight to the fact that a "waterway or natural resource" was at issue there). In *Maryland*, the States alleged that non-AFFF PFAS contaminated their waterways; removal was nevertheless appropriate because the Court was required to credit 3M's allegation that part of the contamination plausibly came from MilSpec AFFF, as well as 3M's

theory that AFFF and non-AFFF contamination were indistinguishable at this stage of the case. *See supra* p.25. Here, plaintiffs allege that they were exposed to and absorbed PFAS through turnout gear; removal is nevertheless appropriate because the district court was required to credit 3M's allegation that part of this exposure plausibly came from PFAS in MilSpec AFFF, as well as 3M's theory that injuries from exposure to PFAS from AFFF and non-AFFF sources are indistinguishable at this stage of the case. *See supra* pp.26–28. The facts might differ slightly, but the "guiding principles" are the same. *Maryland*, 130 F.4th at 387.

Those guiding principles are hardly unique to *Maryland* or even to contamination cases. For decades, courts have rejected plaintiffs' efforts to "trump" a removing defendant's "theory for removal" through "artful pleading." *Maryland*, 130 F.4th at 390.

In *Willingham v. Morgan*, for example, an inmate attempted to sever any federal connection to the case by alleging that the prison officers he sued "had been acting 'on a frolic of their own which had no relevancy of their official duties'" when they allegedly "inoculated him with 'a deleterious foreign substance.'" 395 U.S. at 403, 407. But, the Supreme Court explained, that did not affect the assessment of "the charged conduct," *id.* at 409, because the "ability to remove under § 1442" was not "controlled by the plaintiff's allegations," *Osborn*, 549 U.S. at 249 (describing *Willingham*).

The Second Circuit in *Isaacson v. Dow Chemical Co.* was equally unmoved by the efforts of the plaintiffs in that case to undermine the "connection between Defendants' federal duties and the conduct for which they [were] being sued." 517 F.3d 129, 138 (2d Cir. 2008). The plaintiffs alleged that dioxin in Agent Orange manufactured by defendants had caused their illness. *Id.* at 137. After the manufacturers removed to federal court, the plaintiffs moved to remand, raising several theories as to why the dioxin at issue was produced "outside the scope of Defendants' official duties." *Id.* at 138. Rather than credit those theories, the Second Circuit credited the *manufacturers'* "theory of the case"—that "the Government knew that Agent Orange contained dioxin, and the Government controlled the method of formulation." *Id.* To the extent the plaintiffs doubted that account, the court explained, they raised a factual question "for the federal—not state—courts to answer." *Id.*[1]

---

[1] *Willingham* and *Isaacson* were decided under an earlier version of section 1442 that required the defendant "to establish that the suit against it was '*for* an act under color of office.'" *Sawyer v. Foster Wheeler LLC*, 860 F.3d 249, 258 (4th Cir. 2017) (alteration adopted). Under this version of the statute, there had to be a "causal connection between the charged conduct and the asserted official authority." *Id.* "But in 2011, Congress amended § 1442(a)(1) to cover actions 'for or relating to any act under color of federal office,' adding the words 'or relating to.'" *Id.* (alteration adopted). "This new language broadened the universe of acts that enable federal removal, such that there need be only a connection or association between the act in question and the federal office." *Id.* (cleaned up).

*Baker v. Atlantic Richfield Co.*, a Seventh Circuit decision this Court has expressly endorsed, *see Maryland*, 130 F.4th at 390–92, likewise involved artful pleading about the charged conduct. In *Baker*, residents of a housing complex sued manufacturing companies in state court, alleging that "the companies' operations . . . contaminated the property with 'lead, arsenic and likely other substances,'" causing property damage and physical harm. 962 F.3d at 939. The manufacturers removed, alleging that their wartime production of "Freon-12" for the federal government "resulted in waste streams containing lead and arsenic," thereby contributing at least in part to any contamination. *Id.* at 941. The Seventh Circuit held that the manufacturers properly removed. And it gave no weight to the plaintiffs' allegations that they were suing for injuries resulting from the manufacturers' "general manufacturing operations" rather than the "specific wartime production for the federal government," *id.* at 944: "[T]he fact is," the court explained, the manufacturers "allege[d] that [their] Freon-12 production resulted in waste streams that contained lead and arsenic." *Id.* at 945 n.3. And "[t]hose are the two main toxins the Residents claim harmed them." *Id.* In other words, the charged conduct was lead and arsenic contamination, including from sources plaintiffs had ruled out—just as the charged conduct here is exposure to PFAS, including from sources not mentioned in the complaint. And, as here, "whether the [alleged] injuries arise

from products [3M] manufactured for the government" is "a difficult question that a federal court should be the one to decide." *Id.*

Post-*Maryland* decisions have also followed this Court's lead by refusing to treat a complaint's artificially narrow allegations of the charged conduct as dispositive. *See supra* p.28 (collecting cases).

Take *West Virginia ex rel. Hunt v. CaremarkPCS Health, L.L.C.*, where this Court confirmed that the "principles" "appl[ied] . . . in *Maryland*" apply to *all* "federal officer removal" cases. 140 F.4th at 195. There, West Virginia sued a pharmacy benefit manager, alleging that the company had overcharged the State for insulin through "'opaque and undisclosed dealings,' including 'rebate negotiations.'" *Id.* at 193. "The basis of Caremark's removal theory [was] that it negotiates rebates with manufacturers of insulin and other drugs jointly on behalf of all its clients," which "include federal clients." *Id.* But the district court remanded because West Virginia "was not seeking relief relating to any federal program or any contract related to a federal program." *Id.* at 194 (alteration adopted). Reversing, this Court "[a]ppl[ied] the same principles" as in *Maryland* and held that the State could not "preclude[] federal officer removal by crafting a complaint that facially lacks a federal connection." *Id.* at 195. Instead, the Court echoed the reasoning in *Maryland* by "credit[ing]" Caremark's theory and "alleg[ations] that the conduct for which it [was] being charged—rebate negotiations—include[d] *indivisible federal*

*and non-federal conduct* because it conducted those negotiations for its federal and non-federal clients at the same time." *Id.* (emphasis added).[2]

Or consider *Town of Pine Hill v. 3M Co.* There, the complaint addressed "PFAS contamination" of the town's water supply "from paper mills" and "expressly disclaimed any federal causes of action related to PFAS contamination from AFFF sources." 190 F.4th at 1319, 1321. There, as here, 3M's notice of removal alleged that "PFAS contamination from AFFF" (from a nearby Air Force base) was a plausible source of some of the contamination, that any PFAS from non-AFFF sources indistinguishably "commingled with PFAS from AFFF sources," and that a "federal government contractor defense" was viable "because of the inability to isolate the [source of] the PFAS." *Id.* at 1319. And there, as here, the district court rejected removal by "narrow[ing] the scope of [plaintiff's] charged conduct to" the specific conduct alleged in the complaint—"3M's manufacturing of PFAS products . . . for use in [certain] paper mills." *Id.* at 1321. The Eleventh Circuit vacated.

---

[2] Other circuits have likewise adopted this indivisibility theory. *See, e.g.*, *Cnty. of Westchester v. Express Scripts, Inc.*, 191 F.4th 82, 93–94 (2d Cir. 2026); *Griffin v. Optum, Inc.*, 175 F.4th 897, 905 (8th Cir. 2026); *Ohio ex rel. Yost v. Ascent Health Servs., LLC*, 165 F.4th 999, 1009 (6th Cir. 2026); *Gov't of Puerto Rico*, 119 F.4th at 191; *see also California v. CaremarkPCS Health LLC*, 2024 WL 3770326, at *2 (9th Cir. Aug. 13, 2024) (Ikuta, J., concurring in judgment).

The court of appeals held that the district court's characterization of the charged conduct was "impermissibly narrow[]." 190 F.4th at 1321. Instead of "look[ing] at the discrete acts alleged in the complaint," the district court should have focused on "the gravamen" of the "claim[s] brought against the defendant"—"the effect of PFAS contamination to [the town's] water supply." *Id.* at 1321. And, the Eleventh Circuit continued, "[t]he court should have credited 3M's theory of the case that the resulting contamination related back to the PFAS contamination as a whole and not only the sale of the PFAS products to paper mills." *Id.* With the charged conduct correctly framed, the court of appeals held that 3M had "properly alleged a connection" between "the alleged contamination" and its "federal conduct" of providing AFFF to an Air Force base "near one of the paper mills." *Id.* at 1321–22.[3]

This case is no different. Despite the discrete allegations about turnout gear, the gravamen of plaintiffs' claims is the effect of PFAS exposure on their health. *See supra* pp.10, 26. The district court should have credited 3M's theory that at least some of this exposure plausibly came from MilSpec AFFF. And, with the charged conduct properly framed, there is a clear connection between that exposure and 3M's

[3] Similarly, in a decision on which the district court relied, *see* JA12, this Court confirmed that identifying the charged conduct requires "read[ing]" the complaint "as a whole," without giving undue weight to "references" to discrete acts, *Mayor of Baltimore v. BP P.L.C.*, 31 F.4th 178, 233 (4th Cir. 2022).

manufacture and sale of MilSpec AFFF under the direction of the federal government.

### 2. The District Court Erroneously Held That The Charged Conduct Was Insufficiently Connected To 3M's Federal Work.

Even if the district court correctly characterized the charged conduct as turnout-gear-related PFAS exposure (it did not), it erred by concluding that this conduct does not relate to 3M's government work.

The district court's relatedness conclusion hinged on the view that PFAS from MilSpec AFFF and PFAS from turnout gear are wholly distinct. Although MilSpec AFFF and turnout gear "involve the same broad chemical family," the court reasoned that MilSpec AFFF and turnout gear are "separate firefighting product[s]" that are not "part of the same production chain." JA17. And although the court acknowledged that 3M's allegations about plausible PFAS exposure through AFFF would "defeat Mr. Pope's causation theory," the court concluded that those allegations "do not connect the charged turnout-gear conduct to 3M's federally directed AFFF work"; the court instead deemed them "only a possible alternative exposure pathway." JA14. The district court cited nothing in support of this reasoning.

That is because it is wrong. *First*, it is wrong as a matter of plain text. Charged conduct "relat[es] to" a defendant's federal work, 28 U.S.C. § 1442(a)(1), so long as

the connection "is not tenuous, remote, or peripheral," *Plaquemines*, 146 S. Ct. at 1061 (internal quotation marks omitted). The statute therefore "sweeps broadly" enough to cover "indirect" connections, connections "without a strict causal relationship," and even those connections where the federal work "was not specifically designed to affect" the charged conduct—foreclosing the district court's apparent same-product or same-production-line requirement. *Id.* at 1060 (internal quotation marks omitted).

Here, and by the district court's own account, the connection between plaintiffs' turnout-gear-related injuries and 3M's federal work is close. It is so close that, according to the court, proof that plaintiffs' injuries were "caused by AFFF exposure rather than turnout-gear exposure" would defeat plaintiffs' claims. JA14. This case therefore "fits comfortably within the ordinary meaning of a suit 'relating to' the performance of federal duties." *Plaquemines*, 146 S. Ct. at 1061. That is, whether or not the relatedness requirement would be satisfied based solely on the fact that AFFF and non-AFFF PFAS "involve the same broad chemical family," JA17, the specific connection between those substances *in this case* (identical PFOS and PFOA compounds from AFFF and turnout gear) can hardly be said to be "tenuous, remote, or peripheral," *Plaquemines*, 146 S. Ct. at 1061; *cf. Baker*, 962 F.3d at 945 n.3 (relatedness satisfied where the identical "toxins the [plaintiffs] claim harmed them" could have come from the non-government work mentioned in the

complaint or the government work mentioned in the notice of removal). The only discernible reason for treating the two as wholly *unrelated*—the court's unwillingness to credit 3M's theory that the identical AFFF and non-AFFF PFAS compounds commingle and cause indistinguishable injuries—was erroneous. *See supra* pp.33–36.

*Second*, the district court's reasoning was wrong as a matter of precedent. According to the district court, "a possible alternative exposure pathway" is "distinct[]" from a sufficient connection under section 1442, and "th[is] distinction is important." JA14. According to the district court, that is because "[a] defendant may raise alternative causation in state court." JA14. So, in the court's view, "[t]he existence of that defense does not automatically create federal officer jurisdiction." JA14.

Rejecting this reasoning almost 60 years ago, the Supreme Court admonished that such an approach would "turn[] the removal statute on its head." *Willingham*, 395 U.S. at 405. In *Willingham*, the Court reviewed a decision holding "that the test for removal was 'much narrower' than the test for [federal] immunity, and accordingly that [defendants] *might have to litigate their immunity defense in the state courts*." *Id.* (emphasis added; citation omitted). That holding, the Court explained, was wholly inconsistent with "one of the most important reasons for [federal-officer] removal": "to have the validity of the defense of official immunity

tried in a federal court." *Id.* at 407. Far from "'narrow' or 'limited,'" the Court continued, "[t]he federal officer removal statute" is "[a]t the very least . . . broad enough to cover all cases where federal officers can raise a colorable defense arising out of their duty to enforce federal law." *Id.* at 406–07. A rule that would relegate to state court the resolution of such defenses thus "cannot be sustained." *Id.* at 406.

Just so here: Because "3M has demonstrated a colorable federal defense" under its theory of the case, "it follows that 3M has met the nexus requirement." *Maine*, 159 F.4th at 139; *see supra* pp.29–31; Part III, *infra* (federal defense).

The court's reasoning was also (and again) directly at odds with *Maryland*. The district court described the need to "disentangle" AFFF-related PFAS harms from any harms related to 3M's "non-AFFF products," *Maryland*, 130 F.4th at 391, as an issue of "alternative causation" to be resolved "in state court," JA14. In *Maryland*, however, this Court described *the same issue* as "a challenging causation question" that "establishes that 3M's federal work is inextricably related to the charged conduct" and that will have to be "unravel[ed]" by "a factfinder" in a "*federal*, not a state, court." 130 F.4th at 391 (emphasis added); *see supra* pp.29–30.

The district court thus reversibly erred multiple times in its relatedness analysis—by treating plaintiffs' framing as dispositive, by failing to credit 3M's theory of the case, and by refusing to follow *Maryland*. This Court should reverse.

## III. 3M Asserted A Colorable Federal Defense.

3M satisfies the final element for federal-officer removal because it raised a "colorable federal defense." *Maryland*, 130 F.4th at 388. "To be colorable, the defense need not be clearly sustainable, as the purpose of the statute is to secure that the validity of the defense will be tried in federal court." *Arlington Cnty.*, 996 F.3d at 254 (internal quotation marks omitted). "Instead, the defense must only be plausible." *Id.* A colorable federal defense need not constitute a complete bar to all liability. It is enough for that defense to be "a single . . . ingredient in the mass," *Mesa v. California*, 489 U.S. 121, 129 (1989)—*i.e.*, at least a partial defense, *Magnin v. Teledyne Cont'l Motors*, 91 F.3d 1424, 1428 (11th Cir. 1996).

Here, 3M invoked the federal government-contractor defense, which immunizes government contractors from state-law claims seeking to impose liability for products they furnished to the federal government, so long as "(1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States." *Boyle v. United Techs. Corp.*, 487 U.S. 500, 512 (1988).

3M's notice of removal plausibly alleged sufficient facts to support all three elements of this defense. *See*, *e.g.*, *Maine*, 159 F.4th at 139 (reaching that conclusion under similar circumstances).

*First*, the federal government developed and used "reasonably precise specifications" for the formulation, performance, and testing of MilSpec AFFF, and those specifications required the use of PFAS. JA47; *see supra* p.7.

*Second*, the federal government determined that 3M's AFFF products conformed to those specifications, as shown by the inclusion of those products in the military's "Qualified Products List." JA47–48.

*Third*, 3M was not aware of any material risk regarding MilSpec AFFF about which the federal government did not know. The government has long understood—and publicly acknowledged—that AFFF contains PFAS, that AFFF constituents may spread, and that some studies suggest potential adverse health effects from PFAS. JA48–50.

Taking the notice of removal's allegations as true, 3M has asserted a government-contractor defense that is more than colorable. For good reason, then, plaintiffs in the district court "*agree[d]* that the federal contractor defense is a colorable federal defense"; they were simply of the (mistaken) view that the defense was not viable "*in light of the charged conduct.*" JA132–133 (first emphasis added). That is, they disagreed (again, mistakenly) that the case was "for or relating to" MilSpec AFFF. *Cf. Maryland*, 130 F.4th at 393 (faulting district courts for conflating relatedness with "the colorable defense element").

* * *

3M plausibly alleged all three elements necessary to invoke federal jurisdiction under the federal-officer removal statute.

## CONCLUSION

For these reasons, 3M respectfully requests that the Court reverse the district court's order granting the motion to remand.

Dated: November 6, 2026

Respectfully submitted,

*/s/ Lauren R. Goldman*


Lauren R. Goldman
Justine Goeke
S. Stephanie Hahn
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
(212) 351-2375
LGoldman@gibsondunn.com
JGoeke@gibsondunn.com
SHahn@gibsondunn.com

Paul D. Clement
Joseph J. DeMott
Nicholas A. Aquart
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com
joseph.demott@clementmurphy.com
nicholas.aquart@clementmurphy.com

Elizabeth A. Kiernan
Jed Greenberg
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, TX 75201
(214) 698-3100
EKiernan@gibsondunn.com
JTGreenberg@gibsondunn.com

Branton J. Nestor
Minsoo Kim
GIBSON, DUNN & CRUTCHER LLP
3161 Michelson Drive, Suite 1200
Irvine, CA 92612
(949) 451-3800
BNestor@gibsondunn.com
MKim@gibsondunn.com

Adam I. Steene
Riley K. Segars
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036
(202) 955-8500
ASteene@gibsondunn.com
RSegars@gibsondunn.com

Matthew J. Hundley
BUTLER SNOW LLP
919 East Main Street, Suite 600
Richmond, VA 23219
(804) 762-6028
Matthew.Hundley@butlersnow.com


*Counsel for Defendant-Appellant 3M Company*

## STATEMENT REGARDING ORAL ARGUMENT

3M respectfully requests oral argument pursuant to Federal Rule of Appellate Procedure 34(a) and Local Rule 34(a). This case presents complex and important questions of federal procedure, and 3M submits that oral argument would afford the parties and the Court an opportunity to explore these issues more fully.

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g)(1), the undersigned certifies that this brief complies with the applicable typeface, type style, and type-volume limitations. This brief was prepared using a proportionally spaced typeface (Times New Roman, 14-point font). Exclusive of the portions exempted by Federal Rule of Appellate Procedure 32(f), this brief contains 10,949 words. This certificate was prepared in reliance on the word-count function of the word-processing system used to prepare this brief.

November 6, 2026

Respectfully submitted,

*/s/ Lauren R. Goldman*

Lauren R. Goldman
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
(212) 351-2375
lgoldman@gibsondunn.com

**CERTIFICATE OF SERVICE**

I hereby certify that on November 6, 2026, I caused a copy of the foregoing brief and the joint appendix to be served via ECF on all counsel of record.


*/s/ Lauren R. Goldman*
Lauren R. Goldman
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
(212) 351-2375
lgoldman@gibsondunn.com