No. 26-1891

---

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FOURTH CIRCUIT**

---

ADEN W. SCOTT, III; MARK C. DAVIS; EDWARD A. LANE; JEREMY M. POPE; CASEY BARDEN; JOHN HUDNALL; AMY L. HUTCHESON, Executrix of the Estate of James S. Hutcheson, deceased,

*Plaintiffs-Appellees*,

v.

3M COMPANY,
f/k/a Minnesota Mining & Manufacturing Company,

*Defendant-Appellant*,

AGC CHEMICALS AMERICAS, INC.; ARCHROMA U.S., INC.; ARKEMA, INC.; BLUE RIDGE RESCUE SUPPLIERS, INC.; BRADSDEN SOLUTIONS, INC.; DAIKIN AMERICA, INC.; E.I. DUPONT DE NEMOURS & COMPANY, a/k/a EDIP, INC.; GLOBE MANUFACTURING COMPANY, LLC; HONEYWELL INTERNATIONAL, INC.; HONEYWELL SAFETY PRODUCTS USA, INC.; LION GROUP, INC.; MALLORY SAFETY & SUPPLY LLC; MSA SAFETY SALES, LLC; MSA SAFETY, INC.; MUNICIPAL EMERGENCY SERVICES, INC.; PBI PERFORMANCE PRODUCTS, INC.; STEDFAST USA INC.; TENCATE PROTECTIVE FABRICS USA, d/b/a Southern Mills, INC.; THE CHEMOURS COMPANY, LLC; W.L. GORE & ASSOCIATES, INC.

*Defendants*.

---

On Appeal from the United States District Court
for the Eastern District of Virginia, No. 2:25-cv-00617-AWA-LRL

---

**JOINT APPENDIX**

---

Paul D. Clement
Joseph J. DeMott
Nicholas A. Aquart
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com
joseph.demott@clementmurphy.com
nicholas.aquart@clementmurphy.com

Lauren R. Goldman
Justine Goeke
S. Stephanie Hahn
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
(212) 351-2375
LGoldman@gibsondunn.com
JGoeke@gibsondunn.com
SHahn@gibsondunn.com

Elizabeth A. Kiernan
Jed Greenberg
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, Texas 75201
(214) 698-3100
EKiernan@gibsondunn.com
JTGreenberg@gibsondunn.com

Branton J. Nestor
Minsoo Kim
GIBSON, DUNN & CRUTCHER LLP
3161 Michelson Drive, Suite 1200
Irvine, CA 92612
(949) 451-3800
BNestor@gibsondunn.com
MKim@gibsondunn.com

Adam I. Steene
Riley K. Segars
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036
(202) 955-8500
ASteene@gibsondunn.com
RSegars@gibsondunn.com

Matthew J. Hundley
BUTLER SNOW LLP
919 East Main Street, Suite 600
Richmond, VA 23219
(804) 762-6028
Matthew.Hundley@butlersnow.com

*Counsel for Defendant-Appellant 3M Company*

Kevin Biniazan
Alexis Nicole Bale
BREIT BINIAZAN, PC
600 22nd Street, Suite 402
Virginia Beach, VA 23451
(757) 622-6000
kevin@bbtrial.com
abale@bbtrial.com

*Counsel for Plaintiffs-Appellees*

## TABLE OF CONTENTS


Page

Order Granting Motion to Remand (ECF No. 21) .... JA1

Docket Sheet for No. 25-cv-00617 (E.D. Va.) .... JA21

Notice of Removal (ECF No. 1) .... JA30

Ex. A, Plaintiffs' Complaint (ECF No. 1-1) .... JA53

Plaintiffs' Motion to Remand (ECF No. 10) .... JA111

Plaintiffs' Brief in Support of Motion to Remand (ECF No. 11) .... JA114

Defendant 3M Company's Opposition to Plaintiffs' Motion to Remand (ECF No. 12) .... JA139

Plaintiffs' Reply in Support of Motion to Remand (ECF No. 13) .... JA157

Defendant 3M Company's Motion for Leave to Submit Supplemental Authority (ECF No. 19) .... JA179

Plaintiffs' Response in Opposition to Defendant 3M's Motion for Leave to Submit Supplemental Authority (ECF No. 20) .... JA184

Notice of Appeal (ECF No. 22) .... JA189

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

| | |
|---|---|
| ADEN W. SCOTT, III, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>3M COMPANY, *et al.*,<br><br>Defendants. | Civil No. 2:25cv617 |

**ORDER**

Pending before the Court are a Motion to Remand (the "Motion") (ECF No. 10) and a Memorandum in Support thereof (ECF No. 11) filed by Plaintiffs Aden W. Scott, III, Mark C. Davis, Edward A. Lane, Jeremy M. Pope, Casey Barden, John Hudnall, and Amy L. Hutcheson, *Executrix of the Estate of James S. Hutcheson, deceased* (collectively "Plaintiffs"). The Court has determined that a hearing on the Motion is unnecessary, as the issues for decision are adequately presented in the briefs. *See* E.D. Va. Local Civ. R. 7(J). For the following reasons, the Motion (ECF No. 10) is **GRANTED**.[1]

[1] Also pending before the Court are a Motion to Stay All Proceedings Pending the Judicial Panel on Multidistrict Litigation's Final Decision on Transfer (the "Motion to Stay") (ECF No. 6) and a Memorandum in Support thereof (ECF No. 7), as well as a Motion for Leave to File Supplemental Authority (the "Motion for Leave") (ECF No. 19), filed by Defendant 3M Company. Upon consideration, the Motion for Leave (ECF No. 19) is **GRANTED**. The supplemental authority filed at ECF No. 19-1 has been considered. Further, because the Court remands the case to state court, the Motion to Stay (ECF No. 6) is **DENIED as moot.**

# I. BACKGROUND

## A. Plaintiffs' Allegations

Plaintiffs Aden W. Scott III, Mark C. Davis, Edward A. Lane, Jeremy M. Pope, Casey Barden, and John Hudnall (collectively, the "Firefighter Plaintiffs") are current or retired firefighters who served in Virginia or nearby jurisdictions. Compl. ¶¶ 8, 19–25, ECF No. 1-1. Plaintiff Amy L. Hutcheson is the executrix of the estate of James S. Hutcheson ("Decedent Hutcheson"), a deceased firefighter. *Id.* ¶ 25. On April 15, 2025, Plaintiffs filed a civil complaint in the Circuit Court for the City of Virginia Beach. *See generally id.* Therein, Plaintiffs allege that, in the ordinary course of performing firefighting duties and training, the Firefighter Plaintiffs and Decedent Hutcheson wore protective clothing specifically designed for firefighters, commonly known as "turnouts." *Id.* ¶¶ 9, 13–15.

The Complaint alleges that Defendants manufactured, designed, sold, supplied, distributed, or used per- and polyfluoroalkyl substances ("PFAS") and PFAS-containing materials in firefighter turnouts. *Id.* ¶¶ 9, 13–14. PFAS are alleged to be human-made chemicals used in manufactured products to resist or repel oil, stains, heat, and water. *Id.* ¶ 10. Plaintiffs further allege that PFAS are "forever chemicals" because they resist degradation, bioaccumulate in humans, and have been associated with serious adverse health effects, including cancer. *Id.* ¶¶ 11–12.

The Complaint repeatedly identifies turnout gear as the relevant exposure product. Plaintiffs allege that Defendants manufactured, designed, marketed, sold, supplied, or distributed PFAS-containing turnouts to firefighting training facilities

and fire departments, including facilities and departments in Virginia. *Id.* ¶ 14. Plaintiffs further allege that they wore the turnouts in the usual and normal course of performing firefighting duties and training and were "repeatedly exposed to PFAS in their turnouts." *Id.* ¶ 15. They allege that they used the turnouts as intended and in a foreseeable manner, and that this repeated and extensive exposure caused them to develop various forms of cancer. *Id.* ¶ 17.

The Plaintiff-specific allegations follow the same formulation. Each Plaintiff alleges that their respective cancer resulted from exposure to PFAS contained in turnout gear. *Id.* ¶¶ 19–25.[2] Further, the Complaint's substantive allegations also focus on turnout gear. Specifically, Plaintiffs allege that PFAS in turnouts can off-gas, degrade, or spread as toxic particles and dust when exposed to heat and ordinary use, thereby exposing firefighters through skin contact, ingestion, and inhalation. *Id.* ¶¶ 64–69. The Complaint also alleges that Defendants failed to inform firefighters or the public that turnouts contained PFAS and failed to warn of the health risks allegedly associated with exposure to PFAS-containing turnouts. *Id.* ¶¶ 14–17, 67–77.

---

[2] Specifically, Mr. Scott alleges that his Non-Hodgkin's Lymphoma resulted from "exposure to PFAS contained in his turnouts." Compl. ¶ 19, ECF No. 1-1. Mr. Davis alleges that his High-Grade Ureteral Carcinoma resulted from "exposure to PFAS contained in his turnouts," including Globe-branded turnouts. *Id.* ¶ 20. Mr. Lane alleges that his thyroid cancer resulted from "exposure to PFAS contained in his turnouts," including Morning Pride-branded turnouts. *Id.* ¶ 21. Mr. Pope alleges that he is a firefighter for Walter Reed Fire Department and the Metropolitan Washington Airports Authority Fire and EMS Department, and that his colon cancer resulted from "exposure to PFAS contained in his turnouts, including in Morning Pride and Globe branded turnouts." *Id.* ¶ 22. The other Plaintiff-specific allegations are likewise framed as exposure to PFAS contained in turnouts. *Id.* ¶¶ 23–25.

The Complaint asserts four causes of action under Virginia law: (1) breach of implied warranties; (2) breach of express warranties; (3) negligence, gross negligence, recklessness, and willful and wanton misconduct; and (4) violations of the Virginia Consumer Protection Act. *Id.* ¶¶ 126–202. The implied warranty claim alleges that Defendants placed PFAS-containing turnouts into the stream of commerce and that Plaintiffs were exposed to PFAS through the ordinary and foreseeable use of those turnouts. *Id.* ¶¶ 126–47. The express warranty claim concerns alleged representations and omissions about PFAS-containing turnouts. *Id.* ¶¶ 148–70. The negligence claim concerns the design, research, testing, manufacture, marketing, formulation, supply, promotion, sale, labeling, and distribution of PFAS-containing turnouts. *Id.* ¶¶ 171–89. The Virginia Consumer Protection Act claim concerns allegedly deceptive statements and omissions related to PFAS-containing turnouts. *Id.* ¶¶ 190–202.

**B. 3M's Removal Allegations**

On September 26, 2025, Defendant 3M Company ("3M") removed this action pursuant to the federal officer removal statute, 28 U.S.C. § 1442(a)(1). Notice of Removal, ECF No. 1. 3M does not principally contend that Plaintiffs' turnout gear was manufactured, designed, marketed, sold, labeled, or warned about under the direction of a federal officer. Rather, 3M's federal officer theory rests on a different product: aqueous film-forming foam ("AFFF") that was manufactured according to military specifications ("MilSpec AFFF"). *Id.* ¶¶ 2–5, 23–31.

3M alleges that AFFF is a firefighting foam developed by the United States Naval Research Laboratory and used by the military on bases, airfields, and Navy

ships to suppress fuel fires. *Id.* ¶ 23. 3M further alleges that the design and manufacture of MilSpec AFFF were governed by military specifications created and administered by Naval Sea Systems Command, a component of the Department of Defense. *Id.* ¶ 24. According to 3M, those specifications governed AFFF formulation, performance, testing, storage, inspection, packaging, and labeling. *Id.* ¶¶ 24, 40. 3M alleges that MilSpec AFFF products had to be examined, tested, and approved for inclusion on the applicable Qualified Products List before they could be procured by the military. *Id.* ¶¶ 24, 26.

3M further alleges that, from the inception of the MilSpec AFFF until 2019, the specification expressly required MilSpec AFFF to contain "fluorocarbon surfactants," which are PFAS. *Id.* ¶ 25. 3M alleges that, although the express fluorocarbon-surfactant requirement was later removed, the current specification continues to impose performance requirements that 3M contends cannot be satisfied without fluorocarbon surfactants. *Id.* 3M alleges that it manufactured and sold PFAS-containing MilSpec AFFF to the United States military for more than three decades pursuant to federal contracts. *Id.* ¶ 26. One or more of 3M's AFFF products allegedly appeared on the Navy's Qualified Products List from 1970 until 2010. *Id.*

3M also alleges that MilSpec AFFF was used by non-military users, including certain civilian airports regulated under Part 139 of the Federal Aviation Administration regulations. *Id.* ¶ 27. According to 3M, by 2006, the federal government required Part 139 airports to use AFFF meeting MilSpec standards. *Id.*

3M's most specific removal allegations concern Mr. Pope. 3M alleges that Mr. Pope worked as a firefighter for the Metropolitan Washington Airports Authority Fire and EMS Department ("MWAA Fire/EMS"). *Id.* ¶¶ 3, 28–31. MWAA Fire/EMS serves Ronald Reagan Washington National Airport and Washington Dulles International Airport, both of which 3M alleges are Part 139 airports. *Id.* ¶¶ 3, 28–30. 3M further alleges that those airports have a history of MilSpec AFFF use and that 3M's sales records reflect multiple sales of MilSpec AFFF products to each airport, purchased by MWAA. *Id.* ¶ 30. On that basis, 3M contends that MilSpec AFFF used by MWAA Fire/EMS plausibly contributed to Mr. Pope's alleged PFAS exposure. *Id.* ¶¶ 28–31.

3M also alleges that all Plaintiffs plausibly may have been exposed to MilSpec AFFF through other pathways, including regular consumption of water over their lifetimes. *Id.* ¶¶ 32–36. In support, 3M also relies in part on Case Management Order No. 36 ("CMO No. 36") entered in *In re Aqueous Film-Forming Foams Products Liability Litigation*, MDL No. 2873, in which the MDL court stated that plaintiffs cannot always isolate personal injuries caused by AFFF from personal injuries allegedly caused by non-AFFF PFAS sources at the pleading stage. *Id.* ¶¶ 4, 22, 33–36.

### C. Procedural History

Plaintiffs filed this action in the Circuit Court for the City of Virginia Beach on April 15, 2025. Compl., ECF No. 1-1. On September 26, 2025, 3M removed this action. Notice of Removal, ECF No. 1. On October 27, 2025, Plaintiffs filed their Motion to Remand and accompanying memorandum. Mot., ECF No. 10; Mem. Supp., ECF No. 11. Therein, Plaintiffs argue that 3M cannot satisfy the elements of federal officer

removal because the charged conduct in this case is Defendants' alleged design, manufacture, marketing, sale, supply, distribution, labeling, and failure to warn concerning PFAS-containing firefighter turnout gear—not 3M's manufacture or sale of Mil-Spec AFFF. Mem. Supp. at 8–23, ECF No. 11. Plaintiffs also request costs and expenses under 28 U.S.C. § 1447(c). *Id.* at 23; Reply at 19–20, ECF No. 13.

On November 10, 2025, 3M filed a response in opposition, arguing that MilSpec AFFF plausibly contributed to Plaintiffs' PFAS exposure, particularly Mr. Pope's alleged exposure through MWAA Fire/EMS. Resp. Opp'n, ECF No. 12. On November 17, 2025, Plaintiffs filed a reply. Reply, ECF No. 13. 3M later filed a Motion for Leave to File Supplemental Authority, submitting authority related to federal officer removal and PFAS/AFFF litigation. Mot. Leave, ECF No. 19. The Motion to Remand is ripe for decision.

## II. LEGAL STANDARD

Federal courts are courts of limited jurisdiction. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). When a party seeks to remove a matter from state court to federal court, it bears the burden of demonstrating that removal is proper and that the federal court has jurisdiction. *Mulcahey v. Columbia Organic Chems. Co.*, 29 F.3d 148, 151 (4th Cir. 1994) (citing *Wilson v. Republic Iron & Steel Co.*, 257 U.S. 92, 97 (1921)). "If at any time before final judgment it appears that the district court lacks subject matter jurisdiction," the case must be remanded to state court. 28 U.S.C. § 1447(c).

28 U.S.C. § 1442(a)(1) permits a case that does not otherwise present a federal

question to be removed to federal court if the state law claims arise under the actions of a federal officer. 28 U.S.C. § 1442(a)(1). This section, "commonly referred to as the 'federal officer removal statute,' authorizes the removal to federal court of any 'civil action or criminal prosecution' commenced in a state court against 'any officer (or any person acting under that officer) of the United States or of any agency thereof, in an official or individual capacity, for or relating to any act under color of such office.'" *Sawyer v. Foster Wheeler LLC*, 860 F.3d 249, 254 (4th Cir. 2017) (quoting 28 U.S.C. § 1442(a)(1)). To qualify for removal under this statute, "a private defendant must show: (1) that it acted under a federal officer, (2) that it has a colorable federal defense, and (3) that the charged conduct was carried out for or in relation to the asserted official authority." *Mayor & City Council of Baltimore v. BP PLC*, 31 F.4th 178, 228 (4th Cir. 2022) (citation modified); *see also Anne Arundel Cnty. v. BP PLC*, 94 F.4th 343, 347–48 (4th Cir. 2024).

After an action is removed to federal court, the plaintiff may move to remand if jurisdiction is defective. 28 U.S.C. § 1447(c). In resolving such motions, courts must construe the federal officer removal statute broadly in favor of a federal forum. *See Arizona v. Manypenny*, 451 U.S. 232, 242 (1981) (citing *Willingham v. Morgan*, 395 U.S. 402, 407 (1969)); *Cnty. Bd. of Arlington Cnty. v. Express Scripts Pharmacy, Inc.*, 996 F.3d 243, 250–51 (4th Cir. 2021). The federal officer removal statute "is an exception to the well-pleaded complaint rule insofar as it allows suits against federal officers to be removed despite the nonfederal cast of the complaint." *Maryland v. 3M Co.*, 130 F.4th 380, 388 (4th Cir. 2025) (citation modified). Accordingly, "when a plain-

tiff sues a defendant that can plausibly invoke removal under § 1442(a)(1), he relinquishes his otherwise ubiquitous power to select a state forum instead of a federal one by writing his complaint a certain way." *Id.*; *see Willingham*, 395 U.S. at 407 (holding that "Congress has decided that federal officers . . . require the protection of a federal forum," and "[t]his policy should not be frustrated by a narrow, grudging interpretation of § 1442(a)(1).").

## III. ANALYSIS

Plaintiffs assert that remand is appropriate because 3M has failed to satisfy each element for federal officer removal. Mem. Supp. at 8, ECF No. 11. The Court's analysis begins, and ends, with the nexus requirement. Because the Court concludes that 3M has not shown that the conduct charged in the Complaint was carried out for or in relation to 3M's asserted federal authority, removal was improper under § 1442(a)(1).

### A. The Nexus Requirement Focuses on the Charged Conduct

The third element of federal officer removal is often called the nexus or connection requirement. *Maryland*, 130 F.4th at 389. To satisfy that element, a defendant must show that it is being sued for acts done under, or related to acts done under, federal authority. *Id.*; *Baltimore*, 31 F.4th at 233. Courts generally credit the removing defendant's theory of the case when determining whether such a connection exists. *Cnty. Bd. of Arlington Cnty.*, 996 F.3d at 256; *Maryland*, 130 F.4th at 389.

But crediting the defendant's theory does not eliminate the nexus inquiry. *Maryland*, 130 F.4th at 389, 392. The Fourth Circuit has repeatedly emphasized that

the statutory text identifies "what must relate to what." *Anne Arundel*, 94 F.4th at 348. It is the "act" for which the defendant is being sued—not the plaintiff's entire civil action in a general sense—that must relate to the asserted federal duty. *Id.* at 348–49. Thus, while "the conduct charged in the Complaint need only 'relate to' the asserted official authority," there still must be a connection or association between "the act in question" and the federal office. *Baltimore*, 31 F.4th at 233 (internal citation omitted).

The Supreme Court's recent decision in *Chevron U.S.A. Inc. v. Plaquemines Parish, La.*, confirms that "relating to" is broad, but not boundless. 608 U.S. ___, 146 S. Ct. 1052, 1060–61 (2026). A removing defendant need not show that federal duties specifically required or strictly caused the challenged conduct. *Id.* at 1060–63. But the relationship between the charged conduct and federal authority must still be more than "tenuous, remote, or peripheral." *Id.* at 1061. The Court therefore must first identify the relevant charged conduct and then determine whether that charged conduct has the requisite relationship to the asserted federal authority.

### B. The Charged Conduct is Defendants' Alleged Conduct Concerning PFAS-Containing Turnout Gear

The charged conduct in this action is Defendants' alleged design, manufacture, marketing, sale, supply, distribution, labeling, and failure to warn concerning PFAS-containing firefighter turnout gear. It is not 3M's design, manufacture, sale, or warnings concerning MilSpec AFFF.

Plaintiffs' allegations in the Complaint make the appropriate charged conduct clear. Plaintiffs bring this action for harms resulting from exposure to PFAS "con-

tained in protective clothing specifically designed for firefighters ('turnouts')." Compl. ¶ 9, ECF No. 1-1. According to the Complaint, Defendants used PFAS and PFAS-containing materials in turnouts and Defendants manufactured, designed, marketed, sold, supplied, or distributed PFAS-containing turnouts to firefighting training facilities and fire departments. *Id.* ¶¶ 13–14. Plaintiffs wore the turnouts in the usual and normal course of performing firefighting duties and training and were repeatedly exposed to PFAS "in their turnouts." *Id.* ¶ 15. Further, Plaintiffs used the turnouts as intended and in a foreseeable manner, and this repeated and extensive exposure caused them to develop cancer. *Id.* ¶ 17.

The Plaintiff-specific allegations confirm the same focus. Mr. Pope's allegations are illustrative. The Complaint alleges that Mr. Pope is a firefighter for Walter Reed Fire Department and MWAA Fire/EMS, and that his colon cancer resulted from "exposure to PFAS contained in his turnouts, including in Morning Pride and Globe branded turnouts." *Id.* ¶ 22. The Complaint does not allege that Mr. Pope used AFFF, trained with AFFF, was exposed to MilSpec AFFF, consumed water contaminated by AFFF, or was injured by airport AFFF. The other Plaintiff-specific allegations likewise attribute the relevant injuries to PFAS contained in turnout gear. *Id.* ¶¶ 19–25.

The causes of action themselves are also tied to turnout gear. Count I alleges breach of implied warranties based on Defendants' placement of PFAS-containing turnouts into the stream of commerce and Plaintiffs' use of those turnouts. *Id.* ¶¶ 126–47. Count II alleges breach of express warranties concerning the safety and suitability of turnouts. *Id.* ¶¶ 148–70. Count III alleges negligence and related mis-

conduct in connection with Defendants' design, research, testing, manufacture, marketing, formulation, supply, promotion, sale, labeling, and distribution of turnouts. *Id.* ¶¶ 171–89. Count IV alleges violations of the Virginia Consumer Protection Act based on statements and omissions concerning PFAS-containing turnouts. *Id.* ¶¶ 190–202.

3M points to broader language in the Complaint referring to PFAS chemicals and PFAS-containing products. *See, e.g., id.* ¶¶ 18, 177. But read in context, those references do not convert this case into a general PFAS-exposure action. They are part of Plaintiffs' broader factual narrative concerning the PFAS allegedly used in, contained in, released from, or associated with turnout gear. The Fourth Circuit has cautioned that background allegations do not necessarily define the charged conduct. *See Baltimore*, 31 F.4th at 233–34. There, references to fossil-fuel production in a climate-related complaint did not make production the source of tort liability where the claims were based on alleged deception and failure to warn. *Id.* The same principle applies here. The Complaint necessarily discusses PFAS generally because PFAS is the alleged hazardous substance in the turnout gear. But the source of liability asserted in the Complaint is Defendants' alleged conduct concerning PFAS-containing turnouts.[3]

---

[3] This conclusion is consistent with *Moretz v. 3M Co.*, No. 2:25cv616 (E.D. Va. Mar. 17, 2026), ECF No. 18 (Walker, J.). There, another judge of this court considered materially similar allegations by a firefighter who alleged PFAS exposure from turnout gear. The court held that the charged conduct was the defendant's alleged design, manufacture, marketing, and distribution of PFAS-containing firefighter turnout gear—not general PFAS exposure and not MilSpec AFFF. *Id.* at 7–10. The court rejected 3M's attempt to reframe the complaint as alleging injuries from general PFAS

### C. 3M Has Not Shown a Sufficient Nexus Between the Charged Turnout-Gear Conduct and its MilSpec AFFF Work

Having identified the charged conduct, the Court next considers whether 3M has adequately established that the charged conduct was carried out for or in relation to 3M's asserted federal authority. For the reasons provided below, the Court finds that 3M has not done so.

3M's asserted federal conduct is its manufacture and sale of MilSpec AFFF. Notice of Removal ¶¶ 23–31, ECF No. 1. MilSpec AFFF is a firefighting foam. It is not turnout gear. 3M does not allege that MilSpec AFFF was incorporated into Plaintiffs' turnout gear, used to manufacture the turnout gear, applied to the turnout gear as a component, or otherwise necessary to the production, sale, labeling, or warning of the turnout gear. Nor does 3M allege that the federal government directed the design, manufacture, marketing, sale, labeling, or warnings of the turnouts at issue.

Instead, 3M alleges that MilSpec AFFF is another plausible source of Plaintiffs' PFAS exposure. *Id.* ¶¶ 2–4, 28–36. But a possible alternative source of injury is not the same thing as a connection between the charged conduct and federal authority. Section 1442(a)(1) requires that the "act" for which the defendant is being sued relate to federal authority. *Anne Arundel*, 94 F.4th at 348. The act for which 3M is being sued here is not the manufacture or sale of MilSpec AFFF. It is the alleged manufacture, sale, distribution, labeling, and failure to warn concerning PFAS-con-

exposure, explaining that the factual allegations and substantive counts were centered on one particular product: firefighter turnouts. *Id.*

taining turnout gear. 3M's federal contractor relationship with respect to a different product does not, without more, establish that this case is for or relating to acts taken under color of federal office.

3M's specific allegations related to Mr. Pope do not alter the result. 3M alleges that Mr. Pope worked for MWAA Fire/EMS, that MWAA Fire/EMS served Reagan and Dulles, that those airports were Part 139 airports with a history of MilSpec AFFF use, and that 3M sold MilSpec AFFF products to those airports. Notice of Removal ¶¶ 28–31, ECF No. 1. Those allegations are more specific than 3M's generalized lifetime-water-exposure allegations, and the Court credits them for purposes of the removal inquiry. But even crediting those allegations, they still identify only a possible alternative exposure pathway. They do not connect the charged turnout-gear conduct to 3M's federally directed AFFF work.

The distinction is important. If 3M later proves that Mr. Pope's cancer was caused by AFFF exposure rather than turnout-gear exposure, that proof may defeat Mr. Pope's causation theory. But it would not establish liability for MilSpec AFFF in this case, because Plaintiffs are not seeking recovery for MilSpec AFFF exposure. Nor would it convert Plaintiffs' turnout-gear warranty, negligence, and consumer-protection claims into claims for or relating to 3M's federally directed MilSpec AFFF. A defendant may raise alternative causation in state court. The existence of that defense does not automatically create federal officer jurisdiction.

The Court therefore need not decide whether 3M can prove that Mr. Pope was actually exposed to MilSpec AFFF or whether MilSpec AFFF actually caused or con-

tributed to his injury. Plaintiffs argue that Mr. Pope has no known exposure to Mil-Spec AFFF. 3M responds that actual exposure need not be proven at the removal stage. The Court agrees that a removing defendant need not prove actual exposure or causation to prevail on federal officer removal. *See Dart Cherokee Basin Operating Co., LLC v. Owens*, 574 U.S. 81, 87–89 (2014); *Maryland*, 130 F.4th at 389. But the Court's conclusion does not turn on proof of actual exposure. Even accepting 3M's jurisdictional allegations concerning Mr. Pope, those allegations do not establish that the conduct charged in the Complaint—conduct concerning PFAS-containing turnout gear—was carried out for or in relation to 3M's federal MilSpec AFFF work.

### D. ***Maryland v. 3M*** and ***Chevron U.S.A. Inc. v. Plaquemines Parish*** Do Not Require Removal

In defending removal, 3M relies on both *Maryland v. 3M Co.* and *Chevron U.S.A. Inc. v. Plaquemines Parish, La.* Neither case requires removal here.

In *Maryland*, the plaintiff-states filed actions seeking recovery for PFAS contamination of natural resources. 130 F.4th at 385–87. The states attempted to separate AFFF and non-AFFF claims and disclaim AFFF-related recovery in the non-AFFF actions. *Id.* 3M removed, arguing that PFAS from Military AFFF had commingled with PFAS from non-AFFF products in the same waterways and natural resources. *Id.* The Fourth Circuit held that the disclaimers were not dispositive because 3M plausibly alleged that the contamination at issue included commingled PFAS from Military AFFF and non-AFFF sources and the factfinder would be forced to determine whether the contamination came from Military AFFF, non-AFFF products, or both. *Id.* at 389–92.

Here, Plaintiffs do not seek recovery for environmental contamination of waterways, groundwater, drinking water, or natural resources. They do not allege a common contaminated environmental medium containing indistinguishable PFAS from AFFF and non-AFFF sources. They allege personal injuries caused by a specific product: PFAS-containing firefighter turnout gear. The Complaint does not allege that MilSpec AFFF contaminated the turnout gear, was used in the turnout gear, or formed part of the same contaminated res for which Plaintiffs seek recovery. The Court reads the Complaint as it was pleaded, a turnout-gear case. That limitation does not prevent 3M from arguing alternative causation. It simply confirms that Milspec AFFF is not a source of liability in this action.

Thus, unlike *Maryland*, this case does not require a factfinder to apportion liability for a single contaminated waterway or natural resource between Military AFFF and non-AFFF products. If AFFF caused a Plaintiff's injury instead of turnout gear, Plaintiffs' turnout-gear causation theory fails to that extent. Plaintiffs do not recover for AFFF exposure. That makes AFFF an alternative causation defense, not the charged conduct.

Nor does *Chevron U.S.A. Inc. v. Plaquemines Parish, La.*, 608 U.S. ___, 146 S. Ct. 1052 (2026), require a different result. *Chevron* confirms that the phrase "relating to" in § 1442(a)(1) is broad and does not require strict causation or express federal direction of the precise challenged act. Id. at 1060–63. But the Supreme Court also explained that the relationship must not be "tenuous, remote, or peripheral." *Id.* at 1061. The relationship in *Chevron* was close. The challenged crude-oil production was

closely tied to the defendants' federally directed wartime avgas refining because crude oil was the necessary feedstock for the federal avgas work and the challenged production practices allegedly enabled increased wartime production. *Id.* at 1061–62. Thus, the alleged conduct and the federal work were part of the same production chain.

Here, MilSpec AFFF is not alleged to be a component or necessary predicate for Plaintiffs' turnout gear. It is a separate firefighting product and a separate exposure pathway. 3M's federal work concerning MilSpec AFFF may be related to firefighting generally and may involve the same broad chemical family—PFAS—but that is not enough. The charged conduct concerns turnout gear. The asserted federal work concerns fire-suppression foam. The Complaint does not plausibly tie the design, manufacture, sale, labeling, or warnings of Plaintiffs' turnout gear to 3M's federal MilSpec AFFF work. Therefore, even under the broad reading instructed by *Chevron*, the asserted relationship is too attenuated to satisfy § 1442(a)(1).[4]

[4] 3M also relies on CMO No. 36 to support removal. In CMO No. 36, the MDL court stated that PFAS personal-injury plaintiffs may not avoid the MDL or federal jurisdiction by denying, disclaiming, or omitting allegations concerning AFFF exposure, including in turnout-gear cases. *See* Case Management Order No. 36, *In re Aqueous Film-Forming Foams Prods. Liab. Litig.*, No. 2:18mn2873, (D.S.C. Aug. 22, 2025), ECF No. 7891. The Court does not treat CMO No. 36 as binding. CMO No. 36 is a case-management order entered by another district court in an MDL proceeding. It does not decide subject matter jurisdiction in this case, and this action has not been transferred to the MDL. The Judicial Panel on Multidistrict Litigation's transfer decisions and the MDL court's case-management views may provide context, but they do not control this Court's independent obligation to determine whether § 1442(a)(1) is satisfied.

### E. The Remaining Elements Do Not Cure the Nexus Defect

Because 3M has not satisfied the nexus requirement, the Court need not decide whether 3M acted under a federal officer or whether 3M has asserted a colorable federal defense. *See Baltimore*, 31 F.4th at 228 (holding that the defendant must satisfy all three requirements); *Anne Arundel*, 94 F.4th at 347–48 (same).

Nonetheless, the Court recognizes that 3M's MilSpec AFFF allegations may plausibly describe conduct undertaken while acting under federal officers. Government contractors are often treated as acting under federal officers when they manufacture products needed by the government pursuant to detailed federal specifications. *Watson v. Philip Morris Cos., Inc.*, 551 U.S. 142, 153–54 (2007); *Sawyer*, 860 F.3d at 255; *Papp v. Fore-Kast Sales Co.*, 842 F.3d 805, 812–13 (3d Cir. 2016). 3M alleges that it manufactured MilSpec AFFF pursuant to military specifications and federal procurement procedures. Notice of Removal ¶¶ 23–26, 39–40, ECF No. 1.

The Court also recognizes that 3M invokes the government contractor defense recognized in *Boyle v. United Technologies Corp.*, 487 U.S. 500 (1988), as to MilSpec AFFF. A removing defendant need not prove that a federal defense will prevail; the defense need only be colorable. *Mesa v. California*, 489 U.S. 121, 129–31 (1989); *Ripley v. Foster Wheeler LLC*, 841 F.3d 207, 210 (4th Cir. 2016).

However, even if those elements were satisfied, it would not cure the nexus defect. The relevant issue is not whether 3M has federal contractor conduct somewhere in its history, or whether it may have a colorable federal defense to claims concerning MilSpec AFFF. The issue is that Plaintiffs are not suing 3M for conduct

concerning MilSpec AFFF. They are suing Defendants for conduct concerning PFAS-containing turnout gear. Because 3M has not adequately connected that charged conduct to acts taken under color of federal office, § 1442(a)(1) does not authorize removal.

**F. Fees and Costs**

Plaintiffs request costs and expenses, including attorney's fees, incurred as a result of removal. Mem. Supp. at 23, ECF No. 11; Reply at 19–20, ECF No. 13. Under 28 U.S.C. § 1447(c), an order remanding a case may require payment of just costs and actual expenses, including attorney's fees, incurred as a result of removal. Fees should generally be awarded only where the removing party lacked an objectively reasonable basis for removal. *Martin v. Franklin Capital Corp.*, 546 U.S. 132, 141 (2005).

Although removal was improper, the Court concludes that fees are not warranted. The issues presented are complex and arise in a developing area of law involving PFAS, AFFF, and federal officer removal. 3M's position was not objectively unreasonable given *Maryland*, *Chevron*, CMO No. 36, and 3M's plaintiff-specific allegations concerning Mr. Pope. The Court therefore denies Plaintiffs' request for fees and costs.

* * *

In sum, 3M has not met its burden in making a plausible claim for federal jurisdiction. Accordingly, the Court finds that removal is improper under § 1442(a)(1) and will grant the Motion on this basis.

## IV. CONCLUSION

For the foregoing reasons, the Motion (ECF No. 10) is **GRANTED**. Plaintiffs' request for fees and costs under 28 U.S.C. § 1447(c) is **DENIED**. 3M's Motion for Leave (ECF No. 19) is **GRANTED**. The above-captioned case is **REMANDED** to the Circuit Court for the City of Virginia Beach. Further, because the case is remanded, the Motion to Stay (ECF No. 6) is **DENIED as moot**. The Clerk is **DIRECTED** to close this action and to forward a copy of this Order to all counsel of record.

**IT IS SO ORDERED.**

/s/
Arenda L. Wright Allen
Senior United States District Judge

July 7, 2026
Norfolk, Virginia

APPEAL,CLOSED,JURY

# U.S. District Court
# Eastern District of Virginia - (Norfolk)
# CIVIL DOCKET FOR CASE #: 2:25-cv-00617-AWA-LRL

Scott et al v. 3M Company et al
Assigned to: District Judge Arenda L. Wright Allen
Referred to: Magistrate Judge Lawrence R. Leonard
Demand: $9,999,000
Case in other court: 4CCA Case Manager J. Neal, 26-01891
Circuit Court for the City of Virginia Beach, CL25-1999
Cause: 28:1446 Notice of Removal

Date Filed: 09/26/2025
Date Terminated: 07/07/2026
Jury Demand: Plaintiff
Nature of Suit: 365 Personal Inj. Prod. Liability
Jurisdiction: Federal Question

**Plaintiff**

**Aden W Scott, III** represented by

**Alexis Bale**
Breit Biniazan, P.C.
600 22nd St
Suite 402
Virginia Beach, VA 23451
509-792-2682
Email: abale@bbtrial.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jeffrey Arnold Breit**
Breit Biniazan, PC
600 22nd Street
Suite 402
Virginia Beach
Virginia Beach, VA 23451
757-622-6000
Fax: 757-670-3939
Email: Jeffrey@bbtrial.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kevin Biniazan**
Breit Biniazan, PC
600 22nd Street
Suite 402
Virginia Beach, VA 23451
757-622-6000
Fax: 757-299-8028
Email: kevin@bbtrial.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Lauren Martin**
Breit Biniazan PC
600 22nd St Suite 402
Virginia Beach, VA 23451
757-622-6000
Email: lmartin@bbtrial.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**<u>Plaintiff</u>**

| | | |
|---|---|---|
| **Mark C Davis** | represented by | **Alexis Bale**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br><br>**Jeffrey Arnold Breit**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br><br>**Kevin Biniazan**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br><br>**Lauren Martin**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**<u>Plaintiff</u>**

| | | |
|---|---|---|
| **Edward A Lane** | represented by | **Alexis Bale**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br><br>**Jeffrey Arnold Breit**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br><br>**Kevin Biniazan**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br><br>**Lauren Martin**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**<u>Plaintiff</u>**

| | | |
|---|---|---|
| **Jeremy M Pope** | represented by | **Alexis Bale**<br>(See above for address) |

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jeffrey Arnold Breit**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kevin Biniazan**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Lauren Martin**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Casey Barden** represented by **Alexis Bale**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jeffrey Arnold Breit**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kevin Biniazan**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Lauren Martin**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**John Hudnall** represented by **Alexis Bale**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jeffrey Arnold Breit**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kevin Biniazan**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Lauren Martin**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Amy L. Hutcheson**
*Executrix of the Estate of James S. Hutcheson, deceased*

represented by

**Alexis Bale**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jeffrey Arnold Breit**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kevin Biniazan**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Lauren Martin**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**3M Company**
*formerly known as*
Minnesota Mining & Manufacturing Co.

represented by

**Diana Maria Miller**
Butler Snow LLP
919 East Main Street
Ste 600
Richmond, VA 23219
804-840-0903
Email: diana.miller@butlersnow.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Matthew James Hundley**
Butler Snow LLP
919 E. Main Street
Suite 600
Richmond, VA 23219
804-762-6028
Fax: 804-762-6031
Email: matthew.hundley@butlersnow.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**AGC Chemicals Americas, Inc.**

**Defendant**

**Archroma U.S., Inc.**

**Defendant**

**Arkema, Inc.**

**Defendant**

**Blue Ridge Rescue Suppliers, Inc.** represented by **Imani E. Sowell**
Harman Claytor Corrigan & Wellman
P.O. Box 70280
Richmond, VA 23255
804-877-6912
Fax: 804-654-8131
Email: isowell@hccw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John Patrick Dunnigan**
Harman Claytor Corrigan & Wellman, P.C.
4951 Lake Brooke Drive
Suite 100
Glen Allen, VA 23255
804-622-1104
Email: jdunnigan@hccw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John Ryan Owen**
Harman Claytor Corrigan & Wellman
4951 Lake Brook Dr
Suite 100
Glen Allen, VA 23059
804-747-5200
Email: jowen@hccw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Julie Smith Palmer**
Harman Claytor Corrigan & Willman
PO Box 70280
Richmond, VA 23255
(804) 747-5200
Email: jpalmer@hccw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Bradsden Solutions, Inc.** represented by **Imani E. Sowell**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John Patrick Dunnigan**
(See above for address)

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John Ryan Owen**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Julie Smith Palmer**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Daikin America, Inc.**

**Defendant**

**E.I. du Pont de Nemours and Company**
*also known as*
EDIP, Inc.

**Defendant**

**Globe Manufacturing Company, LLC**

**Defendant**

**Honeywell International, Inc.**

**Defendant**

**Honeywell Safety Products USA, Inc.**

**Defendant**

**Lion Group, Inc.**

**Defendant**

**Mallory Safety and Supply, LLC.**

**Defendant**

**MSA Safety Sales, LLC**

**Defendant**

**MSA Safety Inc.**

**Defendant**

**Municipal Emergency Services, Inc.**

**Defendant**

**PBI Performance Products, Inc.**

**Defendant**

**Stedfast USA, Inc.** represented by **Alyssa Lynn Szymczyk**
Hinshaw & Culbertson LLP
700 12th Street NW

Suite 700
Washington, DC 20005
202-979-5284
Email: aszymczyk@hinshawlaw.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Tencate Protective Fabrics USA**
*doing business as*
Southern Mills Inc.

**Defendant**

**The Chemours Company, LLC**

**Defendant**

**W.L. Gore & Associates, Inc.**

| Date Filed | # | Docket Text |
|---|---|---|
| 09/26/2025 | 1 | Notice of Removal ( Filing fee $ 405, receipt number AVAEDC-10487413.), filed by 3M Company. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Civil Cover Sheet Civil Cover Sheet)(Hundley, Matthew) (Entered: 09/26/2025) |
| 09/26/2025 | 2 | Corporate Disclosure Statement by 3M Company. (Hundley, Matthew) (Entered: 09/26/2025) |
| 09/26/2025 | | Initial Case Assignment to District Judge Arenda L. Wright Allen and Magistrate Judge Lawrence R. Leonard. (epri, ) (Entered: 09/29/2025) |
| 09/26/2025 | 4 | COPY OF ANSWER to Complaint (Notice of Removal) by Blue Ridge Rescue Suppliers, Inc. (epri, ) (Entered: 09/29/2025) |
| 09/26/2025 | 5 | COPY OF ANSWER to Complaint (Notice of Removal) by Bradsden Solutions, Inc. (epri, ) (Entered: 09/29/2025) |
| 09/29/2025 | 3 | Magistrate Judge Notice and Judge's Information to counsel. (epri, ) (Entered: 09/29/2025) |
| 10/02/2025 | | Notice of Electronic Filing received from the United States Judicial Panel on Multidistrict Litigation - The Clerk of the Panel has determined the listed action(s) is not appropriate for inclusion in this MDL. See Rule 7.1(b)(i). -- VAE/2:25-cv-00617. (dbra, ) (Entered: 10/02/2025) |
| 10/02/2025 | 6 | MOTION to Stay by 3M Company. (Hundley, Matthew) (Entered: 10/02/2025) |
| 10/02/2025 | 7 | Memorandum in Support re 6 MOTION to Stay filed by 3M Company. (Attachments: # 1 Exhibit)(Hundley, Matthew) (Entered: 10/02/2025) |
| 10/16/2025 | 8 | Memorandum in Opposition re 6 MOTION to Stay filed by Casey Barden, Mark C Davis, John Hudnall, Amy L. Hutcheson, Edward A Lane, Jeremy M Pope, Aden W Scott, III. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H)(Biniazan, Kevin) (Entered: 10/16/2025) |
| 10/21/2025 | 9 | REPLY to Response to Motion re 6 MOTION to Stay filed by 3M Company. (Hundley, Matthew) (Entered: 10/21/2025) |
| 10/27/2025 | 10 | MOTION to Remand by Casey Barden, Mark C Davis, John Hudnall, Amy L. Hutcheson, Edward A Lane, Jeremy M Pope, Aden W Scott, III. (Biniazan, Kevin) (Entered: |

| | | |
|---|---|---|
| | | 10/27/2025) |
| 10/27/2025 | 11 | Memorandum in Support re 10 MOTION to Remand filed by Casey Barden, Mark C Davis, John Hudnall, Amy L. Hutcheson, Edward A Lane, Jeremy M Pope, Aden W Scott, III. (Biniazan, Kevin) (Entered: 10/27/2025) |
| 11/10/2025 | 12 | Memorandum in Opposition re 10 MOTION to Remand filed by 3M Company. (Attachments: # 1 Exhibit 1)(Hundley, Matthew) (Entered: 11/10/2025) |
| 11/17/2025 | 13 | REPLY to Response to Motion re 10 MOTION to Remand filed by Casey Barden, Mark C Davis, John Hudnall, Amy L. Hutcheson, Edward A Lane, Jeremy M Pope, Aden W Scott, III. (Biniazan, Kevin) (Entered: 11/17/2025) |
| 11/24/2025 | 14 | Request for Hearing by Casey Barden, Mark C Davis, John Hudnall, Amy L. Hutcheson, Edward A Lane, Jeremy M Pope, Aden W Scott, III re 10 MOTION to Remand (Biniazan, Kevin) (Entered: 11/24/2025) |
| 12/17/2025 | 15 | NOTICE by Casey Barden, Mark C Davis, John Hudnall, Amy L. Hutcheson, Edward A Lane, Jeremy M Pope, Aden W Scott, III (Attachments: # 1 Exhibit Ex A)(Biniazan, Kevin) (Entered: 12/17/2025) |
| 12/30/2025 | 16 | NOTICE by Casey Barden, Mark C Davis, John Hudnall, Amy L. Hutcheson, Edward A Lane, Jeremy M Pope, Aden W Scott, III *of Defendants' Withdrawal of All Pending Motions to Transfer to MDL* (Attachments: # 1 Exhibit 3M Notice of Withdrawal, # 2 Exhibit Joinder Notice of Withdrawal)(Bale, Alexis) (Entered: 12/30/2025) |
| 03/19/2026 | 17 | NOTICE by Casey Barden, Mark C Davis, John Hudnall, Amy L. Hutcheson, Edward A Lane, Jeremy M Pope, Aden W Scott, III re 10 MOTION to Remand *Notice of Ruling in Related Matter* (Attachments: # 1 Exhibit Entered order)(Biniazan, Kevin) (Entered: 03/19/2026) |
| 04/22/2026 | 18 | NOTICE of Appearance by Alyssa Lynn Szymczyk on behalf of Stedfast USA, Inc. (Szymczyk, Alyssa) (Entered: 04/22/2026) |
| 05/29/2026 | 19 | MOTION for Leave to File *Supplemental Authority* by 3M Company. (Attachments: # 1 Exhibit Supplemental Authority)(Hundley, Matthew) (Entered: 05/29/2026) |
| 06/12/2026 | 20 | RESPONSE in Opposition re 19 MOTION for Leave to File *Supplemental Authority* filed by Casey Barden, Mark C Davis, John Hudnall, Amy L. Hutcheson, Edward A Lane, Jeremy M Pope, Aden W Scott, III. (Biniazan, Kevin) (Entered: 06/12/2026) |
| 07/07/2026 | 21 | ORDER. The Motion (ECF No. 10) is GRANTED. Plaintiffs' request for fees and costs under 28 U.S.C. § 1447(c) is DENIED. 3M's Motion for Leave (ECF No. 19) is GRANTED. This case is REMANDED to the Circuit Court for the City of Virginia Beach. The Motion to Stay (ECF No. 6) is DENIED as moot. Signed by District Judge Arenda L Wright Allen on 7/7/26. (bwell) (Entered: 07/07/2026) |
| 07/07/2026 | 22 | NOTICE OF APPEAL as to 21 Order on Motion to Remand, Order on Motion for Leave to File, Order on Motion to Stay, by 3M Company. Filing fee $ 605, receipt number AVAEDC-11124478. (Hundley, Matthew) (Entered: 07/07/2026) |
| 07/08/2026 | 23 | Letter to Virginia Beach Circuit Court. (bwell) (Entered: 07/08/2026) |
| 07/09/2026 | 24 | Transmission of Notice of Appeal to US Court of Appeals re 22 Notice of Appeal (All case opening forms, plus the transcript guidelines, may be obtained from the Fourth Circuit's website at www.ca4.uscourts.gov) (Attachments: # 1 Notice of Appeal)(alet, ) (Entered: 07/09/2026) |
| 07/14/2026 | 25 | USCA Case Number 26-1891, 4CCA Case Manager J. Neal for 22 Notice of Appeal filed by 3M Company. (jhie, ) (Entered: 07/20/2026) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 10/16/2026 13:30:48 | | | |
| **PACER Login:** | gi000234 | **Client Code:** | 62096-000242 |
| **Description:** | Docket Report | **Search Criteria:** | 2:25-cv-00617-AWA-LRL |
| **Billable Pages:** | 8 | **Cost:** | 0.80 |

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION**

| | |
|---|---|
| Aden W. Scott III, et al.,<br>Plaintiffs,<br>v.<br>3M Company, et al.,<br>Defendants. | Civil Action No. 25-cv-00617<br>**NOTICE OF REMOVAL** |

Defendant 3M Company ("3M"), by undersigned counsel, hereby gives notice of the removal of this action, pursuant to 28 U.S.C. §§ 1442(a)(1) and 1446, from the Circuit Court for the City of Virginia Beach to the United States District Court for the Eastern District of Virginia, Norfolk Division. As grounds for removal, 3M alleges as follows.

## PRELIMINARY STATEMENT

1. Plaintiffs are current or retired firefighters (and one spouse of a deceased firefighter) who seek to hold 3M and other Defendants liable for their alleged conduct in designing, manufacturing, or selling per- and polyfluoroalkyl substances ("PFAS") and PFAS-containing products. Plaintiffs allege that Defendants manufactured, marketed, or otherwise used PFAS chemicals, including in protective turnout gear worn by firefighters. Plaintiffs allege that they were exposed to PFAS by wearing their turnout gear while working as firefighters and that their exposure to PFAS caused the medical conditions for which they seek to hold Defendants liable.

2. However, one plausible source of at least some of Plaintiffs' alleged PFAS exposure that gives rise to their claims is PFAS-containing aqueous film-forming foam ("AFFF") that was manufactured for and sold to the U.S. military and other users by a select group of suppliers

S(including 3M) in accordance with the military's rigorous specifications ("MilSpec"). Over time, 3M's MilSpec AFFF products have been used by firefighters at military facilities and airports across the United States, including in and around Virginia.

3. Plaintiff Jeremy M. Pope ("Mr. Pope") alleges that he is a firefighter for Walter Reed Fire Department and the Metro-Washington Airports Authority Fire and EMS Department ("Airports Authority FD"). The Metropolitan Washington Airports Authority ("MWAA") is responsible for Ronald Reagan Washington National Airport ("Reagan Airport") and Washington Dulles International Airport ("Dulles Airport"), both of which are FAA Part 139 airports that for decades were required to use MilSpec AFFF by federal regulation. As discussed further below, MilSpec AFFF was used by the Airports Authority FD, where Mr. Pope has worked as a firefighter.

4. Moreover, each Plaintiff (a current or former firefighter) has plausibly been exposed to MilSpec AFFF. As the Court overseeing the multidistrict litigation concerning PFAS exposure from AFFF—*In re: Aqueous Film-Forming Foams (AFFF) Products Liability Litigation*, No. 2:18-mn-2873-RMG (D.S.C.) ("MDL" and "MDL Court")—has recognized, a plaintiff cannot "avoid the MDL and/or federal jurisdiction by denying, disclaiming, or omitting allegations concerning exposure to AFFF," regardless of the alleged source of their exposure. *See* Case Management Order No. 36, No. 2:18-mn-02873-RMG, ECF No. 7891 at 1 (D.S.C. August 22, 2025) ("CMO 36."), attached hereto as Exhibit B. This is because Plaintiffs cannot "isolate" injuries caused by non-AFFF PFAS, so when a defendant alleges a MilSpec AFFF connection, "there exists, at the very least, a plausible basis for alleging federal jurisdiction sufficient to satisfy [a defendant's] initial burden on a notice of removal." *See id.* at 1–2. With this backdrop, the MDL Court, where thousands of firefighter turnout gear cases already are proceeding, also made a

"suggestion and request to the JPML that all such cases, including turnout gear cases, be transferred to this Court to enable it to efficient oversee and manage these cases." CMO 36 at 2.

5. Under the federal government contractor defense recognized in *Boyle v. United Technologies Corp.*, 487 U.S. 500 (1988), 3M is not subject to tort liability for its design and manufacture of MilSpec AFFF and its provision of warnings for the product. Under the federal officer removal statute, 28 U.S.C. § 1442(a)(1), 3M is entitled to remove this action in its entirety to have its federal defense adjudicated in a federal forum. *See Papp v. Fore-Kast Sales Co.*, 842 F.3d 805, 810–15 (3d Cir. 2016) (explaining that the "central aim" of the federal officer removal statute "is protecting officers of the federal government from interference by litigation in state court while those officers are trying to carry out their duties"); *In re Asbestos Prod. Liab. Litig. (No. VI)*, 770 F. Supp. 2d 736, 741 (E.D. Pa. 2011) ("The presumption in favor of removal [28 U.S.C. § 1442] is necessary to ensure that a federal officer does not have to win his case before he can have it removed and provides for a federal forum to adjudicate the merits of the defense.") (internal quotations omitted); *see also Albritton v. A Clemente, Inc.*, 2023 WL 2447422, at *3–8 (D.N.J. Mar. 10, 2023) (holding that defendant properly removed PFAS case based on federal officer jurisdiction because products at issue were made for the federal government). Removal is appropriate here.

## BACKGROUND

6. Plaintiffs filed this action against Defendants on April 15, 2025, in the Circuit Court for the City of Virginia Beach, Virginia, bearing civil action number CL25-1999. 3M has not yet been served with the Complaint. A copy the Complaint is attached hereto as Exhibit A.

7. Plaintiffs allege that they (or their spouse) currently or previously served as firefighters. Compl. ¶¶ 8, 19–25. Mr. Pope alleges that he "is a firefighter for Walter Reed Fire

Department and the [Airports Authority FD].” *Id.* ¶ 22. The Airports Authority FD serves both Reagan and Dulles and “protects tourists and residents alike through striving to prevent incidents that compromise the safety of those working and visiting the airport campuses.” *Id.* ¶ 58.

8. Plaintiffs allege that 3M “manufactured, designed, marketed, sold, supplied, or distributed PFAS-containing turnouts to firefighting training facilities and fire departments,” including throughout Virginia. *See id.* ¶¶ 14, 18, 26.

9. Plaintiffs allege that they were exposed to PFAS in connection with their duties as firefighters and, more specifically, by wearing turnouts containing PFAS “in the usual and normal course of performing their firefighting duties and training.” *See, e.g.*, *id.* ¶¶ 15, 52–63.

10. Plaintiffs assert damages claims against 3M and the other Defendants for breach of implied warranties (*Id.* ¶¶ 126–147); breach of express warranties (*Id.* ¶¶ 148–170); negligence, gross negligence, recklessness and willful and wanton misconduct (*Id.* ¶¶ 171–189); violations of the Virginia Consumer Protection Act (*Id.* ¶¶ 190–202).

**THE PROCEDURAL REQUIREMENTS FOR REMOVAL UNDER 28 U.S.C. §§ 1442(a)(1) AND 1446 ARE MET**

11. Venue is proper in this Court pursuant to 28 U.S.C. §§ 127 and 1442(a) because the Circuit Court for the City of Virginia Beach is located within the Norfolk Division of the United States District Court for the Eastern District of Virginia.

12. 3M is not required to notify or obtain the consent of any other defendant to remove this action under § 1442(a)(1). *See, e.g.*, *Durham v. Lockheed Martin Corp.*, 445 F.3d 1247, 1253 (9th Cir. 2006); *Hilbert v. McDonnell Douglas Corp.*, 529 F. Supp. 2d 187, 195 (D. Mass. 2008).

13. Pursuant to 28 U.S.C. § 1446(a), a true and correct copy of the operative complaint is attached as Exhibit A, and true and correct copies of all other documents on file in the state-court proceedings are attached as Exhibit C.

14. Removal is timely under 28 U.S.C. § 1446(b), as 3M has not yet been served with the complaint.

15. Pursuant to 28 U.S.C. § 1446(d), 3M is serving a copy of this Notice of Removal upon all other parties to this case and is also filing a copy with the Clerk of the Circuit Court for the City of Virginia Beach, a copy of which is attached as Exhibit D.

16. By filing a Notice of Removal in this matter, 3M does not waive the rights of any Defendant to object to service of process, the sufficiency of process, and/or jurisdiction over the person, or venue, and 3M specifically reserves the rights of all Defendants to assert any defenses and/or objections to which they may be entitled.

17. 3M reserves the right to amend or supplement this Notice of Removal.

18. If any question arises as to the propriety of the removal of this action, 3M requests the opportunity to present a brief and oral argument in support of removal.

**REMOVAL IS PROPER UNDER THE FEDERAL OFFICER REMOVAL STATUTE, 28 U.S.C. § 1442(a)(1)**

19. Removal here is proper under the federal officer removal statute, 28 U.S.C. § 1442(a)(1), which provides for removal of an action relating to a defendant's acts undertaken at the direction of a federal officer. Removal is appropriate under this provision where the removing defendant establishes that: (a) it is a "person" within the meaning of the statute; (b) the plaintiff's claims are based on the defendant's conduct "acting under" the United States, its agencies, or officers; (c) the plaintiff's claims are "for or relating to" the defendant's acts under color of federal office; and (d) the defendant raises a colorable federal defense. *See Mesa v. California*, 489 U.S. 121, 124–25, 129–31, 133–35 (1989); *Papp*, 842 F.3d at 812; *Isaacson*, 517 F.3d at 135; *see also* 28 U.S.C. § 1442(a)(1) (providing for removal of cases against United States officers that are "for or relating to any act under color of such office").

20. Removal rights under the federal officer removal statute are broader than under the general removal statute. Suits against defendants acting on behalf of federal officers "may be removed despite the nonfederal cast of the complaint; the federal-question element is met if the defense depends on federal law." *Jefferson Cnty. v. Acker*, 527 U.S. 423, 431 (1999). This is because § 1442(a)(1) protects "the government's need to provide a federal forum for its officers and those who are 'acting under' a federal office." *Albrecht v. A.O. Smith Water Prods.*, 2011 WL 5109532, at *3 (S.D.N.Y. Oct. 21, 2011) (citation omitted). This important federal policy "should not be frustrated by a narrow, grudging interpretation of [§] 1442(a)(1)." *Willingham v. Morgan*, 395 U.S. 402, 407 (1969); *see Durham*, 445 F.3d at 1252. To the contrary, § 1442 as a whole must be "liberally construe[d]" in favor of removal. *Papp*, 842 F.3d at 812 (alterations in original) (internal quotation marks omitted); *accord In re Asbestos*, 770 F. Supp.2d at 741.

21. All requirements for removal under § 1442(a)(1) are satisfied where, as here, the notice of removal alleges that the plaintiff's injuries are caused at least in part by MilSpec AFFF. *See, e.g.*, *Nessel v. Chemguard, Inc.*, No. 1:20-cv-1080, 2021 WL 744683, at *3 (W.D. Mich. Jan. 6, 2021) (denying motion to remand in AFFF case against manufacturers of MilSpec AFFF); *Ayo v. 3M Co.*, No. 18-CV-0373(JS)(AYS), 2018 WL 4781145 (E.D.N.Y. Sept. 30, 2018) (same). The court overseeing the MDL has found on multiple occasions that removal under § 1442(a)(1) is proper where the notice of removal alleges that plaintiff's injuries are caused, at least in part, by MilSpec AFFF. *See In re AFFF Prods. Liab. Litig.* ("*AFFF I*"), No. 2:18-mn-2873, 2019 WL 2807266, at *2–3 (D.S.C. May 24, 2019); Order, *In re AFFF Prods. Liab. Litig.*, MDL No. 2:18-mn-2873-RMG, ECF No. 320 (D.S.C. Sept. 27, 2019) ("*AFFF II*"), at 3–5; Order, *In re AFFF Prods. Liab. Litig.*, MDL No. 2:18-mn-2873-RMG, ECF No. 325 (D.S.C. Oct. 1, 2019) ("*AFFF III*"), at 3–6.

22. The MDL Court's holdings demonstrate that this case, too, is properly removed to federal court.[1] Moreover, in entering CMO 36, the MDL Court recognized that efforts to "avoid the MDL and/or federal jurisdiction by denying, disclaiming, or omitting allegations concerning exposure to AFFF" are "contrary to law," including where a plaintiff alleges exposure from "firefighter turnout gear." CMO 36 at 1 (citing *State of Maryland v. 3M et al.*, 130 F.4th 380 (4th Cir. 2025)). The MDL Court concluded that there is "at the very least a plausible basis for alleging federal jurisdiction sufficient to satisfy its initial burden on a notice of removal" given the various potential AFFF and non-AFFF sources of PFAS and the inability of a plaintiff to isolate personal injuries caused by one or the other, which is sufficient to "substantiate federal officer removal." *See id.* at 1–2.

**A. <u>MilSpec AFFF</u>**

23. Since the late 1960s/early 1970s, the United States military has used MilSpec AFFF on military bases, airfields, and Navy ships—settings where fuel fires are inevitable and potentially devastating—to train its personnel, put out fires, save lives, and protect property. In fact, the United States Naval Research Laboratory developed AFFF—its researchers were granted the first AFFF patent in 1966.[2] Decades later, the Naval Research Laboratory described the development of AFFF as "one of the most far-reaching benefits to worldwide aviation safety."[3]

24. The design and manufacture of MilSpec AFFF are governed by rigorous military specifications created and administered by Naval Sea Systems Command, part of the Department

---

[1] Following removal, 3M intends to designate this action for transfer to the MDL.

[2] U.S. Patent No. 3,258,423 (filed Sept. 4, 1963; published June 28, 1966).

[3] U.S. Navy, NRL/MR/1001-06-8951, U.S. Naval Research Lab., *The U.S. Naval Research Laboratory (1923-2005): Fulfilling the Roosevelts' Vision for American Naval Power*, at 37 (June 30, 2006) ("*Fulfilling the Roosevelts' Vision*"), https://permanent.fdlp.gov/gpo125428/roosevelts.pdf.

of Defense ("DoD"). The applicable specification, Mil-F-24385, was first promulgated in 1969, and has been revised several times since.[4] All MilSpec AFFF products must be "qualified for listing on the applicable Qualified Products List" prior to military procurement.[5] Prior to such listing, a "manufacturer's . . . products are examined, tested, and approved to be in conformance with specification requirements."[6] The MilSpec designates Naval Sea Systems Command as the agency responsible for applying these criteria and determining whether AFFF products satisfy the MilSpec's requirements.[7] After a product is added to the Qualified Products List, "[c]riteria for retention of qualification are applied on a periodic basis to ensure continued integrity of the qualification status."[8] Naval Sea Systems Command "reserves the right to perform any of the [quality assurance] inspections set forth in the specification where such inspections are deemed necessary to ensure supplies and services conform to prescribed requirements."[9]

25. From its inception until 2019, the MilSpec for AFFF included the express requirement that MilSpec AFFF contain "fluorocarbon surfactants." All fluorocarbon surfactants are PFAS, and that category includes PFOA, PFOS, and their precursors—among the compounds expressly alleged to be at issue in the Complaint here.[10] *See, e.g.*, Compl. ¶¶ 74, 76, 115–16. The

---

[4] The 1969 MilSpec and all its revisions and amendments through April 2020 are available at https://tinyurl.com/yxwotjpg.

[5] MIL-PRF-24385F(4) § 3.1 (2020).

[6] DoD SD-6, Provisions Governing Qualification at 1 (Feb. 2014), https://tinyurl.com/y5asm5bw.

[7] *See, e.g.*, MIL-PRF-24385F(4) at 18 (2020). The cited MilSpec designates Naval Sea Systems Command as the "Preparing Activity." The "Preparing Activity" is responsible for qualification. (*See* DoD SD-6, *supra* n.6, at 3.)

[8] DoD SD-6, *supra* n.6, at 1.

[9] *See, e.g.*, MIL-PRF-24385F(4) § 4.1 (2020).

[10] *See* Mil-F-24385 § 3.2 (1969); MIL-PRF-24385F(2) § 3.2 (2017). In May 2019, the MilSpec was revised to drop the explicit requirement that the surfactants in the product be "fluorocarbon." *See* MIL-PRF-24385F(3) § 3.2 (2019). But under current technology, the only AFFF products capable of meeting the MilSpec's stringent performance requirements—and the only ones listed

current MilSpec expressly contemplates the presence of PFOA and PFOS (subject to recently imposed limits) in AFFF formulations.[11] Indeed, the current MilSpec recognizes that it is not yet technically feasible for manufacturers to completely eliminate PFOA and PFOS "while still meeting all other military specification requirements."[12]

26. 3M manufactured and sold PFAS-containing MilSpec AFFF to the U.S. military for over three decades pursuant to contracts with the United States. One or more of 3M's AFFF products were on the Navy's Qualified Products List for AFFF from 1970 until 2010 (even though 3M had phased out production of AFFF beginning in 2000).[13] Over time, the U.S. military used MilSpec AFFF manufactured by 3M throughout the United States, including in Virginia.

27. 3M also historically manufactured and sold PFAS-containing MilSpec AFFF to certain non-military users, including in Virginia. One notable example relates to so-called "Part 139" airports, i.e., certain large civilian airports. See 14 C.F.R. § 139.1 (2019). Part 139 airports historically have used MilSpec AFFF, including 3M's MilSpec AFFF products. In fact, by 2006, the U.S. government was requiring Part 139 airports to use AFFF meeting MilSpec standards.[14]

---

on the military's Qualified Product List—are those containing fluorocarbon surfactants. Thus, as a practical matter, the MilSpec still requires fluorocarbon surfactants.

[11] *See* MIL-PRF-24385F(4) § 6.6 & Tables 1, 3 (2020).

[12] MIL-PRF-24385F(4) § 6.6.

[13] *See* MIL-F-24385 QPL/QPD History for Type 3 AFFF (Oct. 24, 2014) & MIL-F-24385 QPL/QPD History for Type 6 AFFF (Oct. 24, 2014) (available at *In re AFFF Prods. Liab. Litig.*, No. 2:18-mn-02873, ECF No. 1969-24 (D.S.C.)).

[14] *See* FAA Part 139 CertAlert 06-02, Aqueous Film Forming Foam (AFFF) meeting MIL-F-24385 (Feb. 8, 2006) (available at *In re AFFF Prods. Liab. Litig.*, No. 2:18-mn-02873, ECF No. 1971-14 (D.S.C.)).

## B. <u>MilSpec AFFF Plausibly Contributed to Plaintiffs' Alleged PFAS Exposures.</u>

### *1. MilSpec AFFF Use By The Airports Authority FD Plausibly Contributed To Mr. Pope's Alleged PFAS Exposure.*

28. MilSpec AFFF use by the Airports Authority FD—a fire department responsible for two major Part 139 airports—plausibly contributed to Mr. Pope's alleged PFAS exposure. Plaintiffs' claims thus relate to or arise in part from PFAS-containing MilSpec AFFF.

29. The Airports Authority FD "was formed from the Federal Aviation Administration's Aircraft Rescue and Firefighting Branch when the Metropolitan Washington Airports Authority was established in 1987 to operate Ronald Reagan Washington National and Washington Dulles International Airports."[15] The Airports Authority FD is a "full-service department."[16]

30. Both Reagan Airport and Dulles Airport are Part 139 airports with a long history of MilSpec AFFF use.[17] 3M sales records reflect multiple sales of MilSpec AFFF products to each airport, purchased by MWAA. Accordingly, MilSpec AFFF use by the Airports Authority FD plausibly contributed to Mr. Pope's alleged PFAS exposure.

31. Because the alleged PFAS exposure at issue in this action is, at least in part, plausibly attributable and/or related to MilSpec AFFF use at Regan Airport and Dulles Airport by the Airports Authority FD, where Mr. Pope served as a firefighter, 3M is entitled to remove this case as a whole pursuant to federal officer jurisdiction. *See, e.g.*, *Bennett v. MIS Corp.*, 607 F.3d

---

[15] *MWAA Fire & EMS Department*, Metropolitan Washington Airports Authority, available at https://www.mwaa.com/policefireems/mwaa-fire-ems-department.

[16] *Id.*

[17] *See Part 139 Airports*, Bureau of Transportation Statistics, available at https://www.bts.gov/part-139-airports; *supra* n.14.

1076, 1084 n.6 (6th Cir. 2010) ("[S]ection 1442(a)(1) authorizes removal of the entire case even if only one of the controversies it raises involves a federal officer or agency.").

### *2. Each Plaintiff Was Plausibly Exposed to MilSpec AFFF.*

32. In addition to Mr. Pope's plausible exposure to MilSpec AFFF during his service with the Airports Authority FD, each plaintiff in this action was plausibly exposed to MilSpec AFFF through a variety of other means, including through regular consumption of water in many locales over his lifetime.

33. Notably, the MDL Court entered CMO 36 to address plaintiffs who "have sought to avoid the MDL and/or federal jurisdiction by denying, disclaiming, or omitting allegations concerning exposure to AFFF." CMO 36 at 1. The MDL Court, citing binding Fourth Circuit precedent, affirmed that "such efforts were contrary to law," explaining that "[t]he record in the MDL and its related discovery has demonstrated that plaintiffs cannot, at the pleading stage, easily isolate personal injuries caused by AFFF as opposed to personal injures allegedly caused by non-AFFF PFAS." *Id.* (*citing State of Maryland v. 3M Co*., 130 F.4th 380 (4th Cir. 2025)).

34. As recognized by the MDL Court in entering CMO 36, PFAS personal injury plaintiffs "may have lived in many locales over their lifetimes, consumed water daily, and, in many of the cases before this Court, allege that any type of AFFF has the potential to, and do spread through groundwater, surface water, and other media well beyond the locations where they were initially used." CMO 36 at 1. Plaintiffs here make broad allegations about the various alleged pathways of exposure to PFAS and the many products containing PFAS, including allegations about some of the same chemicals that are (or were) contained in MilSpec AFFF (PFOS and PFOA). These allegations are precisely the sort of exposures the MDL Court noted in finding that plaintiffs, at the pleading stage, could not "easily isolate personal injuries alleged caused by AFFF as opposed to personal injuries allegedly caused by non-AFFF PFAS." *Id.*

35. For example, Plaintiffs argue that "PFAS exposure to humans can occur through inhalation, ingestion and dermal contact" (Compl. ¶ 11), that "Defendants knowingly and willfully manufactured, designed, marketed, sold and distributed chemicals and/or products containing PFAS for use within the State of Virginia when they knew or reasonably should have known that the Firefighter Plaintiffs and Decedents would repeatedly inhale, ingest, and/or have dermal contact with these harmful compounds during the ordinary course of [their] profession including during firefighting training exercises and in firefighting emergencies" (*id.* ¶ 18), and that "Defendants continued to manufacture, develop, market, promote, distribute and sell PFA chemicals and PFAS-containing products, including specifically PFAS-containing turnouts" (*id.* ¶ 88). These allegations are exactly the kind of allegations that the MDL Court has suggested provide a plausible basis for federal jurisdiction.

36. Because of the inability of a plaintiff at the pleading stage to distinguish injuries allegedly caused by non-AFFF PFAS from any type of AFFF, which includes MilSpec AFFF, a "plausible basis for alleging federal jurisdiction sufficient to satisfy [a defendant's] initial burden on a notice of removal" exists where a defendant alleges potential MilSpec AFFF exposure, a theory that a federal court "must credit." *See* CMO 36 at 2 (internal quotations omitted). In other words, Plaintiffs' omission of AFFF-related allegations in this case cannot deprive 3M of its right to a federal forum, regardless of whether plaintiffs allege their exposure came from "drinking water, direct exposure to AFFF, firefighter turnout gear or other products allegedly containing PFAS, or some combination." *Id.* at 1.

### C. <u>All the Requirements of 28 U.S.C. § 1442(a)(1) Are Satisfied.</u>

#### *1. The "Person" Requirement Is Satisfied.*

37. The first requirement for removal under the federal officer removal statute is satisfied here because 3M (a corporation) meets the definition of "person" under the statute. For

purposes of § 1442(a)(1), the term "person" includes "corporations." *Papp*, 842 F.3d at 812 (quoting 1 U.S.C. § 1); *Johnson v. Sunoco, Inc. (R&M)*, 2017 WL 783773, at *3 (E.D. Pa. Feb. 28, 2017) (same).

***2. The "Acting Under" Requirement Is Satisfied.***

38. The second requirement ("acting under" a federal officer) is satisfied when an entity assists, or helps carry out, the duties or tasks of a federal officer. *Papp*, 842 F.3d at 812. "The words 'acting under' are to be interpreted broadly . . . ." *Isaacson*, 517 F.3d at 136 (citation omitted). Federal courts "have explicitly rejected the notion that a defendant could only be 'acting under' a federal officer if the complained of conduct was done at the specific behest of the federal officer or agency." *Papp*, 842 F.3d at 813. "[C]ourts have unhesitatingly treated the 'acting under' requirement as satisfied where a contractor seeks to remove a case involving injuries arising from equipment that it *manufactured for the government*." *Sawyer v. Foster Wheeler LLC*, 860 F.3d 249, 255 (4th Cir. 2017); *accord Johnson*, 2017 WL 783773, at *3 ("Where . . . 'the federal government uses a private corporation to achieve an end it would otherwise use its own ends to complete,' the corporation is deemed to be acting under the authority of the federal officer.") (quoting *Papp*, 842 F.3d at 812).

39. The requirement of "acting under" a federal officer is met here because the alleged PFAS exposure that is the focus of Plaintiff's claims plausibly stems in part from MilSpec AFFF, a vital product provided by 3M that otherwise "the Government would have had to produce itself." *Isaacson*, 517 F.3d at 137. MilSpec AFFF is a mission-critical military and aviation safety product that, without the support of private contractors, the government would have to produce for itself. *See Ayo*, 2018 WL 4781145, at *9 (describing MilSpec AFFF as a "mission-critical" and "life-saving product" used by all branches of the U.S. armed forces and NATO members) (internal quotation marks omitted). The Naval Research Laboratory stated that, "[a]lthough [it] was

responsible for the original concepts and formulations, it was necessary to elicit the aid of the chemical industry to synthesize the fluorinated intermediates and agents to achieve improvements in formulations."[18] Accordingly, the military has long depended on outside contractors like 3M to develop and supply AFFF. If 3M and other manufacturers did not provide MilSpec AFFF, the government would have to manufacture and supply the product itself.

40. In designing and manufacturing the MilSpec AFFF at issue, 3M acted under the direction and control of one or more federal officers. Specifically, 3M acted in accordance with detailed specifications, promulgated by Naval Sea Systems Command, that govern AFFF formulation, performance, testing, storage, inspection, packaging, and labeling. Further, the AFFF products in question were subject to various tests by the U.S. Navy before and after being approved for use by the military and for inclusion on the Qualified Products List maintained by the DoD.[19] 3M has satisfied the "acting under" requirement. *See Nessel*, 2021 WL 744683, at *3 (holding that AFFF manufacturers were "acting under" a federal officer in connection with the manufacture and sale of MilSpec AFFF); *Ayo*, 2018 WL 4781145, at *8–9 (same); *AFFF I*, 2019 WL 2807266, at *2 (finding that the "acting under" requirement was satisfied because defendant demonstrated that it was manufacturing AFFF under the guidance of the U.S. military); *AFFF II*, at 3–5 (holding likewise in case involving MilSpec AFFF used at Part 139 airport); *AFFF III*, at 3–6 (same).

***3. The "Under Color of Federal Office" Requirement Is Satisfied.***

41. The third requirement, that the defendant's actions were taken "under color of federal office," requires a "nexus" between a plaintiff's claims and the defendant's acts undertaken at the direction of a federal officer. As with the "acting under" requirement, "[t]he hurdle erected

[18] Fulfilling the Roosevelts' Vision, *supra* n.3, at 37.

[19] *See* DoD SD-6, *supra* n.6, at 1.

by this requirement is quite low." *Isaacson*, 517 F.3d at 137. It is sufficient for a defendant to establish a connection or association between the lawsuit and the federal office. *See Sawyer*, 860 F.3d at 258 (explaining that 28 U.S.C. § 1442 permits removal of actions "for *or relating to* any act under color of [federal] office"); *Isaacson*, 517 F.3d at 137–38 (explaining that it is sufficient if the act that allegedly caused or contributed to the plaintiff's injuries occurred while the defendant was performing its official duties); *Johsnson*, 2017 WL 783773, at *5 (explaining that under Third Circuit precedent, "'in order to meet the for or relating to requirement, it is sufficient for there to be a connection or association between the act in question and the federal office.'") (quoting *Papp*, 842 F.3d at 813); *see also Albritton*, 2023 WL 2447422, at *5 ("Congress revised the Officer Removal Statute in 2011 to 'broaden the universe of acts that enable Federal officers to remove [suits] to Federal Court,'" and accordingly it is "'sufficient for there to be a "connection" or "association" between the act in question and the federal office'") (quoting *Papp*, 842 F.3d at 813).[20]

42. Here, Plaintiff's claims against 3M arise at least in part from alleged PFAS exposure attributable to MilSpec AFFF. The military specifications have expressly or implicitly required the use of PFAS in the product. As a result, Plaintiff's claims against 3M are connected to its acts taken under color of federal office. *See Ayo*, 2018 WL 4781145, at *9 ("[T]here is evidence of a 'casual connection' between the use of PFCs [perfluorinated compounds, *i.e.* PFAS] in AFFF and the design and manufacture of AFFF for the government."); *AFFF I*, 2019 WL 2807266, at *3 (element satisfied where "[Plaintiff]'s claims arise out of use of AFFF products . . . for which the U.S. military imposes MilSpec standards."); *AFFF II*, at 5 (element satisfied where AFFF

---

[20] The "acting under" and "under color of" prongs overlap. Both "are satisfied if the actions subject to suit resulted directly from government specifications or direction." *Albrecht*, 2011 WL 5109532, at *5.

products, "for which the military imposes MilSpec standards," were the alleged cause of plaintiff's injuries); *AFFF III*, at 5–6 (same).

43. It is immaterial that Plaintiffs do not specifically assert exposure from AFFF. Courts "credit Defendants' theory of the case when determining whether [the] causal connection exists." *Isaacson*, 517 F.3d at 137; *see also Maryland v. 3M Co.*, 130 F.4th 380, 389 (4th Cir. 2025); *Puerto Rico v. Express Scripts, Inc.*, 119 F.4th 174, 192 (1st Cir. 2024); *Nessel*, 2021 WL 744683, at *3 (noting that "Plaintiffs cannot decide what defense Defendants might present"); *In Re Asbestos*, 770 F. Supp. 2d at 743 (finding removal proper and rejecting the plaintiff's disclaimer because recognizing it "would deprive the federal officer of the right to have the adequacy of the threshold determination, whether there is federal subject matter jurisdiction under the federal officer removal statute, made by a federal court"). As averred in this Notice of Removal, the alleged injuries arise at least in part from alleged exposure to MilSpec AFFF. Accordingly, Plaintiff's claims are "for or relating to" 3M's actions under color of federal office (28 U.S.C. § 1442(a)(1)), and 3M is entitled to remove this case as a whole pursuant to § 1442(a)(1). *See, e.g.*, *Bennett.*, 607 F.3d at 1084 n.6 ("[S]ection 1442(a)(1) authorizes removal of the entire case even if only one of the controversies it raises involves a federal officer or agency.").

***4. The "Colorable Federal Defense" Requirement Is Satisfied.***

44. The fourth requirement ("colorable federal defense") is satisfied by 3M's assertion of the government contractor defense.

45. At the removal stage, a defendant need only show that its government contractor defense is colorable; that is, "that the defense was 'legitimate and [could] reasonably be asserted, given the facts presented and the current law.'" *Papp*, 842 F.3d at 815 (alteration in original) (citation omitted); *see also In Re Asbestos*, 770 F. Supp. 2d at 742 (defendant had a colorable

federal defense where plaintiffs injuries stemmed directly from exposure to asbestos "on U.S. Naval Ships at U.S. Naval shipyards"); *Albritton*, 2023 WL 2447422, at *7–8 (defendant had "raised a colorable government contractor defense" because defendant "pointed to government contracts and specifications for chemicals alleged" in the complaint). "A defendant 'need not win his case before he can have it removed.'" *Papp*, 842 F.3d at 815 (quoting *Willingham*, 395 U.S. at 407); *see also Isaacson*, 517 F.3d at 139 ("To be 'colorable,' the defense need not be 'clearly sustainable,' as the purpose of the statute is to secure that the validity of the defense will be tried in federal court.") (citation omitted). At the removal stage, the inquiry "is purely jurisdictional, and neither the parties nor the district courts should be required to engage in fact-intensive motion practice, pre-discovery, to determine the threshold jurisdictional issue." *Cuomo v. Crane Co.*, 771 F.3d 113, 116 (2d Cir. 2014); *see also Kraus v. Alcatel-Lucent*, No. 18-2119, 2018 WL 3585088, at *2 (E.D. Pa. July 25, 2018) ("A court does not 'determine credibility, weigh the quantum of evidence or discredit the source of the defense' at this stage. Instead, [the court] only determine[s] whether there are sufficient facts alleged to raise a colorable defense.") (internal citation omitted). Moreover, "this inquiry is undertaken whilst viewing the facts in the light most favorable to Defendants." *Hagen v. Benjamin Foster Co.*, 739 F. Supp. 2d 770, 783–84 (E.D. Pa. 2010). "Precisely in those cases where a plaintiff challenges the factual sufficiency of the defendant's defense, the defendant should 'have the opportunity to present [his] version of the facts to a federal, not a state, court.'" *Cuomo*, 771 F.3d at 116 (alteration in original) (citation omitted).

46. Under the government contractor defense, the defendant is not liable for the design, manufacture, or warnings of equipment or supplies "when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known

to the supplier but not to the United States." *Boyle*, 487 U.S. at 512. 3M has satisfied these elements for purposes of removal.

47. The requirement of "reasonably precise specifications" can be met by evidence showing either (a) that the government's participation in the design of the product "amount[ed] to more than a rubber stamping," or (b) that the government continued to purchase or use a product after the government became aware that the product contained the alleged defect. *Ramey v. Martin-Baker Aircraft Co. Ltd.*, 874 F.2d 946, 950 (4th Cir. 1989). Naval Sea Systems Command participated in the design of MilSpec AFFF, and its role was not merely "rubber stamping." It created (and has updated) detailed specifications governing the product's formulation, performance, testing, storage, inspection, packaging, and labeling.[21] Those specifications are "reasonably precise," including in requiring the use of PFAS.[22] In addition, in the past and continuing to the present, the DoD has purchased and used MilSpec AFFF with awareness of the product's PFAS content and of the alleged risks associated with PFAS in the product. *See Ayo*, 2018 WL 4781145, at *12 ("That the DoD knows of the alleged risks of PFC-based AFFF products but continues to purchase them supports the position that the government approved reasonably precise specifications for the claimed defective design.").

48. With respect to the second requirement, 3M's products have appeared on the DoD Qualified Products List,[23] which could have happened only if Naval Sea Systems Command first

[21] *See* Mil-F-24385 (1969) and subsequent revisions and amendments, cited in note 4, *supra*.

[22] As noted earlier, until 2019 the specification expressly required that MilSpec AFFF contain "fluorocarbon surfactants," all of which are members of the PFAS family. Even since that express requirement was removed from the specification, the use of PFAS has been implicitly mandated because PFAS-containing surfactants are the only kind that allow AFFF to meet the performance requirements of the specification.

[23] *See* QPL/QPD Histories, *supra* n.13.

determined that they conformed to the MilSpec. *See Ayo*, 2018 WL 4781145, at *13 ("There is also colorable evidence . . . that Manufacturing Defendants' AFFF products conformed to the government's reasonably precise specifications."); *AFFF I*, 2019 WL 2807266, at *3 (finding that defendant demonstrated a colorable defense "where it contends that its AFFF products were manufactured according to the U.S. military's MilSpec specifications").

49. Regarding the third requirement, the U.S. government was sufficiently informed regarding alleged product-related "dangers," *Boyle*, 487 U.S. at 512, to exercise its discretionary authority in specifying and procuring MilSpec AFFF. The military specifications have long included testing protocols and requirements for toxicity, chemical oxygen, and biological demand. Indeed, it is clear that the United States has long understood that AFFF contains PFAS and may contain or break down into PFOS and/or PFOA; that AFFF constituents can migrate through the soil and potentially reach groundwater; and that it has been reported that this may raise environmental or human health issues.[24] For example, as early as October 1980, a report supported by the U.S. Navy Civil Engineering Laboratory, U.S. Air Force Engineering Service Center, and the U.S. Army Medical Research and Development Command stated that AFFF contained fluorocarbons and that "[a]ll of the constituents resulting from firefighting exercises are considered to have adverse effects environmentally."[25] In June 1991, the Air Force stated that past Air Force fire training activities resulted in "adverse environmental impact," including "soil contamination"

---

[24] *See, e.g.*, EPA, *Revised Draft Hazard Assessment of Perfluorooctanoic Acid and Its Salts* 1-6 (Nov. 4, 2002).

[25] *See* Edward S. K. Chian et al., *Membrane Treatment of Aqueous Film Forming Foam (AFFF) Wastes for Recovery of Its Active Ingredients* 1 (Oct. 1980), https://apps.dtic.mil/dtic/tr/fulltext/u2/a136612.pdf.

and the "potential" for "groundwater contamination."[26] By no later than 2001, DoD was aware of data purportedly showing PFAS compounds in MilSpec AFFF to be "toxic" and "persistent."[27] In 2002, the United States Environmental Protection Agency issued a draft hazard assessment for PFOA, which reviewed in detail, among other data, human epidemiological studies and animal toxicology studies pertaining to alleged associations between PFOA and cancer.[28] More recently, in a November 2017 report to Congress, the DoD acknowledged the concerns raised by the EPA regarding PFOS and PFOA. Nonetheless, it still described AFFF containing PFOS or PFOA as a "mission critical product [that] saves lives and protects assets by quickly extinguishing petroleum-based fires."[29] Indeed, Naval Sea Systems Command continues to require that MilSpec AFFF contain "surfactants,"[30] and recognizes that PFAS, including PFOS and PFOA, will be present (subject to recently imposed limits for PFOS and PFOA) in AFFF formulations.[31] *See Ayo*, 2018 WL 4781145, at *12 ("That the DoD knows of the alleged risks of PFC-based AFFF products but continues to purchase them supports the position that the government approved reasonably precise specifications for the claimed defective design."); *AFFF I*, 2019 WL 2807266, at *3 ("As to whether [defendant] adequately informed the U.S. military of dangers associated with its AFFF products of which the military was not already aware, [defendant] points to materials such as a

[26] USAF, Engineering Technical Letter ETL 91-4: Site Selection Criteria for Fire Protection Training Areas 2 (June 14, 1991).

[27] EPA Presentation on Activities/Issues on Fluorosurfactants, March 16, 2001 (available at *In re AFFF Prods. Liab. Litig.*, No. 2:18-mn-02873 (D.S.C.), ECF No. 1971-2).

[28] *See* EPA, Revised Draft Hazard Assessment, *supra* n.24.

[29] DoD, *Aqueous Film Forming Foam Report to Congress* 1-2 (Oct. 2017) (pub. Nov. 3, 2017), https://tinyurl.com/wshcww4.

[30] MIL-PRF-24385F(4) § 3.2 (2020).

[31] MIL-PRF-24385F(4) § 6.6 & Tables I, III; *see also* David Vergun, *DOD Officials Discuss Fire-Fighting Foam Replacement, Remediation Efforts* (Sept. 16, 2020), https://tinyurl.com/ty5ku8hp.

November 2017 Department of Defense report to Congress, in which the agency acknowledged the [EPA]'s stated concerns with PFOS/PFOA in drinking water . . . .").

50. At minimum, these facts constitute colorable evidence that Naval Sea Systems Command "made a discretionary determination" regarding the formulation of MilSpec AFFF after weighing the fire-suppression benefits against the alleged risks. *See In re "Agent Orange" Prod. Liab. Litig.*, 517 F.3d 76, 90 (2d Cir. 2008); *see also Albrecht*, 2011 WL 5109532, at *5 ("A defendant is not required to warn the government where 'the government knew as much or more than the defendant contractor about the hazards of the product.'") (citation omitted). Where, as here, the government has exercised "discretionary authority over areas of significant federal interest such as military procurement," the government contractor defense applies. *In re "Agent Orange" Prod. Liab. Litig.*, 517 F.3d at 89-90; *see also Ayo*, 2018 WL 4781145, at *13.

51. 3M's use of PFAS in MilSpec AFFF was required by military specifications. By seeking to impose tort liability on 3M for alleged injuries that were caused in whole or in part by 3M's compliance with military specifications, Plaintiffs are attempting to use state tort law to attack design choices dictated by the military. The government contractor defense precludes such an attack. *See Boyle*, 487 U.S. at 509.

52. In the MDL, the MDL court has found based on an extensive factual record that the government contractor defense asserted by 3M and other MilSpec AFFF manufacturers presents genuine issues of fact for trial. *See In re AFFF Prods. Liab. Litig.*, 2:18-mn-02873, 2022 WL 4291357, at *12, 15 (D.S.C. Sept. 16, 2022). A defense that presents triable issues is "colorable."

WHEREFORE, Defendant 3M hereby removes this action from Circuit Court for the City of Virginia Beach to the United States District Court for the Eastern District of Virginia, Norfolk Division.

DATED: September 26, 2025

DEFENDANT 3M COMPANY

___/s/ Matthew J. Hundley__________
Matthew J. Hundley (VSB No. 76865)
Diana M. Miller (VSB No. 82430)
BUTLER SNOW LLP
919 E. Main Street, Suite 600
Richmond, Virginia 23219
Tel. 804.762.6030
Fax. 804.762.6031
Matthew.Hundley@butlersnow.com
Diana.Miller@butlersnow.com

*Counsel for Defendant 3M Company*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 26, 2025, I filed the foregoing with the Clerk of the Court by the CM/ECF system, and I also caused a true and correct copy of the foregoing to be served on counsel of record for the following parties by electronic mail and/or first class mail as follows:

Kevin Biniazan
Jeffrey A. Breit
Lauren A. Martin
Alexis Bale
Breit Biniazan, PC
Towne Pavilion Center II
600 22nd Street, Suite 402

Virginia Beach, VA 23451
(757) 622-6000 (Telephone)
(757) 299-8028 (Fax)
kevin@bbtrial.com
jeffrey@bbtrial.com
lmartin@bbtrial.com
abale@bbtrial.com
*Counsel for Plaintiff*

John R. Owen
Julie S. Palmer
John P. Dunnigan
Imani E. Sowell
Yevgeniy K. Klinovskiy
HARMAN, CLAYTOR, CORRIGAN &
WELLMAN
P.O. Box 70280
Richmond, Virginia 23255
Tel.: (804) 747-5200
Fax: (804) 747-6085
jowen@hccw.com
jpalmer@hccw.com
jdunnigan@hccw.com
isowell@hccw.com
yklinovskiy@hccw.com
*Counsel for Defendants Blue Ridge Rescue Suppliers, Inc. and Bradsden Solutions, Inc.*

/s/ Matthew J. Hundley
Matthew J. Hundley (VSB No. 76865)
Diana M. Miller (VSB No. 82430)
BUTLER SNOW LLP
919 E. Main Street, Suite 600
Richmond, Virginia 23219
Tel. 804.762.6030
Fax. 804.762.6031
Matthew.Hundley@butlersnow.com
Diana.Miller@butlersnow.com

*Counsel for Defendant 3M Company*

# EXHIBIT A

**VIRGINIA:**

**IN THE CIRCUIT COURT FOR THE CITY OF VIRGINIA BEACH**

**ADEN W. SCOTT, III;**
**MARK C. DAVIS;**
**EDWARD A. LANE;**
**JEREMY M. POPE;**
**CASEY BARDEN;**
**JOHN HUDNALL; and**
**AMY L. HUTCHESON, Executrix of the Estate of**
**JAMES S. HUTCHESON, deceased,**
**Plaintiffs,**

**Civil Action No.** CL25-1999
**TRIAL BY JURY DEMANDED**

**v.**

**3M COMPANY f/k/a**
**MINNESOTA MINING AND MANUFACTURING COMPANY;**
**AGC CHEMICALS AMERICAS, INC.;**
**ARCHROMA U.S., INC.;**
**ARKEMA, INC.;**
**BLUE RIDGE RESCUE SUPPLIERS, INC.;**
**Serve: Blue Ridge Rescue Suppliers, Inc.**
**1060 Butler Branch Rd.**
**South Prince George, VA 23805-8115**

**Serve: J Lee E Osborne, RA**
**Woods Rogers**
**10 South Jefferson St. Suite 1400**
**Roanoke, VA 24011**

FILED
CLERK'S OFFICE
VA BEACH CIRCUIT COURT

APR 15 2025

TINA E. SINNEN, CLERK
BY: [signature] D.C.

**BRADSDEN SOLUTIONS, INC.;**
**Serve: Bradsden Solutions, Inc.**
**1060 Butler Branch Rd.**
**South Prince George, VA 23805-8115**

**Serve: J Lee E Osborne, RA**
**Woods Rogers**
**10 South Jefferson St. Suite 1400**
**Roanoke, VA 24011**

**DAIKIN AMERICA, INC.;**
**E.I. DU PONT DE NEMOURS AND**
**COMPANY., a/k/a EDIP, Inc.;**
**GLOBE MANUFACTURING COMPANY LLC;**
**HONEYWELL INTERNATIONAL, INC.;**

**HONEYWELL SAFETY PRODUCTS USA, INC.;**
**LION GROUP, INC.;**
**MALLORY SAFETY AND SUPPLY, LLC;**
**MSA SAFETY SALES, LLC;**
**MSA SAFETY INC.;**
**MUNICIPAL EMERGENCY SERVICES INC.;**
**PBI PERFORMANCE PRODUCTS, INC.;**
**STEDFAST USA, INC.;**
**TENCATE PROTECTIVE FABRICS USA d/b/a**
**SOUTHERN MILLS INC.;**
**THE CHEMOURS COMPANY LLC; and**
**W.L. GORE & ASSOCIATES, INC.;**

**Defendants.**

## COMPLAINT

COME NOW Plaintiffs, Aden W. Scott III, Mark C. Davis, Edward A. Lane, Jeremy M. Pope, Casey Barden, John Hudnall, and Amy L. Hutcheson, Executrix of the Estate of James S. Hutcheson, deceased, who move this Honorable Court for judgment against Defendants 3M COMPANY (f/k/a MINNESOTA MINING AND MANUFACTURING COMPANY); AGC CHEMICALS AMERICAS, INC.; ARCHROMA U.S., INC.; ARKEMA, INC.; BLUE RIDGE RESCUE SUPPLIERS, INC.; BRADSDEN SOLUTIONS, INC.; DAIKIN AMERICA, INC.; E.I. DU PONT DE NEMOURS AND COMPANY, a/k/a EIDP, Inc.; GLOBE MANUFACTURING COMPANY LLC; HONEYWELL INTERNATIONAL, INC.; HONEYWELL SAFETY PRODUCTS USA, INC.; LION GROUP, INC.; MALLORY SAFETY AND SUPPLY, LLC; MSA SAFETY SALES, LLC; MSA SAFETY INC.; MUNICIPAL EMERGENCY SERVICES INC.; PBI PERFORMANCE PRODUCTS, INC.; STEDFAST USA, INC.; TENCATE PROTECTIVE FABRICS USA (d/b/a SOUTHERN MILLS INC.); THE CHEMOURS COMPANY LLC; and W.L. GORE & ASSOCIATES, INC., jointly and severally, for compensatory damages, punitive damages, costs of this action, and pre-judgment interest and post-

judgment interest together with actual damages, treble damages, and attorney's fees pursuant to the Virginia Consumer Protection Act on the grounds set forth below:

1. This action is filed pursuant to The Multiple Claimant Litigation Act, Va. Code § 8.01-267.1, *et seq.*

2. Plaintiffs total seven individuals joined herein as Plaintiffs in a single action.

3. Plaintiffs' claims involve common issues of law and fact and arise out of the same series of transactions or occurrences, and their claims are properly joined in accordance with Va. Code § 8.01-267.1, *et seq.* The common questions of law or fact predominate and are significant to the actions.

4. Joinder of all Plaintiffs' claims against Defendants herein (i) promotes the ends of justice and the just and efficient conduct and disposition of the actions; (ii) is consistent with each party's right to due process of law; and (iii) does not prejudice any individual party's right to a fair and impartial resolution of each solution.

5. Joinder of all Plaintiffs' claims against Defendants herein will be more convenient for the parties, witnesses, and counsel than individual separate actions.

6. All of the Plaintiffs' claims are at the initial stage of litigation, and joinder of their claims more efficiently utilizes judicial facilities and personnel and the Court's calendar, and avoids inconsistent rulings, orders and judgements.

7. Joinder of all the Plaintiffs' claims against Defendants make prompt settlement of actions more likely and will not result in prejudice or confusion.

**BACKGROUND**

8. The Plaintiffs are current and retired firefighters who have served various cities and municipalities in Virginia, and one spouse of a deceased firefighter. The current and retired firefighters will be referenced to collectively throughout this Complaint as "Firefighter Plaintiffs and Decedents."

9. Plaintiffs brings this action for harms, pursuant to Virginia Code § 8.01-50 *et seq.*, resulting from exposure to per- and polyfluoroalkyl substances ("PFAS") that were manufactured, designed, sold, supplied, distributed and/or contained in protective clothing specifically designed for firefighters ("turnouts") manufactured, designed, sold supplied and/or distributed by each of the Defendants, individually or through their predecessors or subsidiaries.

10. PFAS are human-made chemicals consisting of a chain of carbon and fluorine atoms used in manufactured products to, *inter alia*, resist and repel oil, stains, heat and water. PFAs include "long-chain" PFAS made up of seven or more carbon atoms ("long-chain PFAS") as well as "short-chain" PFAS made up of six or fewer carbon atoms ("short-chain PFAS").

11. PFAS are known as "forever chemicals" because they are immune to degradation, bioaccumulate in individual organisms and humans, and increase in concentration up the food chain. PFAS exposure to humans can occur through inhalation, ingestion and dermal contact.

12. PFAS have been associated with multiple and serious adverse health effects in humans including cancer, tumors, liver damage, immune system and endocrine disorders, high cholesterol, thyroid disease, ulcerative colitis, birth defects, decreased fertility, and pregnancy-induced hypertension. PFAS has also been found to concentrate in human blood, bones, and organs.

13. Unbeknownst to the Firefighter Plaintiffs and Decedents, Defendants have manufactured, marketed, distributed, sold, or used PFAS and PFAS-containing materials in protective clothing specifically designed for firefighters ("turnouts").

14. For decades, Defendants were aware of the toxic nature of PFAS and the harmful impact these substances have on human health. Yet, Defendants manufactured, designed, marketed, sold, supplied, or distributed PFAS-containing turnouts to firefighting training facilities and fire departments, including in the counties of Arlington, Henrico, and Accomack, and in the cities of Portsmouth, Norfolk, Hampton, and Virginia Beach. Defendants did so, moreover, without ever informing firefighters or the public that turnouts contained PFAS, and without warning firefighters or the public of the substantial and serious health injuries that can result from exposure to PFAS or PFAS-containing materials.

15. The Firefighter Plaintiffs and Decedents wore turnouts in the usual and normal course of performing their firefighting duties and training and were repeatedly exposed to PFAS in their turnouts. The Firefighter Plaintiffs and Decedents did not know and, in the exercise of reasonable diligence, could not have known that these turnouts contained PFAS or PFAS-containing materials. The Firefighter Plaintiffs and Decedents also did not know that PFAS were in their body and blood.

16. At all relevant times and continuing to the present, Defendants have represented that their turnouts are safe.

17. The Firefighter Plaintiffs and Decedents used the turnouts as they were intended and in a foreseeable manner which exposed them to PFAS in the course of their firefighting activities. This repeated and extensive exposure to PFAS resulted in the Firefighter Plaintiffs and Decedents developing various forms of cancer.

18. Defendants knowingly and willfully manufactured, designed, marketed, sold, and distributed chemicals and/or products containing PFAS for use within the State of Virginia when they knew or reasonably should have known that the Firefighter Plaintiffs and Decedents would repeatedly inhale, ingest, and/or have dermal contact with these harmful compounds during the ordinary course of his profession, including during firefighting training exercises and in firefighting emergencies, and that such exposure would threaten the health and welfare of firefighters exposed to these dangerous and hazardous chemicals.

## PARTIES

### *Plaintiffs*

19. Plaintiff Aden W. Scott III is an adult resident of the Commonwealth of Virginia. Plaintiff Scott worked as a full-time firefighter serving the City of Virginia Beach for over 14 years. As a result of exposure to PFAS contained in his turnouts, Plaintiff Scott was diagnosed with Non-Hodgkin's Lymphoma.

20. Plaintiff Mark C. Davis is an adult resident of the Commonwealth of Virginia. Plaintiff Davis has served as a Virginian firefighter for over 24 years, beginning with the Norfolk Fire Department in 2000, before transitioning to fire departments in Accomack County. As a result of his exposure to PFAS contained in his turnouts, including in Globe branded turnouts, Plaintiff was diagnosed with High-Grade Ureteral Carcinoma.

21. Plaintiff Edward A. Lane is an adult resident of the Commonwealth of Virginia. Plaintiff Lane has served as a firefighter for the City of Virginia Beach since 2011. Prior to serving in Virginia Beach, Plaintiff Lane volunteered as a firefighter in Moyock, North Carolina. As a result of his exposure to PFAS contained in his turnouts, including in Morning Pride branded turnouts, Plaintiff was diagnosed with medullary thyroid cancer.

22. Plaintiff Jeremy M. Pope is an adult resident of the Commonwealth of Virginia. He is a firefighter for Walter Reed Fire Department and the Metro-Washington Airport Authority Fire and EMS Department ("Airport Authority"). As a result of his exposure to PFAS contained in his turnouts, including in Morning Pride and Globe branded turnouts, Plaintiff Pope was diagnosed with colon cancer.

23. Plaintiff Casey Barden is an adult resident of the Commonwealth of Virginia. He has worked as a firefighter for the Henrico County Division of Fire for almost seventeen years. Plaintiff Moretz began serving in a volunteer role in Hanover County in or around 2007, before transitioning to the role full time in Henrico County in 2008. As a result of his exposure to PFAS contained in his turnouts, including in Morning Pride branded turnouts, Plaintiff was diagnosed with seminoma of testis (testicular cancer).

24. Plaintiff John Hudnall is an adult resident of the Commonwealth of Virginia. He has worked with the Henrico County Division of Fire. As a result of his exposure to PFAS contained in his turnouts, Plaintiff was diagnosed with thyroid cancer.

25. Plaintiff Amy L. Hutcheson, Executrix of the Estate of James S. Hutcheson, deceased, is an adult resident of the Commonwealth of Virginia. She is the widowed spouse of Decedent Hutcheson, and the Clerk of the Gloucester County Circuit Court qualified her as Executrix of Decedent Hutcheson's estate. Decedent Hutcheson worked as a firefighter serving the City of Hampton for over 25 years. Prior to working as a professional, career firefighter, Decedent Hutcheson also served as a volunteer for Gloucester County. As a result of exposure to PFAS contained in his turnouts, Decedent Hutcheson developed and later died from B-Cell Lymphoma in his brain at age 53 on May 2, 2023. Decedent Hutcheson is survived by his wife and stepson.

***Defendants***

26. Defendant 3M Company (a/k/a Minnesota Mining and Manufacturing Company) ("3M") is a Delaware corporation that does business throughout the United States, including conducting business in Virginia. 3M has its principal place of business in St. Paul, Minnesota. 3M developed, manufactured, marketed, distributed, released, sold and/or used PFAS, PFAS materials, and products containing PFAS in turnouts, including in Virginia and in the counties of Arlington, Henrico, and Accomack, and in the cities of Portsmouth, Norfolk, Hampton, and Virginia Beach.

27. Defendant AGC Chemicals Americas, Inc. ("AGC") is a Delaware corporation that does business throughout the United States, including conducting business in Virginia by and through its introduction of its products and goods into the stream of commerce which it knew or had reason to know would enter, be sold, used, and consumed throughout the Commonwealth of Virginia. AGC has its principal place of business in Exton, Pennsylvania. AGC developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts, including in Virginia and in the counties of Arlington, Henrico, and Accomack, and in the cities of Portsmouth, Norfolk, Hampton, and Virginia Beach.

28. Defendant Archroma U.S., Inc. ("Archroma") is a North Carolina corporation that does business throughout the United States, including conducting business in Virginia. Archroma has its principal place of business in Charlotte, North Carolina. Archroma developed, manufactured, marketed, distributed, released, sold and/or used PFAS, PFAS materials, and products containing PFAS in turnouts, including in Virginia and in the counties of Arlington, Henrico, and Accomack, and in the cities of Portsmouth, Norfolk, Hampton, and Virginia Beach.

29. Defendant Arkema, Inc. ("Arkema") is a Pennsylvania corporation that does business throughout the United States, including conducting business in Virginia. Arkema has its principal place of business in King of Prussia, Pennsylvania. Arkema developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts, including in Virginia and in the counties of Arlington, Henrico, and Accomack, and in the cities of Portsmouth, Norfolk, Hampton, and Virginia Beach.

30. Defendant Blue Ridge Rescue Suppliers, Inc. ("Blue Ridge") is or was a Virginia stock corporation doing business throughout the Commonwealth of Virginia by and through its sale and distribution of turnouts containing PFAS to the fire departments in the counties of Arlington, Henrico, and Accomack, and in the cities of Portsmouth, Norfolk, Hampton, and Virginia Beach, including Firefighter Plaintiffs and Decedents.

31. Defendant Bradsden Solutions, Inc. ("Bradsden"), is believed to be the acquiring company or the same corporate entity under a newly registered name as Blue Ridge Rescue Suppliers, Inc. Bradsden Solutions, Inc. is a Virginia stock corporation that did business throughout the Commonwealth of Virginia by and through its sale and distribution of turnouts containing PFAS to the fire departments in the counties of Arlington, Henrico, and Accomack, and in the cities of Portsmouth, Norfolk, Hampton, and Virginia Beach, including Firefighter Plaintiffs and Decedents.

32. Defendant Daikin America, Inc. ("Daikin America") is a Delaware corporation that does business throughout the United States, including conducting business in Virginia. Daikin America has its principal place of business in Orangeburg, New York. Daikin America developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and

products containing PFAS in turnouts, including in Virginia and in the counties of Arlington, Henrico, and Accomack, and in the cities of Portsmouth, Norfolk, Hampton, and Virginia Beach.

33. Defendant E.I. du Pont de Nemours & Co., also known as EIDP, Inc. ("DuPont"), is a Delaware corporation that does business throughout the United States, including conducting business in Virginia. DuPont has its principal place of business in Wilmington, Delaware. DuPont developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts, including in Virginia and in the counties of Arlington, Henrico, and Accomack, and in the cities of Portsmouth, Norfolk, Hampton, and Virginia Beach.

34. Defendant Globe Manufacturing Company, LLC ("Globe") is a New Hampshire corporation that does business throughout the United States, including conducting business in Virginia. Globe has its principal place of business in Pittsfield, New Hampshire. Globe developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts, including in the counties of Arlington, Henrico, and Accomack, and in the cities of Portsmouth, Norfolk, Hampton, and Virginia Beach. Defendant MSA Safety Inc. (formerly known as "Mine Safety Appliances Company") acquired Globe Holding Company, LLC and its subsidiaries (collectively, "MSA/Globe") in 2017 and continues to do business under the Globe name.

35. Defendant Honeywell International, Inc. ("Honeywell International") is a Delaware corporation that does business throughout the United States, including conducting business in Virginia. Honeywell Int'l has its principal place of business in Charlotte, North Carolina. Honeywell International developed manufactured, marketed, distributed, released, sold and/or used PFAS, PFAS materials, and products containing PFAS in turnouts, including its Morning

Pride branded turnouts, to fire departments around Virginia, including in the counties of Arlington, Henrico, and Accomack, and in the cities of Portsmouth, Norfolk, Hampton, and Virginia Beach.

36. Defendant Honeywell Safety Products USA, Inc. ("Honeywell") is a Delaware corporation that does business throughout the United States, including conducting business in Virginia. Honeywell has its principal place of business in Charlotte, North Carolina. Honeywell developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts, including its Morning Pride branded turnouts, to fire departments around Virginia, including in the counties of Arlington, Henrico, and Accomack, and in the cities of Portsmouth, Norfolk, Hampton, and Virginia Beach.

37. Defendant Lion Group, Inc., ("Lion") is an Ohio corporation that does business throughout the United States, including conducting business in Virginia by and through its introduction of its products and goods into the stream of commerce which it knew or had reason to know would enter, be sold, used, and consumed throughout the Commonwealth of Virginia. Lion has its principal place of business in Dayton, Ohio. Lion developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts, including in Virginia and in the counties of Arlington, Henrico, and Accomack, and in the cities of Portsmouth, Norfolk, Hampton, and Virginia Beach.

38. Defendant Mallory Safety and Supply, LLC ("Mallory") is a California corporation that does business throughout the United States, including conducting business in Virginia. Mallory has its principal place of business in Portland, Oregon. Mallory developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts, including in Virginia and in the counties of Arlington, Henrico, and Accomack, and in the cities of Portsmouth, Norfolk, Hampton, and Virginia Beach.

39. Defendant MSA Safety Sales, LLC ("MSA Safety Sales") is a Pennsylvania corporation that does business throughout the United States, including conducting business in Virginia. MSA has its principal place of business in Cranberry Township, Pennsylvania. MSA Safety Sales developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts, including in Virginia and in the counties of Arlington, Henrico, and Accomack, and in the cities of Portsmouth, Norfolk, Hampton, and Virginia Beach.

40. Defendant MSA Safety Inc. ("MSA/Globe"), f/k/a Mine Safety Appliances Company, is a Pennsylvania corporation that does business throughout the United States, including conducting business in Virginia. MSA has its principal place of business in Cranberry Township, Pennsylvania. MSA acquired Globe Holding Company, LLC and its subsidiaries (collectively, "MSA/Globe") in 2017 and continues to do business under the Globe name. MSA developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts, including in Virginia and in the counties of Arlington, Henrico, and Accomack, and in the cities of Portsmouth, Norfolk, Hampton, and Virginia Beach.

41. Municipal Emergency Services, Inc. ("MES") is a Nevada corporation that does business throughout the United States, including conducting business in Virginia. MES has its principal place of business in Sandy Hook, Connecticut. MES developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts, including in Virginia and in the counties of Arlington, Henrico, and Accomack, and in the cities of Portsmouth, Norfolk, Hampton, and Virginia Beach.

42. Defendant PBI Performance Products, Inc., ("PBI") is a Delaware corporation that does business throughout the United States, including conducting business in Virginia. PBI has its

principal place of business in Charlotte, North Carolina. PBI developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts, including in Virginia and in the counties of Arlington, Henrico, and Accomack, and in the cities of Portsmouth, Norfolk, Hampton, and Virginia Beach.

43. Defendant StedFast USA, Inc. ("StedFast") is a Delaware corporation that does business throughout the United States, including conducting business in Virginia. StedFast has its principal place of business in Piney Flats, Tennessee. StedFast developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts, including in Virginia and in the counties of Arlington, Henrico, and Accomack, and in the cities of Portsmouth, Norfolk, Hampton, and Virginia Beach.

44. Defendant TenCate Protective Fabrics USA d/b/a Southern Mills, Inc. ("Tencate") is a Georgia corporation that does business throughout the United States, including conducting business in Virginia by and through its introduction of its products and goods into the stream of commerce which it knew or had reason to know would enter, be sold, used, and consumed throughout the Commonwealth of Virginia. Tencate has its principal place of business in Senoia, Georgia. Tencate developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts, including in Virginia and in the counties of Arlington, Henrico, and Accomack, and in the cities of Portsmouth, Norfolk, Hampton, and Virginia Beach.

45. Defendant The Chemours Company, LLC ("Chemours") is a Delaware corporation that does business throughout the United States, including conducting business in Virginia. Chemours has its principal place of business in Wilmington, Delaware. Chemours developed, manufactured, marketed, distributed, released, sold and/or used PFAS, PFAS materials, and

products containing PFAS in turnouts, including in Virginia and in the counties of Arlington, Henrico, and Accomack, and in the cities of Portsmouth, Norfolk, Hampton, and Virginia Beach.

46. Defendant W. L. Gore & Associates, Inc., ("Gore") is a Delaware corporation that does business throughout the United States, including conducting business in Virginia. Gore has its principal place of business in Newark, Delaware. Gore developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts, including in the counties of Arlington, Henrico, and Accomack, and in the cities of Portsmouth, Norfolk, Hampton, and Virginia Beach.

**JURISDICTION AND VENUE**

47. This Court has personal jurisdiction over the Defendants pursuant to Va. Code § 8.01-328.1(A)(1)–(4), as the cause of action arises from the foreign Defendants' transacting business in Virginia, contracting to supply services or things in Virginia, causing tortious injury by an act or omission in Virginia, and causing tortious injury by an act or omission outside of Virginia when they regularly conduct business in Virginia.

48. This Court has general and specific jurisdiction over Defendants, as they have purposefully availed themselves of the privileges of conducting business activities within Virginia through the marketing, sale, and distribution of products and services in Virginia, and/or profiting from such activity; they have purposefully directed activities towards Virginia and Virginia residents; and this litigation results from injuries that arose out of those activities.

49. This Court has general and specific jurisdiction over Defendants by virtue of their purposeful, continuous, systematic contacts, and general business purpose in Virginia.

50. The Firefighter Plaintiffs' and Decedents' exposure and injuries, resulting from the acts of Defendants alleged herein, occurred within the Commonwealth of Virginia.

51. Venue is proper in this Court under Va. Code § 8.01-262(2), (3) and (4).

## SUBSTANTIVE ALLEGATIONS

### A. The Firefighter Plaintiffs and Decedents' Use of and Exposure to PFAS-Containing Products

52. The Firefighter Plaintiffs and Decedents are eight firefighters who have served their respective counties and cities as firefighters, including Arlington County, County, Henrico County, Accomack County, Portsmouth, Norfolk, Hampton, and Virginia Beach. The Firefighter Plaintiffs and Decedents have worked in various fire stations, engine, truck, and specialized companies throughout the Commonwealth of Virginia for decades.

53. As a first responder to fire, hazardous materials incidents, and other emergency and medical calls, the Firefighter Plaintiffs and Decedents risked their life on a daily basis. They not only saved lives and homes but also provided emergency services and medical care, performed rescues, and offered support to people in traumatic circumstances. To prepare them for this enormously challenging work, the Firefighter Plaintiffs and Decedents wore turnouts and received extensive and ongoing training in fire suppression, fire prevention, rescue, and emergency medical care action to protect and/or minimize the loss of life, property, and damage to the environment.

54. The Virginia Beach Fire Department ("VBFD") serves the residents of Virginia Beach, Virginia by providing an all-hazard response service. Virginia Beach firefighters also provide emergency medical technicians ("EMT") and paramedics to the community. VBFD protects the city's residents, workers and tourists in high-rise buildings, schools, hospitals, churches, community centers, stores, historical landmarks, tunnels, bridges, hotels, and residential structures in densely populated neighborhoods.

55. The Norfolk Fire-Rescue Department ("NFRD") has served the residents of Norfolk, Virginia for over 100 years. Norfolk firefighters are cross-trained fire and emergency service ("EMS") providers. The NFRD protects the city's residents, workers, and tourists in high-rise buildings, schools, hospitals, churches, community centers, stores, historical landmarks, tunnels, bridges, hotels, and residential structures in densely populated neighborhoods.

56. The Accomack County Fire & Rescue Department, composed of a variety of smaller departments serving the greater Eastern Shore area, provides fire and emergency services to residents.

57. The Portsmouth Fire Department ("PFD") serves the residents of Portsmouth, Virginia by providing quality public safety services. Portsmouth firefighters also provide disaster management, emergency medical services, fire and medical prevention, and fire suppression. PFD protects the city's residents, workers and tourists in high-rise buildings, schools, hospitals, churches, community centers, stores, historical landmarks, tunnels, bridges, hotels, and residential structures in densely populated neighborhoods.

58. The Airport Authority has served the Ronald Reagan Washington National and Washington Dulles International Airports since 1987. Airport Authority firefighters are cross-trained fire and emergency medical service ("EMS") providers. The Airport Authority protects tourists and residents alike through striving to prevent incidents that compromise the safety of those working and visiting the airport campuses.

59. The Walter Reed Fire Department is part of the Arlington County Fire Department, serving as Fire Station 9. The Walter Reed Fire Department provides fire suppression, technical rescue, fire prevention, education, pre-hospital care, and transportation services to the community.

60. The Henrico County Division of Fire ("HCDF") serves the residents of Henrico County, Virginia by responding annually to over 55,000 calls for service. The HCDF provides services to residents handling issues in all kinds of buildings (residential, commercial, and industrial), alongside rendering services where needed on the four major roadways that pass through the county: I-64, I-95, I-295, and I-895. HCDF firefighters also provide emergency medical services and advanced life support services to those in need.

61. The Hampton Division of Fire & Rescue ("HDF") is a combination fire and rescue organization – the first of its kind in Virginia to hold a Class 1 rating from the Insurance Services Office and be fully accredited with the Commission on Fire Accreditation International and the Center for Public Excellence. The HDF's service to the local community dates back to 1884 and they have provided diligent fire suppression, emergency medical services, fire prevention, investigations, code enforcement, water rescue, and hazardous materials mitigation services to the City of Hampton's residents since.

62. For decades, Defendants, either individually or through their predecessors or subsidiaries, have manufactured, designed, sold, supplied, and distributed turnouts containing PFAS to firefighters, firefighting training facilities, and fire departments globally, including within the Commonwealth of Virginia, the counties of Arlington, Henrico, and Accomack, the cities of Portsmouth, Norfolk, Hampton, and Virginia Beach, and neighboring communities in Virginia.

63. With over 5,000 individual chemicals, PFAS is a large and ever-growing category of human-made chemicals, consisting of a nearly indestructible chain of carbon and fluorine atoms that are widely used in products to, *inter alia*, resist and repel oil, heat and water, and have been found to have negative health effects. As detailed below, these toxic chemicals are present in firefighter turnouts.

**(1) PFAS-Containing Turnout Gear**

64. Defendants knew or should have known that during firefighting training and when responding to fires and performing fire extinguishment, firefighters wear turnouts that are intended to provide a degree of thermal, chemical, and biological protection for a firefighter. Turnout gear components include a helmet, hood, jacket, pants, boots, and gloves. Each component is made of an outer layer, as well as several inner layers that include a moisture barrier and thermal liner which are meant to protect the firefighter from ambient heat.

65. A June 2020 study of turnout gear by researchers at the University of Notre Dame analyzed 30 new and used turnout jackets and pants originally marketed, distributed and sold in 2008, 2014, and 2017, by six turnout gear makers, including Defendants MSA/Globe, Lion and Honeywell, and found high levels of PFAS in turnout gear worn, used, or handled by firefighters using these brands of turnout gear, which included the Firefighter Plaintiffs and Decedents.

66. In May 2023, Section 338 of the William M. Thornberry National Defense Authorization Act for titled the "Guaranteeing Equipment for Safety for Firefighters Act of 2020," directed the National Institute of Standards and Technology ("NIST") to identify the type, prevalence and concentration of PFAS in unused firefighter turnout gear. The study specifically looked at twenty textiles used to make firefighter turnout gear. The NIST study found between one and seventeen PFAS present in each textile used to construct the turnout gear.

67. When exposed to heat, PFAS chemicals in the turnouts off-gas, break down, and degrade into highly mobile and toxic particles and dust, exposing firefighters to PFAS chemicals, particles and dust, including through skin contact/absorption, ingestion (e.g., hand-to-mouth contact) and/or inhalation. Further firefighter exposure to these highly mobile and toxic materials

occurs through normal workplace activities, because particles or dust from their turnouts spread to fire vehicles and fire stations, as well as firefighters' cars and homes.

68. Such workplace exposure to PFAS or PFAS-containing materials has been found to be toxic to humans. As far back as a July 31, 1980, internal memo, DuPont officials described measures that were needed to prevent workplace exposure to PFOA, which they knew could permeate all protective materials, and noted that PFOA's toxicity varied depending on the exposure pathway, acknowledging that ingestion was "slightly toxic," dermal contact was "slightly to moderately toxic" and inhalation was "highly toxic." The memo concluded "continued exposure is not tolerable."

69. As alleged herein, the Firefighter Plaintiffs and Decedents wore turnouts in the ordinary course of performing their duties, as the turnouts were intended to be used and in a foreseeable manner, which exposed them to significant levels of PFAS.

70. The Firefighter Plaintiffs and Decedents did not know, and in the exercise of reasonable diligence could not have known, that the turnouts they wore or used in the course of performing their duties contained PFAS or PFAS-containing materials, and similarly did not know and could not have known that they routinely suffered exposure to PFAS or PFAS-containing materials in the turnouts they wore or used in performing their duties. The turnout gear worn or used by the Firefighter Plaintiffs and Decedents did not contain labeling information saying that the gear contained PFAS, and similarly did not warn the Firefighter Plaintiffs and Decedents of the health risks associated with exposure to PFAS.

71. Like many fire departments across the country, the Firefighter Plaintiffs and Decedents had a limited number of turnouts to wear for years and would wash their turnouts at home and/or in station machines along with their daily station wear uniforms.

**B. The Chemical Structure of PFAS Makes Them Harmful to Human Health**

72. PFAS are known as "forever chemicals" because they are immune to degradation, bioaccumulate in individual organisms and humans, and increase in concentration up the food chain. Indeed, scientists are unable to estimate an environmental half-life (i.e., the time it takes for 50% of the chemical to disappear) for PFAS. Additionally, some PFAS chemicals (known as "precursors") degrade into different long-chain PFAS chemicals.

73. PFAS are nearly indestructible and are highly transportable. PFAS exposure to humans can occur through inhalation, ingestion, or dermal contact.

74. PFAS chemicals include "older" long-chain PFAS like PFOA, PFOS, and PFNA that have seven or more carbon atoms, and "newer" short-chain PFAS, like PFBA, PFBS, PFHxA, and PFHxS. The PFAS chemical industry has repeatedly asserted that short-chain PFAS are safer and bio-degrade more easily than long-chain PFAS. However, short-chain PFAS are molecularly similar to long-chain PFAS, and recent scientific research conducted in 2020, shows that short-chain PFAS are in fact extremely persistent, highly mobile and transportable, almost impossible to remove from water, bio-accumulate in humans and the environment, and show similar toxicity as long-chain PFAS. For example, short-chain PFBA (with only four carbon molecules) which was created by defendant 3M and reportedly has a shorter half-life than other PFAS, recently has been found to accumulate in the lungs and, in turn, increase the severity of COVID-19 in patients with elevated levels of PFBA, among other health concerns. Short-chain PFAS also have lower technical performance and may therefore be used at higher quantities cancelling out any supposed benefits of lower bioaccumulation potential.

75. In October 2021, the U.S. Environmental Protection Agency ("EPA") updated its 2018 assessment of short-chain PFAS, also known as "GenX", finding that two of Defendant

Chemours GenX chemicals are ***more toxic*** than PFOA - the highly toxic chemical these were intended to replace.

76. To date, there is no safe, acceptable or "normal" level of PFAS in the human body. Further, the fact that PFOA, PFOS, PFHxS, PFHpA, and PFNA are often found together presents a substantial risk to human health. Defendants' assertions that their products are safe because they do not contain PFOA or PFOS, or because they contain short-chain PFAS is just another example of their efforts to deflect from the reality that there are thousands of PFAS – including precursor PFAS which degrade into PFOA and PFOS.

77. PFAS exposure affects nearly every system in the body. It has been associated with multiple and serious adverse health effects in humans including, but not limited to, cancer, tumors, liver damage, immune system and endocrine disorders, thyroid disease, ulcerative colitis, birth defects, decreased fertility, pregnancy-induced hypertension, accelerated changes in gene expression, and increases in oxidative stress which can contribute to DNA changes, tumor promotion, and other health conditions.

**C. Defendants Knowingly Manufactured, Developed, Marketed, Distributed, Supplied, and/or Sold Toxic PFAS and/or Products Containing PFAS**

78. Defendants have each marketed, developed, distributed, sold, promoted, manufactured, released, or otherwise used PFAS chemicals in turnout gear, throughout the United States and in Virginia.

79. PFAS were first developed in the 1930s and 1940s. Soon after, 3M began manufacturing a PFAS material called perfluorooctanoic acid ("PFOA"), selling it to other companies, including DuPont.

80. By the 1950s, PFAS were widely used in large-scale manufacturing. Prior to this, PFAS had never been detected in nor were present in human blood or bodies.

81. Founded in 1918, Defendant MSA/Globe began manufacturing, marketing and selling turnout gear with DuPont's NOMEX® PFAS-containing flame resistant fabric in 1966. MSA/Globe (under the Globe name) continues to manufacture, market and sell turnout gear using PFAS-containing fabrics supplied by its partners, DuPont, Gore, Tencate, and PBI.

82. Defendant Lion began to manufacture, market and sell turnout gear in 1970. Since its founding, and continuing through to the present, Lion makes, markets and sells turnout gear using PFAS-containing fabrics, including Teflon® F-PPE-treated thermal lining material supplied by Defendants DuPont's NOMEX® PFAS-containing flame/water/oil-resistant fabric, and moisture barrier fabrics supplied by Defendant Gore.

83. Defendant Honeywell acquired Norcross Safety Products LLC in 2008, entering the protective gear industry and becoming one of the leading manufacturers of turnouts. Honeywell makes, markets and sells turnout gear using PFAS-containing fabrics, supplied by Defendants DuPont, Gore, PBI and StedFast.

**D. Defendants Knew Exposure to PFAS Causes Serious Health Impacts**

84. Defendants, including specifically 3M and DuPont, have long known about the serious and significant impacts to health caused by exposure to PFAS, having conducted study after study on the exposure and health effects of PFAS on animals, and in some cases, even on their own employees. The findings of these studies were discussed internally within the companies, yet were never made public or shared with any regulatory agencies. Among the findings:

a. A 1950 3M study showed that PFAS could build up in the blood of mice and that PFAS could bind to proteins in human blood suggesting that PFAS would not only remain, but also persist and accumulate in the body of the exposed individuals with each additional exposure.

b. In 1961, a DuPont toxicologist warned that PFAS chemicals enlarge rat and rabbit livers. A year later, these results were replicated in studies with dogs.

c. In 1963, 3M's technical handbook classified PFAS as toxic and advised that "due care should be exercised in handling these materials."

d. In the 1970s, DuPont discovered that there were high concentrations of PFOA in the blood samples of factory workers at DuPont's Washington Works site.

e. By the end of the 1970s, studies performed by at least 3M, indicated that PFAS materials were resistant to environmental degradation and would persist in the environment.

f. In 1981, 3M, which still supplied PFOA to DuPont and other corporations, found that ingestion of PFOA caused birth defects in rats. 3M reported this information to DuPont. DuPont then tested the children of pregnant employees in their Teflon division and found that of seven births, two children had eye defects. Defendants reassigned the female employees, but did not inform the EPA or make this information public.

g. By at least the end of the 1980s, research performed by Defendants, including specifically, Defendants 3M and DuPont, manufacturing and/or using PFAS materials indicated that at least one such PFAS material, PFOA, caused testicular tumors in a chronic cancer study in rats, resulting in at least Defendant DuPont classifying such PFAS material internally as a confirmed animal carcinogen and possible human carcinogen.

h. In the 1990s, Defendant DuPont knew that PFOA caused cancerous testicular, pancreatic and liver tumors in lab animals. One study also suggested that PFOA exposure could cause possible DNA damage. Another study of workers found a link between PFOA exposure and prostate cancer.

i. In response to the alarming and detrimental health impact, DuPont began to develop an alternative to PFOA and in 1993, an internal memo announced that "for the first time, we have a viable candidate" that appeared to be less toxic and showed less bioaccumulation. DuPont decided against using this potentially safer alternative, however, because products manufactured with PFOA were worth $1 billion in annual profit.

j. On June 30, 2000, 3M and DuPont met to share 3M's "pertinent data on PFOA." 3M informed DuPont that the half-life of PFOA was much longer than animal studies showed.

85. Additionally, approximately fifty years of studies by Defendants, including by 3M and DuPont, on human exposure to PFAS found unacceptable levels of toxicity and bio-accumulation, as well as a link to increased incidence of liver damage, various cancers, and birth

defects in humans exposed to PFAS. These studies also revealed that, once in the body, PFAS has a very long half-life and that it takes years before even one-half of the chemicals begins to be eliminated from the body—assuming, of course, the body experiences no additional PFAS chemical exposure.

86. In the face of these findings, and despite passage of the Toxic Substances Control Act in 1976, which requires companies that manufacture, process or distribute chemicals to immediately report to the Environmental Protection Agency ("EPA") information that "reasonably supports the conclusion" that a chemical presents a substantial risk to health or the environment, Defendants did not inform the EPA, the Firefighter Plaintiffs and Decedents, or the public about the health impacts resulting from exposure to PFAS.

87. In 2000, 3M announced that it would cease manufacturing a specific PFAS chemical, PFOS, on the same day the EPA announced that PFOA and PFOS, two chemicals in the PFAS family, had a "strong tendency to accumulate in human and animal tissues and could potentially pose a risk to human health and the environment over the long term."

88. However, 3M did not recall PFOS that it had previously manufactured, sold, or distributed, or that was then stored at firehouses and being used by firefighters around the country. And, no other Defendant stopped manufacturing PFAS chemicals or products containing PFAS. Rather, Defendants continued to manufacture, develop, market, promote, distribute and sell PFAS chemicals and PFAS-containing products, including specifically PFAS-containing turnouts and did so without any warning to firefighters or to the public concerning the fact that these turnouts contained PFAS, or that they posed a serious health risk to human health. Defendants instead continued to claim their products were safe.

89. By the 2000s, Defendants' own research of its employees revealed multiple adverse health effects among workers who had been exposed to PFAS, including increased cancer incidence, hormone changes, lipid changes, and thyroid and liver impacts.

90. In 2001, a class action lawsuit was filed in West Virginia against DuPont on behalf of people whose water had been contaminated by the nearby DuPont chemical plant where PFAS chemicals were manufactured.

91. Defendants continued to manufacture, market, promote, distribute, and sell PFAS and PFAS-containing products, including turnouts, and continued to publicly claim that these products were safe. Defendants affirmatively suppressed independent research on PFAS, and instead commissioned research and white papers to support their claims that PFAS and PFAS-containing products were safe to use, engaging consultants to further this strategy and ensure that they would continue to profit from these toxic chemicals and products.

92. As one consultant wrote in pitching its services to DuPont, it was critical that the PFAS industry develop an aggressive strategy to "[discourage] governmental agencies, Plaintiffs' bar and misguided environmental groups" and "[implement] a strategy to limit the effect of litigation and regulation on the revenue stream generated by PFOA." The strategy was further described by consultant as follows:

> DUPONT MUST SHAPE THE DEBATE AT ALL LEVELS . . . The outcome of this process will result in the preparation of a multifaceted plan to take control of the ongoing risk assessment by the EPA, looming regulatory challenges, likely litigation, and almost certain medical monitoring hurdles. The primary focus of this endeavor is to strive to create the climate and conditions that will obviate, or at the very least, minimize ongoing litigation and contemplated regulation relating to PFOA. This would include facilitating the publication of papers and articles dispelling the alleged nexus between PFOA and teratogenicity as well as other claimed harm. We would also lay the foundation for creating Daubert precedent to discourage additional lawsuits.

93. Defendants also pivoted with a new industry strategy. Defendants continued to publicly represent that PFAS and/or products containing PFAS were safe, while developing newer, "short-chain" PFAS alternatives.

94. In 2005, the EPA fined DuPont $16.5 million for failing to submit decades of toxicity studies of PFOA (one PFAS chemical manufactured by the company). Undeterred by the EPA's action, Defendant turnout manufacturers, such as MSA (Globe) and Lion, partnered with DuPont and with Defendant Gore to develop, manufacture, market, and distribute turnouts made with DuPont's and/or Gore's PFAS-based textile coatings (e.g., Nomex® and Gore® Protective Fabrics).

95. In 2006, the EPA "invited" eight PFOA manufacturers, including Defendants DuPont, 3M, Arkema, and Daikin to join in a "Global Stewardship Program" and phase out production of PFOA by 2015.

96. By this time, Defendants had begun to aggressively manufacture, market and/or distribute short-chain PFAS, such as Gen X, claiming that these alternative PFAS chemicals did not pose significant health risks to humans or the environment. But, these claims, too, were false. Defendants knew that certain of these short-chain PFAS chemicals had been found in human blood, and that at least one of them produces the same types of cancerous tumors (testicular, liver, and pancreatic) in rats as had been found in long-chain PFAS studies.

97. In 2011, a C8 Science Panel convened as part of a settlement in the West Virginia DuPont water contamination case described *supra* began releasing its findings. The Panel had analyzed the blood serum of nearly 70,000 residents living in the water contamination area for two long-chain PFAS (PFOA and PFOS), and found significant negative human health effects

(including, kidney cancer, testicular cancer, ulcerative colitis, thyroid disease, high cholesterol and preeclampsia) associated with exposure to these PFAS chemicals in the area groundwater.

98. In 2013, DuPont entered an agreement with the EPA and ceased production and use of PFOA – just one of thousands of PFAS chemicals the company makes, promotes and sells. Defendants, however, continued manufacturing short-chain PFAS materials, chemical feedstock, and products—all the while peddling them as safer, and as more easily bio-degraded than long-chain PFAS, despite evidence to the contrary.

99. In 2015, DuPont spun-off its PFAS chemicals business, as well two-thirds of its environmental liabilities and 90% of its active litigation, to Defendant Chemours. As part of the transaction, DuPont required Chemours to indemnify the "new" DuPont for all assigned environmental liabilities should a regulatory agency or plaintiff seek to hold the "new" DuPont accountable. As Chemours President Paul Kirsch testified before Congress: "DuPont designed the separation of Chemours to create a company where it could dump its liabilities to protect itself from environmental cleanup and related responsibilities."

100. In June 2018, the Agency for Toxic Substances and Disease Registry (ASTDR), a division of the Centers for Disease Control and Prevention at the US Department of Health and Human Services released an 852-page draft toxicology report analyzing scientific data about the most common PFAS chemical variants, finding that PFAS "are potentially more hazardous than previously known, are particularly concerning because of these compounds' persistence in the environment and widespread prevalence—PFAS are extremely slow to biodegrade."

101. In September 2019, DuPont chief operations and engineering officer Daryl Roberts testified before Congress that the "new DuPont" (to be distinguished from the "old DuPont" which manufactured and sold PFAS for decades before being spun-off to Chemours) no longer uses or

manufactures PFAS and is no longer responsible for obligations and harms resulting from over 65 years of producing PFAS. Roberts further testified that he knew nothing about "old DuPont's" efforts to suppress research on PFAS' toxicity as testified to by one of DuPont's former scientists only a few days earlier. Finally, he stated that any liabilities from "old DuPont's" PFAS operations were now Chemours' problem because DuPont is essentially a completely new company with no past – only a bright future of doing good in the world.

**E. Defendants Failed to Warn Firefighter Plaintiffs and Decedents of the Dangers of Exposure to PFAS and Falsely Represented That Their PFAS Products Were Safe.**

102. As alleged above, Defendants knew that PFAS are persistent, toxic, and bioaccumulating with very long half-life. They knew that exposure to PFAS can cause serious and life-threatening diseases, including cancer.

103. Yet, Defendants **did not warn** the Firefighter Plaintiffs and Decedents that PFAS and Defendants' PFAS-containing turnouts used by Plaintiffs contained PFAS, or that exposure to PFAS in the normal and intended use of such products, causes serious bodily harm and illnesses, including cancer.

104. Instead, Defendants falsely represented—and continue to falsely represent— that PFAS and PFAS-containing turnouts, are safe and not harmful to humans or the environment.

105. Such assertions fly in the face of science and a global movement toward eliminating this class of chemicals from consumer products. In just these past few years, for example, Congress passed legislation to address PFAS in turnouts. The U.S. Food and Drug Administration similarly has called for phasing out of short-chain PFAS that contain 6:2 fluorotelomer alcohol (6:2 FTOH). And private companies like Home Depot, Lowes and Staples recently have begun to discontinue selling products containing any PFAS, as have several outdoor, durable clothing companies (e.g., Columbia and Marmot), clothing retailers (e.g., H&M, Levi Strauss & Co), shoe

companies (e.g., Adidas and New Balance), car seat manufacturers (e.g., Britax and Graco), furniture companies (e.g., IKEA), personal care companies (e.g. Johnson & Johnson and Oral-B), and textile manufacturing companies.

**(1) Defendants Provide No Safety Warnings on Product Labels**

106. The turnouts containing PFAS or PFAS materials sold by Defendants in Virginia, and used by the Firefighter Plaintiffs and Decedents in training, emergency incidents, or in fire suppression during their firefighting career, also contained no warning that the turnouts contain PFAS or PFAS materials. Nor did these labels inform persons handling, wearing, or using the turnouts as they were intended to be handled, worn or used can result in exposure to PFAS and serious bodily harm.

107. Below are pictures of warning labels for turnouts manufactured, marked, sold and distributed by Defendants Honeywell International, Honeywell Safety, MSA/Globe and Lion. As depicted below, the labels make no mention of PFAS, do not advise that the turnouts contain PFAS or PFAS materials, and contain no warning that handling, wearing, or using the turnouts as they were intended to be handled, worn or used can result in exposure to PFAS and serious bodily harm. Further, while the labels provide washing instructions, the instructions do not advise that turnouts should be washed in a commercial extractor to prevent cross-contamination and PFAS-exposure to family members who handle or wash the turnouts with other garments in home washing machines.


Firefighter Suits
37 LOUDON ROAD
"THIS STRUCTURAL FIRE FIGHTING PROTECTIVE GARMENT MEETS THE GARMENT REQUIREMENTS OF NFPA 1971, 2018 EDITION."
PROTECTIVE GARMENT FOR STRUCTURAL FIRE FIGHTING IN ACCORDANCE WITH NFPA 1971-2018


LABEL
Serial #
Model #
Size:



Garment Safety Label

DANGER

You must read and understand these warnings and instructions.
Failure to follow these warnings and instructions will result in serious injury or death. 6150

- Wear this garment ONLY FOR FIREFIGHTING ACTIVITIES
- THIS GARMENT DOES NOT PROVIDE PROTECTION AGAINST CBRN TERRORISM AGENTS
- Before wearing this garment you must read and understand the User Instruction, Safety and Training Guide provided with this garment. The guide explains 1 critical safety information and protective clothing limitations 2 proper sizing/adjustment 3 procedures for putting on and removing protective clothing 4 how to clean, decontaminate, inspect and store this garment 5 use consistent with NFPA1500 6 limitations on useful life and retirement procedures
- You should wear this garment only if you have been properly trained in firefighting techniques and have knowledge of the proper selection, fit, use, care and limitations of protective clothing and equipment

To obtain a free user guide, write Lion 7200 Poe Ave Suite 400 Dayton OH 45414 or call 1-800-421-2926

- This garment provides limited protection against heat and flame. Minimize exposure to heat. You may be burned without warning or without receiving damage to garment. Avoid contact with hot objects. Skin burns occur when skin reaches a temperature of 118°F. Fires burn at temperatures up to 2000°F
- Moisture and/or compression in your garment may reduce protection.
- Exertion in hot conditions may result in heat exhaustion or poor judgment. If you feel dizziness, dehydration, loss of focus, or shortness of breath, get to a safe area, remove this garment, and seek medical attention
- Do not use this garment if it is damaged or dirty, garments will NOT provide the intended protection. ALWAYS follow manufacturer's cleaning instructions
- This garment has limited useful life. You must inspect regularly and retire when appropriate according to the User Instruction, Safety and Training Guide

See also NFPA 1851

DO NOT REMOVE OR WRITE ON THIS LABEL!

Garment Cleaning Label

LION

Questions, write or call immediately
Lion
7200 Poe Ave Suite 400 Dayton OH 45414 1-800-421-2926

CLEANING AND STORAGE INSTRUCTIONS

- Users must clean, inspect, maintain, store and alter only in accordance with the User Instruction, Safety and Training Guide
- Never use chlorine bleach. Chlorine bleach will significantly compromise the protection afforded by textile and film materials utilized in the construction of this garment
- For coats only: remove DRD and launder DRD by hand washing with mild detergent and warm water
- Fasten all hooks and D-rings and turn inside out or place in a laundry bag
- Machine wash, warm water, using only liquid detergent and if needed, liquid non-chlorine bleach. Double rinse in cool water. Never use fabric softeners
- Never dry clean
- Dry by hanging in open area, out of direct or indirect sunlight and fluorescent light
- Store out of direct or indirect sunlight and fluorescent light

THIS STRUCTURAL FIRE FIGHTING PROTECTIVE GARMENT MEETS THE GARMENT REQUIREMENTS OF NFPA1971, 2013 EDITION

PROTECTIVE GARMENT FOR STRUCTURAL FIRE FIGHTING IN ACCORDANCE WITH NFPA 1971-2013 58F6

When worn with the inner liner and outer shell assembled together this garment meets the personal protective equipment criteria of US Dept. of Labor OSHA Bloodborne Pathogens Standard Title 29 CFR Part 1910.1030 and CAL-OSHA Standard Title 8 Section 3406

Rev 1.0 12112

DO NOT REMOVE OR WRITE ON THIS LABEL

Garment Information Label

Janesville
CROSSTECH MOISTURE BARRIER (PTFE)
GLIDE 2L ARAFLO E-89 (K) THERMLINER
NOMEX E-89 QUILT
REQ:481971
MFG DATE:10/8/2012
MODEL:CVFM
LINER:C3K7CVFM

Garment Liner Attachment Safety Label

WARNING

FOR COMPLIANCE WITH THE STRUCTURAL FIRE FIGHTING GARMENT REQUIREMENTS OF NFPA 1971, THE FOLLOWING PROTECTIVE ITEMS MUST BE WORN IN CONJUNCTION WITH THIS GARMENT: OUTER SHELL 7.0 OZ MINIMUM WEIGHT

This INNER LINER alone does not provide protection against heat, flame, chemical or biological hazards. NEVER wear this INNER LINER without the SAME SIZE AND MODEL OUTER SHELL as identified on labels located on each detachable component

To reduce the risk of injury or death, you must assemble and wear together ALL of the following items: 1 protective coat and pant with outer shell, attached inner liner and DRD installed in coat 2 gloves 3 boots 4 helmet with eye protection 5 protective hood 6 SCBA 7 PASS device
ALWAYS make sure that all ensemble layers have the proper overlap and that all items fit with adequate looseness. Tight fit lowers insulation protection and restricts mobility

MADE IN THE U.S.A.
DO NOT REMOVE OR WRITE ON THIS LABEL!

Drag Rescue Device (DRD) Label

**(2) Defendants' Misrepresentations About PFAS Continue to this Day**

108. Despite their decades of knowledge about PFAS and its dangers, Defendants continue to make false claims, continue to misrepresent the safety of PFAS, and continue to minimize and fail to warn about the hazards of exposure to PFAS, or turnouts made with or containing PFAS.

109. Defendants' misinformation campaign is long-standing and continues to this day. Some pertinent examples include:

a. 2017 – Defendant Lion's President, Stephen Schwartz, wrote a letter to the editor of the Columbus Dispatch, expressing outrage at the assertion in a government filing that firefighters may have been exposed to PFAS through turnout gear. Schwartz called this assertion false, stating that Lion's turn-

out gear is not treated or made with PFOS or PFOA:. "PFOAs and PFOSs have never been components of LION's turn-out gear, either as a coating or as a textile." He acknowledged that turn-out gear is treated with PTFE to provide a durable water repellant, and that the textile industry in the past had used PFOA as a processing aid to manufacture PTFE moisture barrier films and repellants. "It is possible that trace amounts may have been present as a residue when the films and finishes were incorporated into LION's turn-out gear. **However, based on all available scientific data, such nominal trace amounts, if they existed at all, would not have posed any health risk to firefighters. There is absolutely no connection at all between PFOS and firefighter turnout gear."** (Emphasis added).

b. 2018 – The National Fire Protection Association (which maintains committees on turnouts that are comprised, in part, of certain Defendants) issued a publication listing 11 ways to minimize risk of occupational cancer – the suggestions centered on wearing turnouts for protection resulting from combustion or spills, and cleaning turnouts after exposure to chemicals. There was not a single mention of the risks of wearing turnouts containing PFAS or PFAS-containing materials.

c. 2019 – Defendant 3M Vice President, Denise Rutherford, testified before Congress that she **absolutely agreed with the statement that "the weight of current scientific evidence does not show that PFOS or PFOA cause adverse health effects in humans at current rates of exposure."** (emphasis added)

110. As frequent sponsors and advertisers in fire service publications, Defendants have been so influential in the industry that fire service leadership have echoed these narratives.

111. For example, in 2017, the International Association of Fire Fighters ("IAFF"), which represents more than 324,000 full-time professional firefighters, issued a statement that both mischaracterized and purported to state that the risks associated with exposure to PFAS and PFAS chemicals and materials in turnouts was minimal to non-existent. The statement even encouraged firefighters to continue to wear turnouts, creating a false sense that these PFAS-containing turnouts were safe. The statement reads, in relevant part:

> Importantly, PFOA use has been almost completely phased out in the US..... If PFOA is a combustion product of PFOA-containing consumer products made prior to phasing out use of this chemical, fire fighters will be exposed in fire suppression

> activities. However, the data are too limited at present to determine this. PFOA is unlikely to be a component in recently US manufactured turnout gear. However, if PFOA is a combustion product, it may be present as a contaminant on turnout gear. PFOA may also be present as a manufactured component of legacy turnout gear....The exposure contribution from any such PFOA content is likely to be minimal since volatilization from the manufactured product would be required....**At this time, IAFF does not recommend that legacy turnout gear be replaced outside of its lifecycle. Fire fighters wishing to minimize PFOA exposure should continue to wear their PPE...and regularly decontaminate their turnout gear.** IAFF will continue to monitor developments and update this fact sheet should new information become available.

112. The IAFF maintained the Defendants' position that the turnout gear was safe until new leadership took over in 2021. Because of these and other false claims and misrepresentations on the part of Defendants, the Firefighter Plaintiffs and Decedents did not know and, in the exercise of reasonable diligence, could not have known that the turnouts they used contained PFAS or PFAS-containing materials, and caused the Firefighter Plaintiffs and Decedents to be exposed to PFAS and/or PFAS-containing materials, leading to their various cancers and in the Decedents' cases, death.

113. Also, in January 2021, Defendants DuPont and Chemours along with Corteva (the agricultural unit of DuPont that it spun off in 2019) announced a cost-sharing agreement worth $4 billion to settle lawsuits involving the historic use of PFAS – thereby acknowledging, at long last, the significant harm their PFAS chemicals have caused to human health and the environment.

**F. New Research Indicates That Firefighters are at Significant Risk of Harm From Exposure to PFAS in Turnouts — But Defendants Continue to Discount or Deny These Risks**

114. In June 2020, scientists at the University of Notre Dame published a ground-breaking study on PFAS in turnout gear, and the exposure risks posed to firefighters that wear, wore, or handle such gear ("Notre Dame Turnout Study"). The Notre Dame Turnout Study analyzed over 30 sets of used and unused (still in their original packaging) turnout gear made by

six U.S. manufacturers, including Defendants MSA/Globe, Lion and Honeywell over several production years, as listed below:

| PPE gear manufacturers sampled: | # samples |
|---|---|
| Globe Manufacturing (Pittsfield MA), | 11 |
| Lion Group (Dayton OH), | 12 |
| Honeywell First Responder (Dayton, OH),<br>Lakeland Fire (Decatur, AL) | 2<br>2 |
| Quest Fire Apparel (Saratoga Springs, NY) | 1 |
| Quaker Safety (Quakertown, PA) | 2 |

The type and number of turnout gear samples used in this study.

115. The Notre Dame Turnout Study noted that these manufacturers' turnout gear (or personal protective equipment-PPE, as it is described in the study) are manufactured "from textiles that are made from fluoropolymers (one form of PFAS) or extensively treated by PFAS in the form of side-chain fluoropolymers." According to the researchers, "[t]hese PFAS include fluoropolymer materials such as PTFE used as a moisture barrier in the inner layers of turnout gear." The study found significant levels of PFAS chemicals – including PFOA, PFOS, PFBA, PFPeA, PFHxA, PFHpA, PFNA, PFDA, PFUnA, PFDoA, PFTrDA, PFToDA, PFBS, PFOSA, N-EtFOSA, MeFOSAA, N-MeFOSE, N-EtFOSE and 6:20FTS – in both new and used turnout gear, and across layers, portions, and materials in the turnout gear, including in material layers that are not intentionally treated with PFAS by the manufacturer, thereby providing "the first evidence that suggests PFAS appear to migrate from the highly fluorinated layers and collect in the untreated layer of clothing worn against the skin."

116. These findings suggest that, as the garments are worn, PFAS from the outer shell and the moisture barrier can migrate from the turnouts and contaminate both the firefighter, their apparatus and workplace with PFAS. The analysis also indicated that fluoropolymers from the outer layer decompose into other PFAS, including PFOA.

Environmental Science & Technology Letters pubs.acs.org/journal/estlcu Letter

Table 2. Quantities of Target PFAS (in ppb) Found in US Turnout Gear by LC–MS/MS Analysis

| | jacket 2000 unused | | | pants 2014 used | | | jacket 2008 used | jacket 2017 unused |
|---|---|---|---|---|---|---|---|---|
| values in ppb | thermal liner | moisture barrier | outer shell | thermal liner | moisture barrier | outer shell | moisture barrier | moisture barrier |
| PFBA | <MDL | 12.8 | 10.6 | 139 | 615 | 21.5 | 20.5 | 951 |
| PFPeA | <MDL | 12.6 | 17.8 | 128 | 106 | 164 | 18.1 | 2.05 |
| PFHxA | <MDL | 30.5 | 36.5 | 199 | 286 | 109 | 35.8 | 36.5 |
| PFHpA | <MDL | 12.4 | 25.4 | 105 | 5.82 | 2.23 | 14.3 | 25.4 |
| PFOA | 78 | 44 | 182 | 850 | 71 | 97 | 37 | <MDL |
| PFNA | 2.63 | <MDL | 8.2 | 15.3 | 1.95 | <MDL | 2.76 | <MDL |
| PFDA | 2.98 | 6.51 | 5.51 | 133 | <MDL | <MDL | 13.7 | <MDL |
| PFUnA | <MDL | <MDL | <MDL | 7.96 | <MDL | <MDL | 2.51 | <MDL |
| PFDoA | <MDL | 5.01 | <MDL | 64.6 | <MDL | <MDL | 15.9 | <MDL |
| PFBS | 283 | 140 | 142 | 53 400 | 47 900 | 1050 | 230 | 90 400 |
| PFOS | <MDL | <MDL | <MDL | 7 | <MDL | <MDL | 1 | <MDL |
| 6:2 FTS | <MDL | <MDL | <MDL | 15.9 | 129 | <MDL | <MDL | <MDL |
| 8:2 FTS | <MDL | <MDL | <MDL | [illegible] | <MDL | <MDL | <MDL | <MDL |

117. "Startlingly," researchers reported, "garment to hand transfer of total fluorine in the ppm range was also observed when researchers simply manipulated the textiles in [the] laboratory." The accumulation of PFAS on researchers' hands strongly suggests that transference of ppm levels of PFAS can occur merely by handling the turnouts and that PFAS exposure pathways include inhalation, ingestion and/or absorption (through dermal contact) – all of which DuPont internally acknowledged as being toxic in 1980. Such exposure pathways are a concern not only for firefighters that rely on turnouts to protect them from heat, fire, water and chemical hazards in the field, but to family members who may be exposed to the PFAS in turnouts as the result of home washing or storage. Lead researcher Graham Peaslee commented that turnouts are "the most highly fluorinated textiles I've ever seen" and that the level of PFAS in the turnout gear means that firefighters are "swimming in a sea of [PFAS]. Those numbers for scientists are scarily high..."




Over time, PFAS in a firefighter's turnout gear can migrate from a moisture barrier (orange) into a thermal liner that contacts skin. PFAS can also be shed from an outer shell (black) into the environment.

118. Despite these findings, Defendants have been quick to mischaracterize, dismiss or downplay the significance of the Notre Dame Turnout Study. Defendant MSA/Globe, when contacted about the study and asked whether Globe planned to study this issue and find an alternative to PFAS for turnouts, merely responded thusly: "[P]rotecting (firefighters) is Globe's business; every piece of our turnout gear meets or exceeds applicable industry standards."

119. Defendant Lion's responses have been similar and have also dismissed or minimized the significance of the Notre Dame Turnout Study's findings. Lion issued a Customer Safety Alert for PFOA and Turnout Gear stating: "Your LION turnout gear continues to be safe and ready for action especially when properly maintained. It is extremely important that firefighters continue to wear and properly care for their gear to stay safe on the job."

120. The Customer Safety Alert goes on to stress that Lion does not use PFOA or PFOS (two long-chain PFAS chemicals) in its turnouts. It does not, however, address that the maker's

turnouts in fact contain other PFAS chemicals, nor warn firefighters or the public about health harms associated with exposure to these toxic, bio-accumulating chemicals.

**HERE'S ALL YOU NEED TO KNOW ABOUT PFOA AND YOUR TURNOUT GEAR.**

**What is PFOA and why are we talking about it?**

**Perfluorooctanic Acid (PFOA) is a chemical that until recently was used in the process to make many different industrial chemicals and products.** The manufacture and use of PFOA was mostly phased out by major chemical companies by 2010. By 2016, its manufacture was eliminated in the United States.

In the firefighting protective clothing industry, PFOA was used as a processing agent in the manufacture of resins used to make [illegible] films – the primary component of the moisture barrier used in turnout gear. While most residual PFOA was eliminated from the manufacturing process of PTFE, some tiny trace amounts remained.

**LION does not use PFOA or PFOS in our turnout gear or any of our protective products.**

PFOS has never been a component of turnout gear. PFOS health and environmental concerns are largely related to AFFF foams and are not connected to turnout gear.

121. Defendant Lion's paid consultant, Dr. Paul Chrostowski, also has taken aim at the Notre Dame Turnout Study and its findings. Refuting a Fire Rescue magazine article about the study, Chrostowski repeated Lion's website statement that "PFOA was never part of the gear itself and frequent independent testing has found only trace amounts of it in any of the gear – not nearly enough to cause concern, and in amounts similar to consumer products." Chrostowski went on to say "[t]he fact is that one may find trace amounts of 'short-chain' PFAS such as PFBS and PFHxA in firefighting textiles, but the scientific research shows that these materials are far less toxic than even PFOA and at the tiny trace levels the risk are extremely low based on numerous credible published scientific research papers." Finally, Chrostowski falsely stated that the link between PFAS exposure and cancer is "extremely weak."

122. And yet, Lion concedes that dermal absorption is a pathway of exposure to cancer causing chemicals for firefighters. In a *Not in Our House* cancer awareness fact sheet that currently appears on the company's website, Lion warns firefighters: "For every 5 degree increase in temperature, skin becomes 400% more absorbent. The hotter you are, the more carcinogens your

skin absorbs. This statistic is alarming given that the core body temperature of firefighters routinely increases during firefighting activities while wearing turnouts which contain known carcinogens.




123. The IAFF holds a yearly cancer summit and yet has done little to address the PFAS in turnouts. Defendants, including at least DuPont, Gore, Lion and MSA (Globe), have been regular sponsors of the IAFF Cancer Summit.



124. At this event, as well as in firefighter cancer-related publications, programs and events, Defendants repeatedly used the summit as an opportunity to push the narrative that incidence of cancer among firefighters is attributable either to ***other chemicals*** encountered in the line of duty, or firefighters' failure to wash their turnouts after every call. Not once have the Defendants admitted that the PFAS materials in their turnouts have been found to be carcinogenic, and that the very equipment that should be protecting firefighters are causing the most harm. Further, Lion's recently launched "Not in Our House" cancer awareness program is sadly ironic in that it encourages *firefighters to make a pledge* ("I will make every effort to protect myself and my team by doing my part to take precautions that will minimize the risk of exposure to carcinogens that may lead to cancer…") while refusing to take any responsibility for continually exposing firefighters to carcinogens in their protective gear.

125. The Firefighter Plaintiffs and Decedents deserved more. Firefighters are the first to respond to emergencies faced by their community and never hesitate to help. Whether delivering a baby, responding to a fire, medical emergency, accident, mass shooting, terrorist attack, natural disaster, or teaching kids about fire safety, they always put the community first. When a child is drowning in a pool or a family is caught in a burning house, firefighters do not stop to calculate whether they will benefit by doing the right thing. They are true public servants. They step in and do what is needed when it is needed the most. Their health, safety and well-being must be of the highest priority.

**COUNT I | BREACH OF IMPLIED WARRANTIES**

126. This cause of action is asserted against all Defendants.

127. Plaintiffs incorporate by reference all allegations asserted in this Complaint, as though fully set forth herein.

128. Each Defendant, their predecessors-in-interest, and/or their alter egos, and/or entities they have acquired, have engaged in the business of manufacturing, distributing, supplying, testing, labeling, promoting, or advertising of turnouts and through that conduct have knowingly placed PFAS-containing turnouts into the stream of commerce with full knowledge that they were sold to firefighters, fire departments, or to companies that sold turnouts to fire departments for use by firefighters, such as the Firefighter Plaintiffs and Decedents, who were exposed to PFAS through ordinary and foreseeable uses for the purpose of firefighting activities and training.

129. Defendants intended that the turnouts they were manufacturing, selling, distributing, supplying, promoting, and or selling would be used by firefighters, including the Firefighter Plaintiffs and Decedents, without any substantial change in the condition of the products from when it was initially manufactured, sold, distributed, and marketed by Defendants. Turnouts were not safe for use by firefighters even when used as directed by the manufacturer and for its intended purpose for firefighting activities which include training, extinguishment, ventilation, search-and-rescue, salvage, containment, and overhaul.

130. Further, knowing of the dangerous and hazardous properties of turnouts, Defendants could have manufactured, marketed, distributed, and sold alternative designs or formulations of turnouts that did not contain PFAS.

131. These alternative designs and/or formulations were already available, practical, similar in cost, and technologically feasible.

132. The use of these alternative designs would have reduced or prevented the reasonably foreseeable harm to Firefighter Plaintiffs and Decedents caused by the Defendants' manufacture, marketing, and sale of PFAS-containing turnouts.

133. Additionally, the turnouts that were designed, manufactured, marketed, tested, advertised, promoted, sold, and distributed by the Defendants contained PFAS or PFAS-containing materials that were toxic and unreasonably dangerous to human health and the environment, with the toxic chemicals being so mobile and persistent, that the act of designing, formulating, manufacturing, marketing, distributing, and selling these products was unreasonably dangerous under the circumstances.

134. The turnouts designed, manufactured, marketed, tested, advertised, marketed, promoted, sold and distributed by the Defendants were dangerous and defective in design or formulation because, at the time in which the products left the hands of the manufacturer or distributors, the foreseeable risks exceeded the benefits associated with the design or formulation of turnouts.

135. The turnouts designed, manufactured, marketed, tested, advertised, marketed, promoted, sold, and distributed by the Defendants were dangerous and defective in design or formulation because, when the PFAS-containing turnouts left the hands of the manufacturer or distributors, said turnouts were unreasonably dangerous, unreasonably dangerous in normal use, and were more dangerous than an ordinary consumer-firefighter would expect.

136. The turnouts were in a defective condition and unsafe, and Defendants knew or had reason to know that these PFAS-containing turnouts were defective and unsafe, especially when used in the form and manner as provided by Defendants. In particular, Defendants' PFAS-containing turnouts were defective in the following ways:

a. When placed in the stream of commerce, Defendants' PFAS-containing turnouts were defective in design and formulation and as a result failed to meet ordinary

users' expectations as to their safety and failed to perform as an ordinary user would expect.

b. When placed in the stream of commerce, Defendants' PFAS-containing turnouts were defective in design and formulation, and as a result, dangerous to an extent beyond which an ordinary consumer-firefighter would anticipate.

c. When placed in the stream of commerce, Defendants' PFAS-containing turnouts were unreasonable dangers in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

d. When placed in the stream of commerce, Defendants' PFAS-containing turnouts contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated manner.

e. When placed in the stream of commerce, Defendants' PFAS-containing turnouts did not provide an adequate warning of the potential harm that might result from exposure to PFAS and/or emitted from the turnouts and, alternatively, did not have adequate instructions for safe use of the products.

f. Exposure to PFAS presents a risk of grave and harmful side effects and injuries that outweigh any potential utility stemming from their use.

137. Defendants knew or should have known at the time of manufacturing, selling, distributing, promoting or marketing their PFAS-containing turnouts that exposure to PFAS could result in cancer and other grave and serious illnesses and injuries as alleged herein.

138. The foreseeable risk of harm could have been reduced or eliminated by the adoption of a reasonable, alternative design that was not unreasonably dangerous.

139. The Firefighter Plaintiffs and Decedents used these PFAS-containing turnouts in the ways that Defendants intended them to be used.

140. The Firefighter Plaintiffs and Decedents used these PFAS-containing turnouts in ways that were foreseeable to Defendants.

141. The Firefighter Plaintiffs and Decedents were exposed to PFAS by using Defendants' turnouts in the course of their employment, as described above, without knowledge of turnouts' dangerous propensities.

142. The design defect in turnouts containing PFAS exposed Plaintiffs to toxic levels of PFAS and therefore, was a substantial factor in causing Plaintiffs' various forms of cancers and Decedent Hutcheson's injuries and death as described herein.

143. Through the use of advertising and marketing, Defendants, by and through their agents, employees, officers, representatives, and others for whom they are legally responsible, directed the attention of the public, including the Plaintiff, to their products by means of implied representations, statements, and descriptions that the PFAS-containing turnouts they were manufacturing, selling, distributing, supplying, and/or promoting were safe for use and free from hazards or dangerous properties in their ordinary uses and in the manner directed and for the purposes intended by the Defendants, which became a part of the basis of the bargain.

144. In using the PFAS-containing turnouts designed manufactured, sold, distributed, supplied, and/or promoted by the Defendants, the Plaintiffs relied upon the skill and judgment of the Defendants, upon implied warranties of merchantability and fitness for a particular purpose that the PFAS-containing turnouts were safe and fit for their intended and foreseeable functions for which they were designed without causing the injuries of which Plaintiffs complains as a result of probable, foreseeable, and ordinary uses of the product.

145. At all times mentioned herein, the Defendants implied warranties of merchantability and fitness for a particular purpose in that the PFAS-containing turnouts designed, manufactured, sold, distributed, supplied, and/or advertised were unreasonably dangerous for their ordinary use and other reasonably foreseeable uses/purposes at the time they left Defendants' possession.

146. As a direct and proximate result of the foregoing acts and omissions, Plaintiffs suffered the injuries and damages described herein.

147. Defendants acted with willful or conscious disregard for the rights, health, and safety of Plaintiffs, as described herein, thereby entitling Plaintiffs to an award of punitive damages.

**COUNT II | BREACH OF EXPRESS WARRANTIES**

148. This cause of action is asserted against all Defendants.

149. Plaintiffs incorporates by reference all allegations asserted in this Complaint, as though fully set forth herein.

150. Each Defendant, their predecessors-in-interest, and/or their alter egos, and/or entities they have acquired, have engaged in the business of manufacturing, distributing, supplying, testing, labeling, promoting, or advertising of turnouts containing PFAS or PFAS-containing materials therein and, through that conduct, have knowingly placed PFAS-containing products into the stream of commerce with full knowledge that they were sold to fire departments, firefighters, or to companies that sold turnouts to fire departments for the use by firefighters such as the Firefighter Plaintiffs and Decedents, who was exposed to PFAS through ordinary and foreseeable uses for the purpose of firefighting activities and training.

151. The turnouts complained of were manufactured, designed, sold, supplied and/or distributed by each of the Defendants and they were exposed to PFAS while using turnouts in the ordinary course and as part of performing their duties as firefighters.

152. Defendants expected that the PFAS-containing turnouts they were manufacturing, selling, distributing, supplying, and/or promoting would reach firefighters, including the Firefighter Plaintiffs and Decedents, without any substantial change in the condition of the products from when it was initially manufactured, sold, distributed, and marketed by Defendants.

153. Defendants knew or should have reasonably known that the manner in which they were manufacturing, marketing, and selling turnouts containing PFAS was hazardous to human health.

154. The potential risks of using PFAS-containing turnouts presented a substantial danger to firefighters, including the Firefighter Plaintiffs and Decedents, when the turnouts were used or worn in an intended or reasonably foreseeable way.

155. The Firefighter Plaintiffs and Decedents wore turnouts in the intended or reasonably foreseeable way in the ordinary course of performing their duties as a firefighter.

156. The turnouts manufactured, marketed, and sold by the Defendants were dangerous and defective because the foreseeable risk of harm could have been reduced or eliminated by the adoption of a reasonable, alternative design that was not unreasonably dangerous.

157. Defendants' products were in a defective condition and unreasonably dangerous, in that turnouts which, by design, contain PFAS or PFAS-containing products, were deleterious, toxic, and highly harmful to the Firefighter Plaintiffs and Decedents.

158. Defendants knew or should have reasonably known that exposure to PFAS was hazardous to human health, but:

a. Did not provide an adequate warning of the potential harm that might result from exposure to PFAS or PFAS-containing materials in turnouts;

b. Did not have adequate instructions for safe use of the products;

c. Did not have warnings to persons, such as the Firefighter Plaintiffs and Decedents, who had been, or reasonably may have been, exposed to Defendants' turnouts, of their disease potential, the proper steps to take to reduce the harmful effects of previous exposure, the need to have periodic medical examinations including the giving of histories which revealed the details of the previous exposure, and the need to have immediate and vigorous medical treatment for all related adverse health effects;

d. Did not manufacture, market, promote, distribute, or sell reasonably comparable products not containing PFAS when it became feasible to design.

159. At the time of manufacture, distribution, promotion, labeling, distribution, and/or sale, Defendants could have provided warnings or instructions regarding the full and complete risks of turnouts containing PFAS, because Defendants knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

160. At all relevant times, Defendants' turnouts did not contain an adequate warning or caution statement, which was necessary.

161. The Firefighter Plaintiffs and Decedents were unaware of the defective and unreasonably dangerous condition of Defendants' PFAS-containing turnouts at a time when such products were being used for the purposes for which they were intended, and the Firefighter Plaintiffs and Decedents were exposed to PFAS released from the Defendants' turnouts.

162. The Firefighter Plaintiffs and Decedents did not and could not have known that the use of turnouts in the ordinary course of performing their duties as a firefighter could be hazardous to their health, bio-accumulate in the blood, and cause serious health effects, including cancer.

163. Defendants knew that the use of turnouts, even when used as instructed by Defendants, subjected the Firefighter Plaintiffs and Decedents and others to a substantial risk of harm and yet, failed to adequately warn the Firefighter Plaintiffs and Decedents, the EPA or the public.

164. As a result of their inadequate warnings, Defendants' turnouts were defective and unreasonably dangerous when they left the possession and/or control of Defendants, were distributed by Defendants, and used or worn by the Firefighter Plaintiffs and Decedents.

165. The lack of adequate and sufficient warnings was a substantial factor in causing the Firefighter Plaintiffs cancers and Decedent Hutcheson's cancer and death, as described herein.

166. Through the use of such advertising and marketing, Defendants, by and through their agents, employees, officers, representatives, and others for whom they are legally responsible, directed the attention of the public, including the Firefighter Plaintiffs and Decedents, to their products by means of express and implied representations, statements, and descriptions that the PFAS-containing products they were manufacturing, selling, distributing, supplying, and/or promoting were safe for use and free from hazards or dangerous properties in their ordinary uses and in the manner directed and for the purposes intended by the Defendants, which became a part of the basis of the bargain.

167. In using the PFAS-containing turnouts designed manufactured, sold, distributed, supplied, and/or promoted by the Defendants, the Firefighter Plaintiffs and Decedents relied upon the skill and judgment of the Defendants, upon implied warranties of merchantability and fitness

for a particular purpose that the PFAS-containing turnouts were safe and fit for their intended and foreseeable functions for which they were designed without causing the injuries of which Plaintiff complains as a result of probable, foreseeable, and ordinary uses of the product.

168. At all times mentioned herein, the Defendants breached express warranties in that the PFAS-containing turnouts designed, manufactured, sold, distributed, supplied, and/or advertised were defective and unreasonably dangerous for their ordinary use and other reasonably foreseeable uses/purposes at the time it left Defendants' possession contrary to express representations made by Defendants regarding the PFAS-containing turnouts safety and or lack of or absence of harmful substances such as PFAS.

169. As a direct and proximate result of the foregoing acts and omissions, the Firefighter Plaintiffs and Decedents suffered the injuries and damages described herein.

170. Defendants acted with willful or conscious disregard for the rights, health, and safety of the Firefighter Plaintiffs and Decedents, as described herein, thereby entitling Plaintiffs to an award of punitive damages.

**COUNT III | NEGLIGENCE, GROSS NEGLIGENCE, RECKLESSNESS AND WILLFUL AND WANTON MISCONDUCT**

171. This cause of action is asserted against all Defendants.

172. Plaintiffs incorporate by reference all allegations asserted in this Complaint.

173. Defendants owed a duty of care towards the Firefighter Plaintiffs and Decedents that was commensurate with the inherently dangerous, harmful, injurious, bio-persistent, environmentally-persistent, toxic, and bio-accumulative nature of turnouts containing PFAS or PFAS-containing materials.

174. Defendants had a duty to exercise reasonable care in the design, research, testing, manufacture, marketing, formulation, supply, promotion, sale, labeling, training of users,

production of information materials, use and/or distribution of turnouts into the stream of commerce, including a duty of care to ensure the PFAS did not infiltrate, persist in, accumulate in the blood and/or body of the Firefighter Plaintiffs and Decedents and including a duty to assure their products would not cause users to suffer unreasonable, dangerous side effects.

175. Defendants had a duty to exercise reasonable care to ensure that turnouts were manufactured, marketed, and sold in such a way as to ensure that the end users of turnouts were not exposed to the likely harm posed by PFAS and/or in such a way as to ensure that the end users were aware of the potential harm PFAS can cause to human health, and were advised to use it in such a way that would not be hazardous to their health.

176. Defendants had a duty to warn of the hazards associated with PFAS and PFAS-containing materials and were in the best position to provide adequate instructions, proper labeling, and sufficient warnings about the turnouts. However, Defendants knowingly elected not to do so.

177. Defendants failed to exercise ordinary care in the designing, researching, testing, manufacturing, formulating, marketing, testing, promotion, supply, sale, and/or distribution of their PFAS chemicals and PFAS-containing turnouts in the regular course of business, in that Defendants knew or should have known that use and exposure to PFAS and PFAS-containing turnouts and materials therein were hazardous to human health and created a high risk of unreasonable, dangerous side effects, including but not limited to severe personal injuries, as described herein.

178. Defendants also knew or should have known that the manner in which they were manufacturing, marketing, distributing, and selling PFAS to be used in turnouts and PFAS-containing turnouts was hazardous to human health, bio-accumulated in the blood, and caused serious health effects, including cancer.

179. Defendants negligently and deceptively underreported, underestimated, downplayed the serious health dangers of the PFAS-containing turnouts.

180. At all times material, the Firefighter Plaintiffs and Decedents inhaled, ingested and/or absorbed dermally hazardous PFAS contaminants released from the Defendants' turnouts.

181. The Firefighter Plaintiffs and Decedents' exposure to Defendants' turnouts, which were connected to and incidental to Defendants' manufacture, design, sale, supply and/or distribution of its PFAS-containing turnouts, was harmful and substantially increased the risk of injuries to the Firefighter Plaintiffs and Decedents and did cause injuries to the Firefighter Plaintiffs and Decedents.

182. Defendants knew or should have known that the manner in which they were manufacturing, marketing, distributing and selling turnouts containing PFAS or PFAS-containing materials therein would result in harm to the Firefighter Plaintiffs and Decedents as a result of using turnouts in the ordinary course of performing their duties as a firefighter.

183. Defendants knew, foresaw, anticipated, and/or should have foreseen, anticipated, and/or known that the design, engineering, manufacture, fabrication, sale, release, handling, use, and/or distribution of PFAS or PFAS-containing materials in turnouts, and/or Defendants' other acts and/or omissions as described in this complaint, could likely result in PFAS exposure to the Firefighter Plaintiffs and Decedents, the persistence and accumulation of toxic and harmful PFAS in their blood and/or body, and cause injuries to the Firefighter Plaintiffs and Decedents as herein alleged.

184. Despite knowing, anticipating, and/or foreseeing the bio-persistent, bio-accumulative, toxic, and/or otherwise harmful and/or injurious nature of PFAS, Defendants, their agents, servants, and/or employees, committed negligent acts and/or omissions that resulted in

PFAS exposure to the Firefighter Plaintiffs and Decedents by and through their foreseeable use of turnouts, resulting in the persistence and accumulation of toxic and harmful PFAS in his blood and/or body, and causing injuries to the Firefighter Plaintiffs and Decedents as herein alleged.

185. Defendants, through their acts and/or omissions as described in this complaint, breached their duties to the Firefighter Plaintiffs and Decedents.

186. It was reasonably foreseeable to Defendants that the Firefighter Plaintiffs and Decedents would likely suffer the injuries and harm described in this complaint by virtue of Defendants' breach of their duty and failure to exercise ordinary care, as described herein.

187. Defendants' acts and omissions amount to negligence, gross negligence, reckless disregard for human life and safety, and willful and wanton misconduct.

188. As a direct and proximate result of the Defendants' acts and omissions, the Firefighter Plaintiffs and Decedents suffered injuries.

189. Defendants acted with willful or wanton conduct, or such recklessness as evinces a conscious disregard for the rights, health, and safety of others including the Firefighter Plaintiffs and Decedents, as described herein, thereby entitling Plaintiffs to an award of punitive damages.

**COUNT IV | VIOLATIONS OF THE VIRGINIA CONSUMER PROTECTION ACT [VCPA], Va. Code § 59.1-196, *et seq.***

190. This cause of action is asserted against all Defendants.

191. Plaintiffs incorporate by reference all allegations asserted in this Complaint.

192. Plaintiffs' claims arise under the Commonwealth of Virginia's Consumer Protection Act [VCPA], Va. Code § 59.1-196, *et seq*.

193. Defendants are "suppliers" as that term is defined by the VCPA.

194. The turnouts designed, developed, manufactured, marketed, distributed, released, and/or sold by Defendants the reached Firefighter Plaintiffs and Decedents as end users are "goods" as that term is defined by the VCPA.

195. Defendants design, develop, manufacture, marketing, distribution, release, and/or sale of the turnouts into the chain of commerce and ultimately reaching Firefighter Plaintiffs and Decedents were consumer transactions as that term is defined under the VCPA. Va. Code § 59.1-198.

196. Defendants, by and through their acts and omissions alleged *supra*, violated Sections 59.1-200(A)(5)(6) and (14) of the VCPA by

a. Misrepresenting that goods or services have certain quantities, characteristics, ingredients, uses, or benefits, Va. Code § 59.1-200(A)(5);

b. Misrepresenting that goods or services are of a particular standard, quality, grade, style, or model; and

c. Using any other deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction, Va. Code § 59.1-200(A)(14).

197. Defendants made various material misrepresentations to the general public regarding the attributes of turnouts and the dangers, or lack thereof, of PFAS chemicals for the purpose of inducing members of the general public to purchase their goods and rely on the safety of their goods.

198. Defendants knew or should have known that the Firefighter Plaintiffs and Decedents would rely, and they did rely, on the material misrepresentations concerning the safety and quality of their turnouts.

199. As a direct and proximate result of the Defendants' acts and omissions, the Firefighter Plaintiffs and Decedents suffered the injuries and death described herein.

200. Defendants acted with willful or wanton conduct, or such recklessness as evinces a conscious disregard for the rights, health, and safety of others including the Firefighter Plaintiffs and Decedents, as described herein, thereby entitling Plaintiffs to an award of punitive damages.

201. Plaintiffs are also entitled to reasonable attorneys' fees and court costs pursuant to the VCPA, Va. Code § 59.1-204(B).

202. Because the violations of the VCPA as alleged herein were willful, Plaintiffs are entitled to treble damages pursuant to Va. Code § 59.1-204(A).

**DAMAGES**

203. Plaintiffs incorporate by reference all allegations asserted in this Complaint.

204. As a direct and proximate result of Defendants' aforementioned wrongful acts or omissions, and each of them, Plaintiffs are entitled to recover punitive damages and treble damages pursuant to Virginia § 59.1-204(A).

205. As a direct and proximate result of Defendants' aforementioned wrongful acts or omissions, and each of them, the Plaintiff AMY L. HUTCHESON, Executrix of the Estate of JAMES S. HUTCHESON, deceased, incurred the following damages:

a. Sorrow, mental anguish, and solace which may include society, companionship, comfort, guidance, kindly offices and advice of the Decedent Hutcheson;
b. Compensation for reasonably expected loss of income of Decedent Hutcheson;
c. Compensation for reasonably expected services, protection, care, and assistance provided by Decedent Hutcheson;
d. Expenses for the care, treatment and hospitalization of Decedent Hutcheson; and

e. Reasonable funeral expenses; and

f. Other damages allowable at law.

206. As a direct and proximate result of Defendants' aforementioned wrongful acts or omissions, and each of them, the Plaintiffs ADEN W. SCOTT III, MARK C. DAVIS, EDWARD A. LANE, JEREMY M. POPE, CASEY BARDEN, AND JOHN HUDNALL incurred the following damages:

a. Bodily injuries, permanent in nature, which have affected their life;

b. Past, present and future physical pain and mental anguish;

c. Disfigurement and/or deformity coupled with associated humiliation and embarrassment;

d. Past, present and future inconvenience;

e. Past, present and future lost earnings, and a lessening of earning capacity;

f. Personal, social and financial limitations resulting from the injuries sustained by Plaintiffs; and

g. Other damages allowable at law, including medical expenses incurred in the past, present and future, and attorneys' fees and costs.

WHEREFORE, Plaintiffs respectfully move this Court for the following relief:

A. Plaintiff Aden W. Scott III respectfully prays for relief against Defendants, jointly and severally, in the sum of SEVENTY-FIVE MILLION DOLLARS ($75,000,000.00) in compensatory damages, ONE HUNDRED FIFTY MILLION DOLLARS ($150,000,000.00) in punitive damages or in an amount deemed recoverable pursuant to the law of the state deemed applicable to Plaintiff's claim to punitive damages, reasonable attorneys' fees and court costs pursuant to the VCPA, Va. Code Ann. § 59.1-204(B), treble

damages pursuant to Va. Code § 59.1-204(A), the cost of this action, pre-judgment interest, post-judgment interest, and any other relief this Court deems just and proper.

B. Plaintiff Mark C. Davis respectfully prays for relief against Defendants, jointly and severally, in the sum of SEVENTY-FIVE MILLION DOLLARS ($75,000,000.00) in compensatory damages, ONE HUNDRED FIFTY MILLION DOLLARS ($150,000,000.00) in punitive damages or in an amount deemed recoverable pursuant to the law of the state deemed applicable to Plaintiff's claim to punitive damages, reasonable attorneys' fees and court costs pursuant to the VCPA, Va. Code Ann. § 59.1-204(B), treble damages pursuant to Va. Code § 59.1-204(A), the cost of this action, pre-judgment interest, post-judgment interest, and any other relief this Court deems just and proper.

C. Plaintiff Edward A. Lane respectfully prays for relief against Defendants, jointly and severally, in the sum of SEVENTY-FIVE MILLION DOLLARS ($75,000,000.00) in compensatory damages, ONE HUNDRED FIFTY MILLION DOLLARS ($150,000,000.00) in punitive damages or in an amount deemed recoverable pursuant to the law of the state deemed applicable to Plaintiff's claim to punitive damages, reasonable attorneys' fees and court costs pursuant to the VCPA, Va. Code Ann. § 59.1-204(B), treble damages pursuant to Va. Code § 59.1-204(A), the cost of this action, pre-judgment interest, post-judgment interest, and any other relief this Court deems just and proper.

D. Plaintiff Jeremy M. Pope respectfully prays for relief against Defendants, jointly and severally, in the sum of SEVENTY-FIVE MILLION DOLLARS ($75,000,000.00) in compensatory damages, ONE HUNDRED FIFTY MILLION DOLLARS ($150,000,000.00) in punitive damages or in an amount deemed recoverable pursuant to the law of the state deemed applicable to Plaintiff's claim to punitive damages, reasonable

attorneys' fees and court costs pursuant to the VCPA, Va. Code Ann. § 59.1-204(B), treble damages pursuant to Va. Code § 59.1-204(A), the cost of this action, pre-judgment interest, post-judgment interest, and any other relief this Court deems just and proper.

E. Plaintiff Casey Barden respectfully prays for relief against Defendants, jointly and severally, in the sum of SEVENTY-FIVE MILLION DOLLARS ($75,000,000.00) in compensatory damages, ONE HUNDRED FIFTY MILLION DOLLARS ($150,000,000.00) in punitive damages or in an amount deemed recoverable pursuant to the law of the state deemed applicable to Plaintiff's claim to punitive damages, reasonable attorneys' fees and court costs pursuant to the VCPA, Va. Code Ann. § 59.1-204(B), treble damages pursuant to Va. Code § 59.1-204(A), the cost of this action, pre-judgment interest, post-judgment interest, and any other relief this Court deems just and proper.

F. Plaintiff John Hudnall respectfully prays for relief against Defendants, jointly and severally, in the sum of SEVENTY-FIVE MILLION DOLLARS ($75,000,000.00) in compensatory damages, ONE HUNDRED FIFTY MILLION DOLLARS ($150,000,000.00) in punitive damages or in an amount deemed recoverable pursuant to the law of the state deemed applicable to Plaintiff's claim to punitive damages, reasonable attorneys' fees and court costs pursuant to the VCPA, Va. Code Ann. § 59.1-204(B), treble damages pursuant to Va. Code § 59.1-204(A), the cost of this action, pre-judgment interest, post-judgment interest, and any other relief this Court deems just and proper.

G. Plaintiff Amy L. Hutcheson, Executrix of the Estate of James S. Hutcheson, deceased, respectfully prays for relief against Defendants, jointly and severally, in the sum of SEVENTY-FIVE MILLION DOLLARS ($75,000,000.00) in compensatory damages, ONE HUNDRED FIFTY MILLION DOLLARS ($150,000,000.00) in punitive damages

or in an amount deemed recoverable pursuant to the law of the state deemed applicable to Plaintiff's claim to punitive damages, reasonable attorneys' fees and court costs pursuant to the VCPA, Va. Code Ann. § 59.1-204(B), treble damages pursuant to Va. Code § 59.1-204(A), the cost of this action, pre-judgment interest, post-judgment interest, and any other relief this Court deems just and proper.

**TRIAL BY JURY DEMANDED**

The Plaintiffs demand a trial with a jury on all issues in the cause, including liability and damages, and on any issue raised by this Complaint that involves any fact disputed by the Defendants and on any issue that may be raised by the Defendants that involves any fact disputed by the Plaintiffs.

**Respectfully submitted,**

Dated: April 15, 2025

Kevin Biniazan | VSB No. 92109
Jeffrey A. Breit | VSB No. 18876
Lauren A. Martin | VSB No. 93653
Alexis Bale | VSB No. 100318
BREIT BINIAZAN, PC
Towne Pavilion Center II
600 22nd Street, Suite 402
Virginia Beach, VA 23451
Telephone | 757.622.6000
Facsimile | 757.299.8028
Email | kevin@bbtrial.com
Email | jeffrey@bbtrial.com
Email | lmartin@bbtrial.com
Email | abale@bbtrial.com

*Counsel for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Norfolk Division**

| | |
|---|---|
| Aden W. Scott III, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>3M COMPANY, et al.,<br><br>Defendants. | Case No. 2:25-cv-00617 |

**PLAINTIFFS' MOTION TO REMAND**

COMES NOW Plaintiffs Aden W. Scott, III; Mark C. Davis; Edward A. Lane; Jeremy M. Pope; Casey Barden; John Hudnall; and Amy L Hutchenson, Executrix of the Estate of James S. Hutcheson, deceased, (collectively, the "Scott Plaintiffs" or "Plaintiffs), who respectfully move this Honorable Court to remand this matter back to Virginia state court in the Circuit Court for the City of Virginia Beach for all further proceedings. Plaintiffs also request this Court grant payment from Defendant 3M Company for all just costs and expenses, as this action was improperly removed to federal court in the absence of proper subject matter jurisdiction. In support of this Motion, Plaintiffs relies on their accompanying Brief in Support.

**Respectfully yours,**
**ADEN W. SCOTT, III,**
**MARK C. DAVIS,**
**EDWARD A. LANE,**
**JEREMY M. POPE,**
**CASEY BARDEN,**
**JOHN HUDNALL,**
**and**
**AMY L. HUTCHESON, Executrix of the**

**Estate of JAMES S. HUTCHESON, deceased,**

**Plaintiffs**

s/ Kevin Biniazan

Kevin Biniazan | VSB No. 92109
Jeffrey A. Breit | VSB No. 18876
Don Scott | VSB No. 88725
Lauren Martin | VSB No. 93653
Alexis Bale | VSB No. 100318
BREIT BINIAZAN, PC
Towne Pavilion Center II
600 22nd Street, Suite 402
Virginia Beach, VA 23451
Telephone | 757.622.6000
Facsimile | 757.299.8028
Email | kevin@bbtrial.com
Email | jeffrey@bbtrial.com
Email | don@bbtrial.com
Email | lmartin@bbtrial.com
Email | abale@bbtrial.com

*Counsel for Plaintiff*

## CERTIFICATE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will then send notification of electronic filing (NEF) to counsel of record.

Date: October 27, 2025

s/ Kevin Biniazan
Kevin Biniazan | VSB No. 92109
Jeffrey A. Breit | VSB No. 18876
Lauren Martin | VSB No. 93653
BREIT BINIAZAN, PC
Towne Pavilion Center II
600 22nd Street, Suite 402
Virginia Beach, VA 23451
Telephone | 757.622.6000
Facsimile | 757.299.8028
Email | kevin@bbtrial.com
Email | jeffrey@bbtrial.com
Email | lmartin@bbtrial.com

*Counsel for Plaintiff*

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Norfolk Division**

| | |
|---|---|
| Aden W. Scott III, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>3M COMPANY, et al.,<br><br>Defendants. | Case No. 2:25-cv-00617 |

**PLAINTIFFS' BRIEF IN SUPPORT OF THEIR MOTION TO REMAND**

COMES NOW Plaintiffs Aden W. Scott, III; Mark C. Davis; Edward A. Lane; Jeremy M. Pope; Casey Barden; John Hudnall; and Amy L Hutchenson, Executrix of the Estate of James S. Hutcheson, deceased, (collectively, the "Scott Plaintiffs" or "Plaintiffs), who respectfully move this Honorable Court to remand this matter back to the Virginia Beach Circuit Court for all further proceedings. Plaintiffs also request this Court grant payment from Defendant 3M Company ("3M") for all just costs and expenses, as this action was improperly removed to federal court in the absence of proper subject matter jurisdiction.

**PRELIMINARY STATEMENT**

The Scott Plaintiffs are current and retired firefighters who respectfully served the counties of Arlington, Henrico, and Accomack, as well as the cities of Norfolk and Virginia Beach, alongside the spouse of a deceased firefighter who served the City of Hampton.

Plaintiffs brought suit alleging claims for breach of express and implied warranties, as well as negligence and gross negligence, following their exposures to per- and polyfluoroalkyl

substances ("PFAS"). PFAS are human-made chemicals consisting of a chain of carbon and fluorine atoms used in manufactured products to resist and repel oil, stains, heat, and water. These "forever chemicals," as they are colloquially known due to their immunity from degradation, bioaccumulate in humans, causing serious adverse health effects, including cancer. Plaintiffs were exposed to these "forever chemicals" through the protective clothing specifically designed for, and worn by, firefighters (known as "turnouts"). These turnouts were manufactured, designed, sold, supplied, and/or distributed by each of the Defendants, individually or through their predecessors or subsidiaries, resulting in the Plaintiffs' subsequent development of various cancers, and for one, his death.

Plaintiffs' Complaint does not set forth any federal issues or causes of action nor does complete diversity exist between the parties. Moreover, federal officer jurisdiction has been improperly asserted. Thus, subject matter jurisdiction is lacking and this matter must be remanded to the Circuit Court for the City of Virginia Beach.

## PROCEDURAL BACKGROUND

On April 15, 2025, Plaintiffs filed their initial Complaint in this action in a Virginia state Circuit Court. Prior to service, on September 26, 2025, Defendant 3M removed this matter to federal court under a theory of federal officer removal. See Def. 3M. Not. Removal., ECF No. 1; see also 28 U.S.C. § 1442(a)(1). Plaintiffs now file this Motion to Remand.

In the interim, Defendant 3M attempted to insert this litigation into the *In re Aqueous Film-Forming Foams ("AFFF") Products Liability Litigation*, MDL No. 2873 (D.S.C.) ("the MDL") – despite the case already having been rejected by the JPML Clerk. On September 29, 2025, under the guise of a non-binding "suggestion" from a South Carolina District Court Judge, Defendant 3M Company sought to transfer this case to the MDL via a Notice of Tag-Along Action. Just days

later, on October 1, 2025, the JPML Clerk rejected Defendant's attempt, indicating that they would not issue a Conditional Transfer Order for the Scott matter. More specifically, the Clerk notified counsel for all parties that Scott was "not appropriate for inclusion in this MDL." See In re AFFF Prods. Liab. Litig., MDL No. 2873, ECF No. 3822 (J.P.M.L. Oct. 1, 2025).[1] Despite this, Defendant 3M has again moved to transfer this case into the MDL, filing a Motion for Transfer the next day. Plaintiffs intend to continue opposing Defendant's attempts at transfer.

Regardless of the viability of transfer to the MDL, of which there is none, this case does not belong in the federal forum. Plaintiffs hereby bring the following Motion to Remand, as no proper federal subject matter jurisdiction exists.

## LEGAL STANDARD

Cases may be removed from state court to federal court when original jurisdiction lies in the federal district courts. 28 U.S.C. § 1441(a). The burden of establishing federal jurisdiction is placed upon the party seeking removal. Wilson v. Republic Iron & Steel Co., 257 U.S. 92, 97 (1921) (citing Carson v. Dunham, 121 U.S. 421, 425 (1887)). Congress has imposed limits on removal to show that it did not intend to allow all defendants an unqualified right to remove. Home Depot U.S.A., Inc. v. Jackson, 139 S. Ct. 1743, 1749 (2019). For example, a case that is otherwise removable based on diversity jurisdiction is not removable if any of the defendants properly joined and served are citizens of the forum state. 28 U.S.C. § 1441(b)(2). See, e.g., Linnin v. Michielsens, 372 F. Supp. 2d 811, 816 (E.D. Va. 2005); Hurley v. Motor Coach Indus., 222 F.3d 377, 380 (7th

---

[1] Defendant has also ***unsuccessfully*** sought to transfer *four* other PFAS cases brought by Plaintiff's counsel: Jenkins-Griffin v. 3M Company, et al., No. 2:24-cv-00600 (E.D. Va.); Chiaverotti, et al. v. 3M Company, et al., No. 2:25-cv-00232 (E.D. Va.); Clarke v. 3M Company, et al., No. 3:25-cv-00738 (E.D. Va.); Moretz v. 3M Company, et al, No. 2:25-cv-00616 (E.D. Va.). As of today's date, each and every attempt to transfer has been rejected by the Panel Clerk. Additionally, in Jenkins-Griffin, Scott's sister case, the Panel themselves has once previously rejected transfer, finding **transfer to be "inappropriate,"** as Plaintiff Jenkins-Griffin's claims were outside the scope of the MDL. See In re AFFF Prods. Liab. Litig., MDL No. 2873, ECF No. 3260 at 3-4 (emphasis added).

Cir. 2000); Roche v. Lincoln Prop. Co., 373 F.3d 610, 620 (4th Cir. 2004) (cases discussing the forum-defendant rule).

A less-traditional pathway into federal court is through the federal officer removal statute, which permits a "person" to remove a civil action that was commenced against an "officer (or any person acting under that officer) of the United States or any agency thereof, in an official or individual capacity, for or relating to any act under color of such office." 28 U.S.C. § 1442(a)(1). § 1442(a)(1) was created to protect federal officers "when particular litigation implicates a cognizable federal interest." Gov't of P.R. v. Express Scripts, Inc., No. 23-1613, 2024 U.S. App. LEXIS 26384, at *15 (1st Cir. Ct. App. October 18, 2024) (quoting Camacho v. Autoridad de Telefonos de Puerto Rico, 868 F.2d 482, 487 (1st Cir. Ct. App. 1989)).

For a private defendant to assert jurisdiction under § 1442(a)(1), the defendant must show: (1) that it "acting under" a federal officer; (2) that it had a "colorable federal defense"; and (3) that the conduct at issue was carried out for, or in relation to, the asserted official authority of the federal government (a.k.a. "under color of [federal] office"). Sawyer v. Foster Wheeler LLC, 860 F.3d 249, 254 (4th Cir. 2017) (internal citations omitted); Issacson v. Dow Chem. Co., 517 F.3d 129, 135 (2008).

The Defendants still bear the burden of establishing proper federal jurisdiction under § 1442(a)(1). Cnty Bd. of Arlington Cnty. v. Express Scripts Pharmacy, Inc., 996 F.3d 243, 251 (4th Cir. 2021).

Beginning with the first prong, it is true that courts have interpreted "acting under" broadly, allowing federal officer jurisdiction to be "liberally construed" in favor of removal, see ECF No. 1 at ¶ 20, *but* "broad language is not limitless[,] [a]nd a liberal construction nonetheless can find limits in a text's language, context, history, and purposes." Watson v. Phillip Morris Cos., 551

U.S. 142, 147 (2007). The United States Supreme Court has interpreted this to only authorize private parties to assert § 1442(a) removal jurisdiction "if they were 'authorized to act with or for [federal officers or agents] in affirmatively executing duties under . . . federal law.'" Id. at 151 (quoting City of Greenwood v. Peacock, 284 U.S. 808, 824 (1966)).

For a private person to be "acting under" a federal officer, the actions at issue in the litigation sought to be removed "must involve an effort to *assist*, or to help *carry out*, the duties or tasks of the federal superior." Id. at 152 (citing Davis v. South Carolina, 107 U.S. 597, 600 (1882)) (emphasis in original). See also Sawyer, 860 F.3d at 255 ("[C]ourts have unhesitatingly treated the 'acting under' requirement as satisfied where a contractor seeks to remove a case involving injuries arising from equipment that it *manufactured for the government*.") (emphasis in original).

The second prong requires that the Defendants raise a "colorable" federal defense. See, e.g., Sawyer, 860 F.3d at 254; Issacson, 517 F.3d at 138; Mesa v. California, 489 U.S. 121, 132-34 (1989). This requires that Defendants raise a claim that is "defensive" and "based in federal law." Mesa, 489 U.S. at 129-30. While Plaintiffs agree that the government contractor defense has been recognized as a colorable federal defense, see ECF No. 1 at ¶ 5; see also, e.g., Boyle v. United Technologies Corp., 487 U.S. 500, 512 (1988), Plaintiffs do not agree that such defense extends to Defendant 3M in these circumstances, as they have been pled in Plaintiffs' Complaint.

Finally, the third prong requires Defendants to show that the acts complained of were taken under "color of [federal] office." 28 U.S.C. § 1442(a)(1). For non-governmental defendants, this means that the entity must show that the *acts* for which it is being sued occurred *because of* what it was asked to do by the federal government. Issacson v. Dow Chem. Co., 517 F.3d 129, 137 (2d Cir. 2008). Put differently, Defendant must establish that the *acts* sued-upon occurred *while Defendants was performing their official duties*. Id.

## ANALYSIS

Defendant 3M has claimed federal officer jurisdiction by arguing that "one plausible source of at least some of Plaintiffs' alleged PFAS exposure" was MilSpec AFFF, a chemical "manufactured for and sold to the U.S. military," and thus, under Defendant's Notice of Removal,"[a]ll requirements for removal under § 1442(a)(1) are satisfied. ECF No. 1 at ¶¶ 2, 21. Despite Plaintiffs' Complaint not alleging exposure to MilSpec AFFF (nor having any relationship with the military), Defendant 3M relies upon an extra-jurisdictional, non-binding MDL Case Management Order ("CMO 36") to claim that non-AFFF exposure and AFFF exposure cannot be "isolate[d]."[2] ECF No. 1 at ¶ 4.

Plaintiffs' claims have no direct relationship to the federal government so as to provide a basis for removal – so now the Defendant asks this Honorable Court to find one. Here, Defendant believes that Plaintiffs' claims *could* "plausibly stem[] in part" from exposure to an "aviation safety product," called MilSpec AFFF, used "on military bases, airfields, and Navy ships." ECF No. 1 at ¶¶ 23, 27-28, 32, 39. However, none of the Plaintiffs are in the military, none have ties to Navy ships or seaman-related work, and most, if not all, have no ties to aviation-related work. Of the seven Plaintiffs, only one of them, Plaintiff Jeremy Pope, participated in providing services related to aviation, namely, through Plaintiff Pope's work with the Metro-Washington Airport Authority Fire and EMS Department ("Airport Authority"), in addition to work with his local fire department. The remaining Plaintiffs have no ties to aviation-related work. For them, then, according to Defendant, these six Plaintiffs *may* have been exposed to MilSpec AFFF in "certain large civilian airports." ECF No. 1 at ¶ 27.

---

[2] Notably, CMO 36 does not cite to, or seemingly rely upon, the opinions of medical or scientific experts in determining whether the sources of exposure can be delineated, nor does it engage in any fact-specific analysis.

If Plaintiffs were not exposed while visiting an airport, then, "each plaintiff was plausibly exposed to MilSpec AFFF through a variety of other means, *including through regular consumption of water* in many locales over their [*sic*] lifetime[s]." ECF No. 1 at ¶ 32 (emphasis added). First, for Plaintiff Pope, despite his time firefighting for the Airport Authority, he has no known, identified, and/or claimed exposure to MilSpec AFFF, beyond that which Defendant speculates he may have generally been exposed to. The remaining Plaintiffs have seemingly *no* known, identified, and/or claimed exposure to MilSpec AFFF, as it relates to their firefighting duties or otherwise. Similarly, neither Plaintiff Pope nor any Scott Plaintiff has asserted allegations related to, about, or alleging injury from, MilSpec AFFF exposure. Finally, of utmost importance to the issues underlying removal, the Defendant has not alleged that MilSpec AFFF was used in the manufacture or distribution of Plaintiffs' *turnout gear* – that is, the conduct actually charged in the Complaint.

Moreover, as to the Plaintiffs' possible general exposure "through a variety of other means," ECF No. 1 at ¶ 32, Defendant failed to list or identify any specific airports, waterways, or sources of contamination, instead opting to argue for general commingling. Defendant 3M's assertions about the general populace's exposure to PFAS cannot rationally form the basis of removal jurisdiction. While federal officer jurisdiction under § 1442(a)(1) may be broad, it is not limitless.

While Defendant's argument seems patently absurd on its face, stretching the bounds of § 1442(a)(1) jurisdiction far beyond the intent of the statute, it is also (a) insufficient to satisfy the three-prong test for federal officer removal; and (b) is contrary to Fourth Circuit precedent in <u>Maryland v. 3M Company</u>. Defendant's argument for federal officer removal contains a fatal flaw: It fully disregards the charged conduct, that is, the conduct actually putting 3M at issue in

this litigation. Herein, the charged conduct is the manufacture and distribution of PFAS-containing turnout gear. In Defendant's 23-page Notice of Removal, they mention "turnout gear" *nine* total times – and *not even one* of those times is during their argument for § 1442(a)(1) removal. See generally ECF No. 1 at ¶¶ 37-52. In fact, as is discussed herein, Defendant 3M fails to make a single argument justifying removal on the basis of the actual claims alleged in Plaintiffs' Complaint.

As Defendant lacks any other grounds for federal jurisdiction, given that the parties are not properly diverse to satisfy 28 U.S.C. § 1332(a)[3], nor is there any federal question at issue, this matter must be remanded back to Virginia state court.

## I. Defendant 3M Has Improperly Invoked Federal Subject Matter Jurisdiction: Defendant 3M Fails to Satisfy Any and All Elements of Federal Officer Jurisdiction.

This Court must remand this matter back to state court, as Defendant 3M does not satisfy the three elements of § 1442(a)(1) federal officer removal. Defendant 3M has hinged their argument for removal on the basis of the Plaintiffs' so-called MilSpec AFFF contamination – an argument which may have prevailed, *if Plaintiffs' allegations had any relationship with Defendant's MilSpec AFFF production*. While Defendant is correct in asserting that a "defendant's well-pleaded facts of removal" can entitle them to a federal forum, regardless of the non-federal cast of Plaintiffs' Complaint, they still must demonstrate "**whether the *conduct* with which [they] have been charged is related to [their] federal work.**" W. Va. ex rel. Hunt v. CaremarkPCS Health, L.L.C., 140 F. 4th 188, 195 (4th Cir. 2025) (quoting Maryland v. 3M Co., 130 F. 4th 380, 389 (2025)) (emphasis added). Upon this requirement, that the charged conduct have a *nexus* to the federal government, all three elements of § 1442(a)(1) fail.

[3] Defendants Bradsden Solutions, Inc. and Blue Ridge Rescue Suppliers, Inc. are Virginia stock corporations, thus defeating diversity jurisdiction.

**a) Defendant 3M's *charged conduct*, that is, manufacturing and distributing turnout gear containing PFAS-chemicals, was not carried out for or in relation to federal authority – in other words, Defendant 3M cannot satisfy the "nexus" requirement.**

Beginning with the third prong of federal officer jurisdiction, Defendant 3M must demonstrate that the conduct complained-of was "connected," "associated," or "relat[ed] to" official federal authority. See Papp v. Fore-Kast Sales Co., 842 F.3d 805, 813 (3rd Cir. 2016); Cnty Bd. of Arlington Cnty. v. Express Scripts Pharmacy, Inc., 996 F.3d 243, 254-55 (4th Cir. 2021). Put differently, Defendant 3M must show that the **acts they are being sued for** occurred because of what they were asked to do by the federal government. Issacson v. Dow Chem. Co., 517 F.3d 129, 137-38 (2d Cir. 2008). Here, this distinction is critical, as Defendant 3M is being sued for the act of manufacturing and distributing PFAS-containing *turnout gear* – not MilSpec AFFF. The recent decision by the Fourth Circuit Court of Appeals in Maryland v. 3M Company, 130 F. 4th 380 (2025) is instructive.

In Maryland, the states of Maryland and South Carolina (collectively, "the States") respectively each brought two lawsuits alleging **3M's environmental contamination of waterways**. The States' respective lawsuits included one directed specifically towards 3M's PFAS production of MilSpec AFFF chemicals and a second directed generally towards the production of other non-AFFF PFAS-containing products. With regard to their non-AFFF suits, the States disclaimed any AFFF-related claims, seeking to distinguish their environmental contamination claims into two categories: environmental contamination from AFFF products produced for the Military and contamination from non-AFFF products produced for consumers.

3M removed the non-AFFF suit under 28 U.S.C. § 1442(a)(1), claiming that "PFAS from 3M's non-AFFF products **indistinguishably commingled** with the PFAS from 3M's Military AFFF. . . . [a]nd because the PFAS from both sources were commingled, PFAS from 3M's Military

AFFF '**inseparably contributed** to any alleged "non-AFFF" PFAS contamination.'" Maryland, 130 F. 4th at 386 (emphasis added). In addressing **only** the third element of § 1442(a)(1) removal, that is, the nexus requirement, the Fourth Circuit declined to give dispositive effect to the States' disclaimer, while still noting that, regardless of the disclaimer's non-dispositive effect, **3M still carried the burden of proving the requisite nexus.**

To satisfy this nexus element, "a defendant must show it is being sued for an act or acts that it claims were done under—or related to acts done under—federal authority." Anne Arundel County v. BP P.L.C., 94 F. 4th 343, 349 (4th Cir. 2024). In considering whether the relevant conduct relates to a defendant's federal work, pursuant to established standards, the Court "credit[s] *Defendants'* theory of the case when determining whether there is such a connection or association." Cnty. Bd. of Arlington Cnty., 996 F.3d at 256 (quoting Isaacson v. Dow Chem. Co., 517 F.3d 129, 137 (2d Cir. 2008) (emphasis in original)). "**That said, a proponent for removal decidedly does not satisfy the nexus element by alleging only that the 'plaintiff's entire civil action in a general sense' is related to the defendant's federal work.**" Maryland, 130 F. 4th at 389 (quoting Anne Arundel Cnty., 94 F.4th at 348) (emphasis added).

Thus, the unique facts, joined by 3M's specific theory of their case, were of utmost importance to the Court in coming to their conclusion in Maryland. The Court noted that, under 3M's theory:

> [T]he nexus requirement would be satisfied because PFAS from different sources commingle to the point that it is impossible to identify the precise source of a contaminant once those chemicals **seep into the relevant waterways.** Some of the **PFAS contamination *charged by the States* came from Military AFFF**, so any remediation would necessarily implicate work that 3M did for the federal government.

Maryland, 130 F.4th at 390 (emphasis added). This was dependent on the specific factual circumstances, including the fact that the *Plaintiffs* had pled *general PFAS contamination near*

*military bases* – thus, making it plausible that the *contamination* ***at issue*** in the non-AFFF case came from military AFFF production.

Factually, the Scott case is incredibly distinct from Maryland – namely, here, Plaintiffs have pled one specific, identifiable source of PFAS contamination: **their turnout gear**. The nature of Plaintiffs' claims are patently clear from the ninth paragraph of Plaintiffs' Complaint: "Plaintiffs bring[] this action for harms . . . resulting from [PFAS] that were manufactured, designed, sold, supplied, distributed, and/or contained in **protective clothing specifically designed for firefighters ("turnouts")** manufactured, designed, sold[,] supplied[,] and/or distributed by each of the Defendants." Pl. Compl. ¶ 9. Unlike Maryland, where Plaintiffs pled general environmental contamination, no specific factual circumstances exist here which necessarily implicate AFFF – let alone implicate Defendant 3M's *general* creation of MilSpec AFFF for the U.S. Government over a period of sixty years.

Even for Plaintiff Pope, who provided firefighting services to the Airport Authority, Maryland remains distinct and commands remand. The Court of Appeals noted that the question to be asked was "if, under 3M's theory of the case, it is plausibly alleged that its charged conduct was related to its federal work." Maryland, 130 F.4th at 390. Here, there are *no* allegations that the charged conduct – the production and distribution of turnout gear – was related to MilSpec AFFF production. In fact, the Defendant's Notice of Removal fatally fails to even argue the relevant nexus inquiry. Moreover, unlike the Plaintiffs in Maryland, Plaintiffs here have not alleged any contamination that "came from Military AFFF" sources. Id. Finally, the intermingling of different PFAS sources, when the charged conduct arises from environmental contamination via certain waterways, is factually quite distinct from Plaintiffs alleged direct exposure from one specific, identifiable source (their turnout gear). To date, no party has alleged AFFF exposure

(Milspec AFFF or otherwise) *from Defendant's charged conduct* of producing and distributing turnout gear.

Instead, at most, the connection between MilSpec AFFF and the Scott Plaintiffs is attenuated to general lifetime exposure through working at the Airport Authority or from "regular consumption of water." ECF No. 1 at ¶ 28, 32. Defendant cannot satisfy the nexus requirement by generally claiming that Plaintiffs *may have* been exposed to MilSpec AFFF at some time in their lives and/or careers. This is exactly the general pleading prohibited in Anne Arundel County.

In Anne Arundel County v. BP P.L.C., 94 F. 4th 343, 348 (4th Cir. 2024), the Court of Appeals was *exceptionally* clear on what is needed to satisfy the third prong of § 1442(a)(1) jurisdiction – and it is not "novel and atextual attempt[s] to expand the scope of the relevant inquiry." In Anne Arundel, the defendants sought § 1442(a)(1) removal, alleging that the nexus prong should be broadly interpreted to ask whether "the civil action . . . relat[es] – at least in part – to the defendant's action(s) under the direction of federal officers." Id. at 348 (cleaned up). Based upon this interpretation, the defendants appealed the lower court's denial of jurisdiction, claiming that "the district court erred [by] focusing only on whether 'the alleged tortious conduct' identified in the complaints relate to the companies' asserted federal duties or obligations." The Court of Appeals responded succinctly:

> The statutory text tells us what must relate to what. To qualify for removal, a defendant must show, as relevant here, that a suit is "against" "any person acting under [an] officer" "for or relating to any *act* under color of" a federal office. 28 U.S.C. § 1442(a), (a)(1) (emphasis added). **It is the "act" for which the defendant is being sued**—not the plaintiff's entire civil action in a general sense—**that must relate to the asserted federal duty.**

Anne Arundel, 94 F. 4th at 348. The Court continued on to cite to other cases describing the statute in "precisely" that way – that is, requiring the *conduct charged in the Complaint* to relate to the asserted official authority. Moreover, the Court further makes clear that the relatedness

requirement is ***not* to be construed to inquire about the relationship between the *injury* and the federal authority**, see id. at 348-49, but instead, again reiterated that it involves the *charged conduct*, that is, the *acts* for which the defendant is being sued.

Here, the charged conduct, the acts for which Defendant 3M is being sued, relate to the creation and distribution of turnout gear. Defendant has not claimed that the *production of turnout gear,* including specifically the turnout gear worn by Plaintiffs, was related to any asserted federal duty or authority, including any duties related to MilSpec AFFF production. At most, Defendant 3M's argument is, in itself, a claim about how Plaintiffs' *injuries* may be related to their potential general MilSpec exposure – in fact, Defendant's Notice of Removal states as much: arguing that plaintiffs cannot "distinguish **injuries** allegedly caused by non-AFFF PFAS from any type of AFFF, which includes MilSpec AFFF." ECF No. 1 at ¶ 36 (emphasis added). Even for Plaintiff Pope, at most, Defendant's arguments for MilSpec AFFF exposure inquires into the relationship between Pope's *injuries* and 3M's federal authority, as Defendant's MilSpec AFFF production for the Airport Authority is **not** the "act or acts" that "it is being sued for." Anne Arundel, 94 F.4th at 349 (distinguishing defendants' arguments that the conduct charged is usually the same as the injury, noting that is not the standard governing removal).

At most, Defendant makes an unexplained, undetailed one-line reference to "military specifications" which "expressly or implicitly required the use of PFAS in the product." ECF No. 1 at ¶ 42. It is unclear what "the product" is here – whether it be MilSpec AFFF or turnout gear. Even if Defendant is intending to vaguely refer to turnout gear, they have failed to demonstrate, specify, or even name what military specifications governed *turnout gear* manufacturing and distribution. Even if such specifications exist, of which Plaintiffs are currently unaware, the mere compliance with a governmentally set standard does not justify removal. See Sawyer v. Foster

Wheeler LLC, 860 F.3d 249, 255 (4th Cir. 2017) (citing Watson, 551 U.S. at 154-54). See also Cnty Bd. of Arlington Cnty. v. Express Scripts Pharmacy, Inc., 996 F.3d 243, 251 (4th Cir. 2021) ("[B]usinesses that operate in fields subject to stringent federal regulations cannot use their compliance with federal law – without more – to invoke the federal officer statute."); Gov't of P.R. v. Express Scripts, Inc., No. 23-1613, at *17 (1st Cir. Ct. App. Oct. 18, 2024) ("[A] private entity that merely complies with federal regulations does not act under a federal officer's authority because 'simple compliance with the law' does not assist the government in the same way."); Doe v. BJC Health Sys., 89 F.4th 1037, 1042 ("A business that simply follows federal law, even highly detailed and complex regulations, does not act under a federal officer."). If Defendant is referring to the military specifications governing MilSpec AFFF, then their argument is irrelevant and non-consequential, for those reasons previously articulated above.

Anne Arundel further serves as a useful example to demonstrate why Defendant 3M's nexus argument fails. After distinguishing the injury from the charged conduct, in Anne Arundel, the Court rejected Defendants' nexus arguments that "federal authority involve[s] extraction of gasoline or operation of energy infrastructure, either under federal regulations or via commercial relationships with the federal government." Anne Arundel, 94 F.4th at 349. Why? Because the plaintiffs' claims did "not challenge the companies' production and supply of fossil fuels" and were instead focused on the defendants' allegedly misleading marketing materials. Id. This is critical – the mere fact that Defendant had a separate relationship to the federal government did not entitle them to a federal forum when the charged conduct "fail[ed] to show the required relatedness." Id. The Court continued on, in rejecting federal officer jurisdiction, to note the same distinction that prevails herein: "Here, by contrast, the companies do not argue the federal government required them to market or describe their products in a certain way. We thus join the

First, Second, Eighth, and D.C. Circuits in holding that allegations like those here do not support federal officer removal." Id. at 350.

The Fourth Circuit has been exceptionally clear that the relationship between the *charged conduct* and the asserted authority is *only* the correct analysis upon which to satisfy the "nexus" requirement. The relationship between the *injury* and the asserted authority is insufficient. Defendant has not demonstrated, or even discussed, how the *charged conduct* of turnout gear manufacture and distribution is related to any government authority, let alone related to their MilSpec AFFF production. Thus, Defendant **fails** to satisfy the third prong of § 1442(a)(1) removal.

**b) Plaintiffs have properly disclaimed, to the extent necessary, any grounds of recovery related to Defendant's AFFF or Milspec AFFF production, distribution, and/or general contamination.**

While the analysis can end here, given Defendant's failure to satisfy the nexus prong, a discussion of the effect of disclaimers remains worthwhile. Throughout their Notice of Removal, Defendant 3M argues that Plaintiffs cannot deny, disclaim, or omit allegations related to AFFF to avoid the MDL and/or federal jurisdiction. See ECF No. 1 at ¶ 33. First, Plaintiffs, whose claims have no relationship with the military, groundwater, or aviation, did not deny or omit allegations by not discussing Plaintiffs' water consumption and civilian airport visits in their Complaint. Plaintiffs' claims have no relationship to Defendant 3M's federal work, *a required element for § 1442(a)(1) removal*, and such a relationship is not created merely because Defendant can broadly claim PFAS-exposure for the entire American population. See Anne Arundel County v. BP P.L.C., 94 F. 4th 343, 348 (4th Cir. 2024).

In Maryland, after noting that disclaimers were not *dispositive* on the issue of jurisdiction, the Fourth Circuit continued on to note two "pertinent" issues that, in the Fourth Circuit's words, "highlight how the charged conduct relates to [3M's] federal work." Id. at 391. First, a causation

issue existed – that is, deciding whether certain environmental contamination came from 3M's Military AFFF or its non-AFFF products. Second, assuming the first issue could be resolved, the factfinder would then need to apportion out the contamination between AFFF products and non-AFFF products. Thus, **"[t]he need to unravel such challenging questions in this case establishes that 3M's federal work is inextricably related to the charged conduct**." Id. at 391 (emphasis added).

Of pertinent note herein, the Fourth Circuit's specifically conceded that, "[i]f, on the other hand, **a plaintiff concedes that those difficult questions are unnecessary for the purposes of establishing liability, it may remain in state court."** Id. at 392 (emphasis added). Citing to Illnois ex rel. Raoul v. 3M Co., 111 F.4th 846, 849 (7th Cir. 2024), the Fourth Circuit acknowledged that **remand was appropriate where the plaintiff expressly disclaimed contamination** from any facility besides a single specific one enumerated in their complaint, thus agreeing that a factfinder need not apportion out the sources of contamination. In Maryland, the States (Plaintiffs) refused to make these concessions, thus leaving the "important" causation and allocation questions best reserved for federal court.

This opinion in Maryland both contradicts the position taken in CMO 36, see *infra*, and supports Plaintiffs' Motion to Remand. First, in Maryland, the allegations by the plaintiffs involved *general environmental contamination with various, inextricably linked sources*, including sources produced for and on behalf of the U.S. Military. Meanwhile, the Plaintiffs have alleged one specific source, wholly unrelated to the federal government, groundwater, and the U.S. Military – that is, their firefighting turnouts, worn while providing services to various Virginian counties and cities. Plaintiffs' Complaint, and claims therein, are not just a "disclaiming" AFFF claims – they are a completely separate, premised on non-AFFF contaminants, and unrelated to

AFFF entirely. This is clearly factually distinct from the issues of environmental contamination pled in Maryland.

Second, and of utmost importance to the pending Motion to Remand, is that the Fourth Circuit Court of Appeals has expressly approved the delineation between non-AFFF cases and AFFF cases – wholly permitting Plaintiffs to disclaim AFFF claims, provided that the "plaintiff concedes that [certain] difficult questions are unnecessary for the purposes of establishing liability." Id. at 392. Plaintiffs' lawsuit is not premised on AFFF contamination, including groundwater or airport contamination. It is a fallacy to claim that the potential for general lifetime exposure to chemicals present in the air or water is so interlinked to Plaintiff's *specific* contamination from a single source so as to make the two indistinguishable – even for Plaintiff Pope. A factfinder will *never* "need to identify the sources of pollutants where the company has been charged with polluting the environment through manufacturing some products for the federal government," Maryland, 130 F. 4th at 391, *because those are not the facts before the Court.*

To the extent it is even necessary, it is worth noting that Plaintiffs' Complaint does not include, and implicitly concedes, any claims against Defendants as it relates to AFFF exposure, including potential MilSpec AFFF exposure by Plaintiff Pope. Like the Plaintiffs in Illnois ex rel. Raoul v. 3M Co., 111 F.4th 846, 849 (7th Cir. 2024), Plaintiffs here, including Pope, are not seeking relief for mixed PFAS contamination nor will a factfinder need to apportion out the sources of the contamination. See also Maryland, 130 F.4th at 392 (discussing Illinois and comparing the Plaintiffs therein seeking to recover for injuries from mixed contamination). Plaintiffs' sole source of PFAS contamination, as is alleged in Plaintiffs' Complaint, arises from one source: their turnout gear.

Taken together, regardless of Case Management Order No. 36, a non-binding Order, see discussion *infra*, the Fourth Circuit has recognized not only that a distinction exists between AFFF and non-AFFF claims – but that a plaintiff *can* successfully plead as much, removing them from both MDL jurisdiction *and* federal court jurisdiction entirely.

**c) Recognizing CMO 36's non-binding impact on other Fourth Circuit Jurisdictions.**

As CMO 36 forms the basis of Defendant's arguments for removal, a brief discussion is warranted herein. On August 22, 2025, the Honorable Judge Gergel issued a Case Management Order (CMO 36) attempting to come to a universal decision concerning the applicability of remand in non-AFFF cases. See ECF No. 7-1 at 314 (attaching CMO 36 as an exhibit). Of primary note, while Honorable Judge Gergel serves as the MDL Presiding Judge, *he does not begin to possess authority or jurisdiction over cases until* ***after*** *they have been incorporated into the MDL by the JPML Panel*. In other words, the MDL Court cannot command the transfer of non-MDL cases into the MDL. Taken together, the weight of authority to be afforded to CMO 36 is, *at its most*, persuasive.

In issuing CMO 36, Judge Gergel cites to the Fourth Circuit's opinion in Maryland, claiming that the Maryland case stands for the proposition that it is contrary to law to avoid the MDL by "denying, disclaiming, or omitting allegations concerning exposure to AFFF." See CMO 36 at 1. Plaintiffs do not disagree with Judge Gergel's interpretation of Maryland, insofar as the Maryland Court did acknowledge that disclaimers are not ***dispositive*** on the issue of jurisdiction. However, to the extent that CMO 36 implies as much, Plaintiffs *do disagree* with the contention that disclaiming or excluding allegations concerning AFFF exposure is blanketly improper. See *supra*, discussion of Maryland.

Moreover, since the issuance of CMO 36, despite its claim that federal officer jurisdiction is de facto applicable in any case involving PFAS, at least one district court has already disagreed. See Marathon Petroleum Company LP v. Arkema, Inc., et al, No. C25-1250, 2025 U.S. Dist. LEXIS 171664 (W.D. WA. Sep. 3, 2025) (hereinafter, "Marathon").[4] In contrast to the assumption "inextricably link[ing]" AFFF and non-AFFF claims, as was reached by the Court in CMO 36, the Court in Marathon found that "Tyco has failed to provide any evidence that would show by a preponderance that the PFAS contamination at the Refinery is causally linked to MilSpec AFFF used at NAS Whidbey or the Airport." No. C25-1250, at *14-15. Thus, since the release of CMO 36, federal district courts have already found themselves in disagreement – indicating that the issue is not as "open and shut" as the Defendant (and the Court in CMO 36) would like this Court to believe.

CMO 36 concludes with a "suggestion and request" to the JPML, asking them to transfer all cases to the presiding court. As noted previously, this Order is no more controlling over the Panel than an Order from this Honorable Court would be – it may be persuasive, but it holds no authority. This Court need not obey CMO 36 – but it must follow the precedent set in Anne Arundel and Maryland, both of which clearly command remand.

**d) Defendant 3M has failed to satisfy the second prong of § 1442(a)(1), namely, Defendant has failed to assert allegations indicating that they were a federal contractor, as it pertains to the production of Turnout Gear, and thus, has failed to demonstrate the applicability of a Colorable Federal Defense.**

Plaintiffs agree that the federal contractor defense is a colorable federal defense for the purpose of establishing § 1442(a)(1) jurisdiction. See, e.g., Cnty Bd. of Arlington Cnty. v. Express Scripts Pharmacy, Inc., 996 F.3d 243, 254-55 (4th Cir. 2021) (discussing the invocation of government contractor immunity in the context of 1442(a) removal). However, that does not

[4] Marathon was provided to this Court as an exhibit to Plaintiff's Motion to Stay.

save Defendant 3M's argument under this second prong. At its core, before an analysis of the elements required to satisfy this defense can begin, the federal contractor defense requires the invoking party to be a federal contractor. See Express Scripts Pharmacy, Inc., 996 F.3d at 255 (quoting Ripley v. Foster Wheeler LLC, 841 F.3d 207, 210 (2016)) (emphasis added). Defendant 3M is neither a federal contractor nor do they meet the requirements for the federal contractor defense *in light of the charged conduct*.

In Defendant's words, under the government contractor defense, "the defendant is not liable . . . 'when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States.'" ECF No. 1 at ¶ 46 (quoting Boyle, 487 U.S. at 512). Defendant continues on to argue how their production of MilSpec AFFF satisfies those three requirements – without any reference to turnout gear. See ECF No. 1 at ¶¶ 44-50.

Defendant 3M cannot be, and has not been alleged to be, a federal contractor, *at least in their production and distribution of turnout gear*. Plaintiffs' turnout gear has zero relationship to MilSpec AFFF, used for unrelated purposes at unrelated places. Defendant has not demonstrated (or even discussed) how the United States "approved reasonably precise specifications" for Plaintiffs' turnout gear; how Plaintiffs' turnout gear "conformed to those specifications"; or how 3M warned the United States about the dangers in the use of turnout gear. See ECF No. 1 at ¶ 46 (quoting Boyle, 487 U.S. at 512). The Defendant has not made any other allegations about a contractor relationship with the federal government for *turnout gear production*. The mere fact that the Defendant may count as a federal contractor for the production of certain products does not broadly entitle them to a federal forum in suits concerning unrelated items. Since Defendant

fails to assert any other ground to prove they are a contractor, their argument inherently must fail, precluding jurisdiction altogether.

**e) Defendant 3M has failed to satisfy the first prong of § 1442(a)(1), namely, Defendant has failed to demonstrate how they were "Acting Under" federal authority when manufacturing such Turnout Gear.**

Beginning with the first prong of § 1442(a), the Supreme Court has found that, where a private person "acts as an assistant to a federal official[,]" or, in other words, "assists" a federal officer "in the performance of his official duty[,]" some of the considerations underlying federal removal apply. Watson v. Phillip Morris Cos., 551 U.S. 142, 150 (2007) (quoting Davis v. South Carolina, 107 U.S. 597, 600 (1882)). In this context, then, "acting under" must refer to "what has been described as a relationship that involves 'acting in a certain capacity, considered in relation to **one holding a superior position or office.'**" Id. at 151 (quoting 18 Oxford English Dictionary 948 (2d ed. 1989)). See also Doe v. Cedars-Sinai Health Sys., 106 F.4th 907, 914 (9th Cir. 2024) ("Something more must be present, like the 'delegation of legal authority,' which might include 'evidence of any contract, any payment, any employer/employee relationship, or any principal/agent arrangement.") (quoting Watson, 551 U.S. at 156); Cnty. of San Mateo v. Chevron Corp., 32 F.4th 733, 756-57 (9th Cir. Ct. App. 2022); Doe v. BJC Health Sys., 89 F.4th 1037, 1043 (8th Cir. 2023) ("[A] party acts under a federal officer, within the meaning of the federal officer removal statute, only when it performs a 'basic governmental task.' A basic governmental task involves a 'delegation of legal authority' from a federal entity. **In other words, the party acts on the government's behalf.**) (emphasis added) (internal citations omitted).

Thus, § 1442(a)(1) *only* applies to private parties when they were "authorized to **act with or for** [federal officers or agents] in **affirmatively executing duties** . . . under federal law." Id. (quoting City of Greenwood v. Peacock, 384 U.S. 808, 824 (1966)) (emphasis added).

Defendant's entire argument for the "acting under" prong assumes, incorrectly, that "the alleged PFAS exposure that is the focus of Plaintiffs' *[sic]* claims plausibly stems in part from MilSpec AFFF." ECF No. 1 at ¶ 39. Defendant fails to assert *any* other ground for the "acting under" element – thus, once Defendant's argument fails on the third prong, then, it inherently must fail on the first.

The "focus" of Plaintiffs' Complaint has no relationship, connection, or correlation to MilSpec AFFF. While it may be true that Defendant's production of MilSpec AFFF might satisfy the "acting under" prong, *if it was being sued for such production*, it is an analysis wholly irrelevant to the removal of the Scott Plaintiffs' turnout gear cases. If Sodexo USA argued removal was appropriate in a tortious food poisoning case arising out of a private event, merely because Sodexo *also* unrelatedly contracts with the U.S. Military to provide food on military bases, we'd agree that jurisdiction is inappropriate. This is one of many examples that can be envisioned to compare to Defendant 3M's argument herein. See Anne Arundel, 94 F.4th at 349-350 (rejecting Defendant's arguments about government involvement in oil production and sale, as the charged conduct related to *marketing*). The mere fact that a global company provides *separate* services to both private citizens and the U.S. Government does not indefinitely entitle them to a federal forum. A defendant's authority to act under the government in the production of one item does not de facto extend this same federal authority to all other products they create.

Defendant has not demonstrated that they produced the *turnout gear* at issue as a "vital product" that the "Government would otherwise have to produce itself." ECF No. at 1 at ¶ 39 (quoting Issacson, 517 F.3d at 137). Defendant has not shown how their production of *turnout gear* was a task delegated to them by a federal authority or was otherwise undertaken to "assist" the federal government. But see ECF No. 1 at ¶ 40; Watson v. Phillip Morris Cos., 551 U.S. 142,

150 (2007). Defendant has not articulated how Plaintiffs' *turnout gear* was created per 3M Company's authorization "to **act with or for** [federal officers or agents] in **affirmatively executing duties** . . . under federal law." Id. (quoting City of Greenwood v. Peacock, 384 U.S. 808, 824 (1966)) (emphasis added). In fact, none of Defendant's 23-page brief articulates a *single* argument tying the charged conduct to the federal government. In ignoring turnout gear altogether, Defendant has asserted a litany of unrelated arguments to mislead and distract – all while failing to satisfy the "acting under" prong. See ECF No. 1 at ¶¶ 38-40 ("acting under" argument).

As Defendant's arguments fail on all three prongs of § 1442(a)(1), and as Fourth Circuit precedent advises, this Court should remand this matter back to appropriate state court.

## CONCLUSION

WHEREFORE, for the foregoing reasons, Plaintiff respectfully requests this Honorable Court grant the Scott Plaintiffs' Motion to Remand this matter back to the Circuit Court for the City of Virginia Beach and order the payment of any just costs and expenses incurred by Plaintiffs.

**Respectfully yours,**
**ADEN W. SCOTT, III,**
**MARK C. DAVIS,**
**EDWARD A. LANE,**
**JEREMY M. POPE,**
**CASEY BARDEN,**
**JOHN HUDNALL,**
**and**
**AMY L. HUTCHESON, Executrix of the Estate of JAMES S. HUTCHESON, deceased,**

**Plaintiffs**

s/ Kevin Biniazan
Kevin Biniazan | VSB No. 92109
Jeffrey A. Breit | VSB No. 18876

Don Scott | VSB No. 88725
Lauren Martin | VSB No. 93653
Alexis Bale | VSB No. 100318
BREIT BINIAZAN, PC
Towne Pavilion Center II
600 22nd Street, Suite 402
Virginia Beach, VA 23451
Telephone | 757.622.6000
Facsimile | 757.299.8028
Email | kevin@bbtrial.com
Email | jeffrey@bbtrial.com
Email | don@bbtrial.com
Email | lmartin@bbtrial.com
Email | abale@bbtrial.com

*Counsel for Plaintiff*

## C E R T I F I C A T E

I hereby certify that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will then send notification of electronic filing (NEF) to counsel of record.

Date: October 27, 2025

s/ Kevin Biniazan
Kevin Biniazan | VSB No. 92109
Jeffrey A. Breit | VSB No. 18876
Lauren Martin | VSB No. 93653
BREIT BINIAZAN, PC
Towne Pavilion Center II
600 22nd Street, Suite 402
Virginia Beach, VA 23451
Telephone | 757.622.6000
Facsimile | 757.299.8028
Email | kevin@bbtrial.com
Email | jeffrey@bbtrial.com
Email | lmartin@bbtrial.com

*Counsel for Plaintiff*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**NORFOLK DIVISION**

| | |
|---|---|
| Aiden W. Scott, III, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>3M Company, et al.,<br><br>Defendants. | No. 2:25-cv-00617-AWA-LRL |

**DEFENDANT 3M COMPANY'S OPPOSITION TO PLAINTIFFS' MOTION TO REMAND**

3M removed this action to federal court because Plaintiffs' alleged exposure to per- and polyfluoroalkyl substances ("PFAS") was plausibly caused, at least in part, by PFAS-containing aqueous film-forming foam ("AFFF") that was manufactured for and sold to the U.S. military and other users. A select group of suppliers (including 3M) manufactured that AFFF in accordance with the military's rigorous specifications ("MilSpec"). 3M alleged that firefighters like Plaintiffs[1] have used its MilSpec AFFF products, which has contaminated drinking water in various locations across the United States, including in and around Virginia. As a result, 3M is entitled to litigate its government contractor defense in a federal forum including to find the facts necessary to resolve Plaintiffs' claimed exposure to PFAS. As the court overseeing the *In re: Aqueous Film-Forming Foams (AFFF) Products Liability Litigation* ("MDL")[2] has recognized, Plaintiffs cannot "isolate" injuries caused by non-AFFF PFAS, so "there exists, at the very least, a plausible basis for alleging

[1] Plaintiffs include current and former firefighters and one spouse of a deceased firefighter. They are collectively referred to as "Plaintiffs."
[2] No. 2:18-mn-2873-RMG (D.S.C.).

federal jurisdiction sufficient to satisfy [a defendant's] initial burden on a notice of removal." MDL Case Management Order 36 at 2 ("CMO 36").[3]

Although Plaintiffs argue that 3M cannot satisfy any element of the federal officer removal statute, the argument underlying Plaintiffs' Motion to Remand[4] ("Mot." or "Motion") is that Plaintiffs' complaint concerns the manufacture and production of turnout gear, so 3M must establish that it has a federal connection with respect to the manufacture and production of turnout gear. This argument seeks to avoid the application of binding precedent, which instructs courts that they cannot "blindly" accept Plaintiffs' version of "charged conduct" for purposes of federal officer removal. Plaintiffs' Motion also seeks to avoid the reasoning of CMO 36, which was entered by the MDL Judge who has overseen the MDL for nearly a decade and which explains that the arguments 3M has made in support of removal here are sufficient to satisfy 3M's burden. Plaintiffs' Motion should be denied.

## BACKGROUND

Plaintiffs brought this action in state court seeking to hold 3M liable for its alleged role in designing, manufacturing, or selling PFAS and PFAS-containing products. NOR ¶ 1. Plaintiffs allege that they were exposed to PFAS from protective firefighter turnout gear that they wore while working as firefighters. *Id.* ¶ 17. Plaintiffs brought several claims against 3M and other defendants for personal injuries they allegedly received as a result of their exposure to PFAS in turnout gear. *See id.* ¶ 9.

---

[3] CMO 36 is attached as Exhibit B to 3M's Notice of Removal. *See* ECF No. 1-2. 3M's Notice of Removal ("NOR") with relevant exhibits is attached as Exhibit 1 to this Opposition.

[4] Plaintiffs' Motion and supporting brief are collectively referred to as his "Motion." Pincite citations refer to Plaintiffs' Brief. *See* ECF No. 11.

On September 26, 2025, 3M removed this case to federal court under the federal officer removal statute. *See id.* ¶¶ 1–5. 3M's Notice of Removal asserted that one of the plaintiffs—Jeremy M. Pope ("Mr. Pope")—was exposed to MilSpec AFFF while working as a firefighter for the Walter Reed Fire Department and the Metro-Washington Airports Authority Fire and EMS Department, which is the fire department responsible for Ronald Reagan Washington National Airport and Washington Dulles International Airport. *Id.* ¶ 3. 3M further alleged that these airports had a long history of AFFF use, including because they are Part 139 airports, which means that the U.S. government had required them to use MilSpec AFFF. *Id.* ¶¶ 3, 27–30.

Although removal of the entire action based on 3M's allegations concerning Mr. Pope alone is proper, *see, e.g.*, *Bennett v. MIS Corp.*, 607 F.3d 1076, 1084 n.6 (6th Cir. 2010), 3M also separately alleged that each Plaintiff was plausibly exposed to MilSpec AFFF through their use of MilSpec AFFF in connection with their training and service as firefighters. *See id.* ¶¶ 32–36. 3M further alleged that Plaintiffs were exposed to PFAS through various other means such as regular consumption of drinking water contaminated with PFAS from the use of MilSpec AFFF. *See id.* 3M alleged that MilSpec AFFF has been used in fire management and prevention for decades, and MilSpec AFFF exposure is indistinguishable from exposure to other PFAS sources. *See id.* ¶¶ 2, 4, 23, 25, 34, 36. 3M also explained that the MDL Court recently issued CMO 36, which addresses plaintiffs who seek "to avoid the MDL and/or federal jurisdiction by denying, disclaiming, or omitting allegations concerning exposure to AFFF." *Id.* ¶ 33 (internal quotations omitted). As the MDL Court explained, personal injury plaintiffs at the pleading stage cannot "easily isolate personal injuries caused by AFFF as opposed to personal injuries allegedly caused by non-AFFF PFAS," so a defendant whose removal theory is based on alleged MilSpec AFFF exposure—as

3M asserts here—has a "plausible basis for alleging federal jurisdiction sufficient to satisfy its initial burden on a notice of removal." *Id.* ¶¶ 28–36 (internal quotations omitted).

**LEGAL STANDARDS**

Under the federal officer removal statute, a civil action may be removed to federal court if it is "against or directed to" "any person acting under [any] officer[] of the United States or of any agency thereof," and is "for or relating to any act under color of such office." 28 U.S.C. § 1442(a)(1). A private defendant thus may remove a case by showing that (1) "it acted under a federal officer"; (2) "the charged conduct was carried out for or in relation to the asserted official authority"; and (3) the defendant "has a colorable federal defense." *Sawyer v. Foster Wheeler LLC*, 860 F.3d 249, 255 (4th Cir. 2017) (cleaned up). Section 1442(a)(1) authorizes removal of the entire case even if only a portion of the case relates to the defendant's federal work. *See id.* at 257; *see also Cnty. Bd. of Arlington Cnty., Va. v. Express Scripts Pharm., Inc.*, 996 F.3d 243, 247–248, 252 n.8 (4th Cir. 2021).

The Supreme Court has held that § 1442(a)(1) is "liberally construed" in favor of removal, *Watson v. Philip Morris Co., Inc.*, 551 U.S. 142, 147 (2007), and "should not be frustrated by a narrow, grudging interpretation," *Willingham v. Morgan*, 395 U.S. 402, 407 (1969). Section 1442(a)(1) furthers the important Congressionally adopted policy of affording federal agents a "federal forum for a federal defense." *Sawyer*, 860 F.3d at 254 (internal quotations omitted). Therefore, the "ordinary 'presumption against removal' does not apply," *Cnty. Bd. of Arlington Cnty.*, 996 F.3d at 251, and § 1442 "*mandates* a liberal construction," *West Virginia ex rel. Hunt v. Caremark PCS Health, L.L.C.*, 140 F.4th 188, 194 (4th Cir. 2025) (emphasis added). Moreover, § 1442(a)(1) is "an exception to the well-pleaded complaint rule." *Ripley v. Foster Wheeler LLC*, 841 F.3d 207, 210 (4th Cir. 2016). Actions against federal agents "may be removed despite the

nonfederal cast of the complaint" so long as "the defense depends on federal law." *Jefferson Cnty. v. Acker*, 527 U.S. 423, 431 (1999). Courts "must credit a removing defendant's theory of the case as to whether the conduct with which it has been charged is related to its federal work." *Maryland v. 3M Company*, 130 F.4th 380, 389 (4th Cir. 2025).

As in other contexts, "a defendant's notice of removal need include only . . . *plausible* allegation[s]" supporting removal. *Dart Cherokee Basin Operating Co., LLC v. Owens*, 574 U.S. 81, 89 (2014) (emphasis added); *see* 28 U.S.C. § 1446(a). Although the "[t]he removing party bears the burden" of showing "that the actions belong in federal court," the party will "carry that burden" when its notice of removal contains a "'plausible allegation' that federal jurisdiction is proper." *Maryland*, 130 F.4th at 387; *accord Caremark PCS Health, L.L.C.*, 140 F.4th at 194.

**ARGUMENT**

3M's NOR plausibly alleged each element of federal officer jurisdiction: 3M "acted under a federal officer," 3M "has a colorable federal defense," and "the charged conduct was carried out for or in relation to the asserted official authority." *See Sawyer*, 860 F.3d at 255 (cleaned up); NOR ¶¶ 37–52; *see also Boyle v. United Techs. Corp.*, 487 U.S. 500, 512 (1988). Plaintiffs make three primary arguments in their Motion. First, Plaintiffs argue that the "charged conduct" is the manufacture and distribution of turnout gear containing PFAS, so 3M cannot satisfy the "nexus" requirement under the Federal Officer Removal Statute. Second, Plaintiffs argue that they properly disclaimed recovery related to AFFF and that CMO 36 misapplies *Maryland v. 3M Company*. Third, relying in large part on their incorrect argument that 3M cannot satisfy the "nexus" element of federal officer removal, Plaintiffs argue that 3M cannot demonstrate the remaining elements of federal officer removal. Plaintiffs' arguments do not withstand scrutiny.

## I. The "Charged Conduct" Is 3M's Alleged Role In Exposing Plaintiffs To PFAS.

Plaintiffs' Complaint makes clear their position that 3M is responsible for their alleged exposure to PFAS:

> Defendants knowingly and willfully manufactured, designed, marketed, sold, and distributed chemicals and/or products containing PFAS for use within the State of Virginia when they knew or reasonably should have known that the Firefighter Plaintiffs and Decedents would repeatedly inhale, ingest, and/or have dermal contact with these harmful compounds during the ordinary course of his profession, including during firefighting training exercises and in firefighting emergencies, and that such exposure would threaten the health and welfare of firefighters exposed to these dangerous and hazardous chemicals.

Compl. ¶ 18.[5] However, Plaintiffs attempt to avoid removal by arguing that the "charged conduct" against 3M is narrower: "manufacturing and distributing PFAS-containing *turnout gear*." Mot. at 9. Thus, Plaintiffs contend that because 3M has not claimed the production of turnout gear was related to its role as a federal contractor, removal is improper. *See id.* at 11–12. This argument is contrary to controlling authority.

To determine whether the acts for which a defendant has been sued were related to its federal work, a court "credit[s] [the] *Defendant*[*'*]*s* theory of the case when determining whether there is such a connection or association." *Maryland*, 130 F.4th at 389 (internal quotations omitted). Thus, courts consider a complaint's allegations in the context of a defendant's notice of removal because a plaintiff "cannot preempt removal to a federal court merely because the complaint is glossed only in state law." *Id.*; *see also Cnty. Bd. of Arlington Cnty.*, 996 F.3d at 256 (rejecting plaintiff's arguments that "would elevate form over substance"). Plaintiffs brought this suit against 3M seeking to recover for alleged personal injuries stemming from PFAS exposure. In other words, Plaintiffs' exposure to PFAS is "the 'gravamen' or 'the heart of the' claim brought

[5] Plaintiffs' Complaint is attached as Exhibit A to 3M's Notice of Removal. *See* ECF No. 1-1.

by [Plaintiffs].” *City of Irondale v. 3M Company, Inc.*, No. 2:24-cv-01327-AMM, 2025 WL 2419238, at *6 (N.D. Ala. Aug. 19, 2025) (citation omitted).

The cases upon which Plaintiffs principally rely do not change the outcome. Plaintiffs contend that *Maryland v. 3M Company* demonstrates that 3M cannot show the charged conduct relates to its work as a federal contractor because “no specific factual circumstances exist here which necessarily implicate AFFF – let alone implicate Defendant 3M’s *general* creation of MilSpec AFFF for the U.S. Government over a period of sixty years.” Mot. at 11. According to Plaintiffs, this is because they “have pled one specific, identifiable source of PFAS contamination: **their turnout gear**.” *Id.* Yet, the Fourth Circuit rejected similar arguments made by the plaintiffs in *Maryland*. There, the plaintiffs asserted that the court “should credit how they defined the charged conduct which, by definition, exclude[d] 3M’s production and sale of Military AFFF, thus severing 3M’s alleged federal connection.” *Maryland*, 130 F.4th at 389. The Fourth Circuit disagreed, determining that this argument “ignores the unique lens through which we consider federal officer removal,” and explaining that a “removing defendant’s theory of the case as to whether the conduct with which it has been charged is related to its federal court” must be “credit[ed].” *Id.* Thus, a court “cannot blindly accept [a plaintiff’s] theory of charged conduct and the connection to 3M’s federal work.” *Id.* In short, though Plaintiffs have pleaded that their PFAS exposure relates only to 3M’s alleged conduct with respect to turnout gear, there is *still* a sufficient nexus for removal because 3M plausibly alleges that Plaintiffs were exposed to PFAS from MilSpec AFFF through their work as firefighters and elsewhere—a theory this Court must credit. *See id.*

The Court in *Anne Arundel County v. BP P.L.C.*, 94 F.4th 343 (4th Cir. 2024) did not hold otherwise. There, the Fourth Circuit found federal officer jurisdiction to be unavailable to

defendants asserting that they acted under a federal officer in producing fossil fuels where plaintiffs' claims were not premised on "any production-related activities." *Id.* at 350. Here, by contrast, 3M's alleged tortious conduct is its manufacture and sale of PFAS that allegedly contributed to Plaintiffs' alleged PFAS exposure. 3M's plausible allegations that Plaintiffs' PFAS exposure was caused at least in part by its manufacture of MilSpec AFFF for the U.S. government, *see* NOR ¶¶ 23–36, fit squarely within the conduct for which Plaintiffs allegedly seek to hold 3M liable, as *Maryland* makes clear. *See Maryland*, 130 F.4th at 390 (holding that charged conduct is "general PFAS contamination" of natural resources despite disclaimer). Indeed, Plaintiffs' Complaint contains several pages discussing the toxic nature of PFAS generally and not solely in the context of turnout gear. *See, e.g.*, Compl. ¶¶ 72–102.

Plaintiffs conclude that because 3M only connects Plaintiffs' injury—and not charged conduct—to MilSpec exposure, 3M cannot satisfy the "third prong of § 1442(a)(1) removal," the "for or relating to element" or "nexus" element. *See* Mot. at 14–15. In 2011, Congress amended the federal officer removal statute to add the "or relating to" phrase now in the text of § 1442(a)(1), which "broadened the universe of acts that enable federal removal . . . such that there need only be a connection or association between the act in question and the federal office." *Sawyer*, 860 F.3d at 258 (cleaned up); *see also Caver v. Central Alabama Elec. Cooperative*, 845 F.3d 1135, 1144 (11th Cir. 2017) (explaining that "the hurdle erected by [the connection or association] requirement is quite low") (internal quotation marks omitted). In determining whether the requisite connection exists, a court must "credit [the removing party's] theory of the case." *Acker*, 527 U.S. at 432. The removing party need not set forth "an airtight case on the merits," as such a standard "would defeat the purpose of the removal statute." *Id.*

3M has plausibly alleged the requisite connection here. As discussed above, the "charged conduct" is 3M's alleged role in causing Plaintiffs' PFAS exposure. 3M's Notice of Removal plausibly alleges that the use of MilSpec AFFF it manufactured for the U.S. government and used by firefighters like Plaintiffs would have contributed to their PFAS exposure. NOR ¶ 2, 23–36. 3M further alleges that, as the MDL Court observed, Plaintiffs cannot at this stage of the case "distinguish injuries allegedly caused by non-AFFF PFAS from any type of AFFF, which includes MilSpec AFFF." *Id.* ¶ 36 (citing CMO 36 at 2). Rather, the parties therefore will need to litigate whether and how any portion of Plaintiffs' alleged PFAS exposure resulted from 3M's manufacture of MilSpec AFFF, and the factfinder will need to apportion PFAS between MilSpec AFFF and any other sources.[6] "The need to unravel such challenging questions in this case establishes that 3M's federal work is inextricably related to the charged conduct." *Maryland*, 130 F.4th at 391. In other words, 3M has "satisfi[ed] its initial burden on [its] notice of removal." CMO 36 at 2.

## II. Plaintiff's Disclaimer Is Ineffective.

Although CMO 36 explains that personal injury plaintiffs cannot "avoid the MDL and/or federal jurisdiction by denying, disclaiming, or omitting allegations concerning exposure to AFFF," *id.* at 1, Plaintiffs argue that their disclaimer is effective because their allegations "have no relationship to Defendant 3M's federal work," so they were not omitting anything. Mot. at 15.

[6] Notably, this nexus remains even if Plaintiffs were correct regarding their narrowly-framed "charged conduct." Because PFAS compounds in MilSpec AFFF are chemically indistinguishable from the same PFAS compounds allegedly present in turnout gear (including PFOS and PFOA), any imposition of liability—even if the charged conduct is artificially narrowed to the sale of non-AFFF products—would necessarily hold 3M liable for its manufacture of MilSpec AFFF for the military. At the very least, a court would have to determine whether it is possible to disentangle the indistinguishable chemical compounds, and if so, a factfinder would need to determine what PFAS stemmed from which source.

In other words, Plaintiffs contend that their "lawsuit is not premised on AFFF contamination" and purports to allege "*specific* contamination from a single source," attempting to contort these facts into the court's ruling in *Maryland*. *Id.* at 17. Plaintiffs' argument is flawed.

The crux of *Maryland*'s reasoning is that "[a] disclaimer that requires a state court to determine the nexus 'between the charged conduct and federal authority' is not a valid means of precluding removal." 130 F.4th at 389 (citation omitted). In assessing this question for purposes of federal officer removal, courts "cannot blindly accept the [plaintiff's] theory of charged conduct and connection to 3M's federal work." *Id.* Instead, courts "must credit a removing defendant's theory of the case as to whether the conduct with which it has been charged is related to its federal court." *Id.* However, to accept Plaintiffs' disclaimer based on their contention that a fact finder will not need to identify the source of their PFAS exposure "*because those are not the facts before the Court*," Mot. at 17, would require this Court to reject, rather than credit, 3M's allegations and theory of removal. "But Plaintiffs cannot decide what defense Defendants might present." *Nessel v. Chemguard*, No. 1:20-cv-1080, 2021 WL 744683, at *3 (W.D. Mich. Jan. 6, 2021). Accordingly, it is not enough for a plaintiff to assert in conclusory fashion—as Plaintiffs do here—that a factfinder will not need to examine causation questions because their action does not involve MilSpec AFFF.

Plaintiffs assert that their complaint "does not include, and implicitly concedes, any claims against Defendants as it relates to AFFF exposure" and contend that they are "not seeking relief for mixed PFAS contamination nor will a factfinder need to apportion out the sources of the contamination." Mot. at 17 (citing *People ex rel. Raoul v. 3M Co.*, 111 F.4th 846, 849 (7th Cir. 2024)). This "concession" is a fiction. Plaintiffs have never conceded that "100% of [their PFAS exposure] must be sourced" from turnout gear for them to recover or that "if even a morsel" of

their PFAS exposure resulted from anything other than PFAS from turnout gear, then their "recovery is barred." *Raoul*, 111 F.4th 849. Rather, Plaintiffs' "implicit[] conce[ssion]" that they will not seek relief for AFFF contamination is in reality no more than an unsupported assertion by plaintiffs that no AFFF exposure occurred: "Plaintiffs' sole source of PFAS contamination . . . arises from one source: their turnout gear." Mot. at 17. However, because 3M has plausibly alleged that Plaintiffs were exposed to MilSpec AFFF and that their injuries were caused at least in part by that exposure, a theory that must be "credit[ed]," *Maryland*, 130 F.4th at 389, Plaintiffs' "disclaimer" fails to defeat federal jurisdiction. This is the very conclusion reached by the MDL Court when it issued CMO 36 and held that personal injury plaintiffs cannot "avoid the MDL and/or federal jurisdiction by denying, disclaiming, or omitting allegations concerning exposure to AFFF." CMO 36 at 1.

Plaintiffs nonetheless contend that CMO 36 is non-binding and contrary to Fourth Circuit precedent. Mot. at 18–19. It is of course true that the order of another district court is not binding on this Court. However, as the Judicial Panel on Multidistrict Litigation has noted, the MDL Court has a "special vantage point with respect to the conduct of coordinated or consolidated pretrial proceedings under Section 1407." *In re King Res. Co. Sec. Litig.*, 458 F. Supp. 220, 222 (J.P.M.L. 1978). Given that backdrop, and considering the MDL Court's years of experience managing the MDL, CMO 36 should be given due consideration by this Court and not disregarded out of hand.

Moreover, Plaintiffs' assertion that CMO 36 is contrary to Fourth Circuit precedent because it concludes that disclaimers concerning AFFF exposure are "blanketly improper" is premised on a misreading of CMO 36. Mot. at 18. In CMO 36, the MDL Court concluded that "[t]he record in this MDL and its related discovery has demonstrated that plaintiffs cannot, at the pleading stage, easily isolate personal injuries allegedly caused by AFFF as opposed to personal

injuries allegedly caused by non-AFFF PFAS." CMO 36 at 1. Thus, when a defendant alleges, as 3M does here, that a plaintiff's exposure to PFAS was the result of both AFFF and non-AFFF PFAS, that defendant establishes "at the very least, a plausible basis for alleging federal jurisdiction sufficient to satisfy its initial burden on a notice of removal." *See id.* at 2. This reasoning is consistent with Fourth Circuit authority, and 3M has satisfied that initial burden.[7]

## III. 3M Has Alleged Each Element Of The Federal Officer Removal Statute.

3M's Notice of Removal adequately alleges each element of federal officer jurisdiction. Plaintiffs argue that 3M cannot establish the first and second prongs of the federal officer removal statute—that it was acting under federal authority and that it has a colorable federal defense. In arguing that 3M has failed to satisfy these prongs, Plaintiffs reiterate their position that this action is not about AFFF and repackage their argument about charged conduct, asserting that because the charged conduct purportedly relates only to turnout gear, 3M cannot satisfy these elements to the extent they are premised on 3M's production of MilSpec AFFF. *See* Mot. at 19–22. Plaintiffs' arguments depend on this Court accepting Plaintiffs' contentions concerning the charged conduct, which are contrary to controlling authority.

As explained above in Sections I & II, Plaintiffs' arguments "ignore[] the unique lens through which [courts] consider federal officer removal." *Maryland*, 130 F.4th at 389. Plaintiffs' argument that 3M cannot satisfy the federal officer removal statute because their complaint does not involve MilSpec AFFF and the charged conduct concerns turnout gear ignores that Plaintiffs

[7] Plaintiffs also argue that "at least one district court has already disagreed" with CMO 36 and its "claim that federal officer jurisdiction is de facto applicable in any cases involving PFAS." Mot. at 19. As explained above, this is not what CMO 36 concluded. In any event, the case upon which Plaintiff relies—*Marathon Petroleum Co. LP v. Arkema, Inc.*, No.C25-1250 MJP, 2025 WL 2528353 (W.D. Wash. Sept. 3, 2025)—is not a personal injury case and does not reference CMO 36 anywhere in the opinion.

"[are] no longer the master of [their] complaint." *Id.* Instead, courts "look to a defendant's well-pleaded facts of removal" and, in doing so, "credit [3M's] theory of the case as to whether the conduct with which it has been charged is related to its federal work." *Id.* Under the federal officer removal statute, a private defendant thus may remove a case by showing that (1) "it acted under a federal officer"; (2) "the charged conduct was carried out for or in relation to the asserted official authority"; and (3) the defendant "has a colorable federal defense." *Sawyer*, 860 F.3d at 255. (cleaned up). 3M has done so here.

*First*, 3M's manufacture of MilSpec AFFF qualifies 3M as a "person acting under" a federal officer. 28 U.S.C. § 1442(a)(1). The "acting under" provision requires defendants to show "an effort to *assist*, or to help *carry out*, the duties or tasks" of a federal officer. *Watson*, 551 U.S. at 152. Courts across the country repeatedly have held that MilSpec AFFF manufacturers were "acting under" the U.S. military in producing "mission-critical" AFFF that the federal government otherwise would have had to produce. *Ayo v. 3M Co.*, No. 18-CV-0373(JS)(AYS), 2018 WL 4781145, at *9 (E.D.N.Y. Sept. 30, 2018); *accord Nessel*, 2021 WL 744683, at *3; *In re AFFF*, No. 2:18-mn-2873-RMG, 2019 WL 2807266, at *2 (D.S.C. May 24, 2019). Plaintiffs do not deny that 3M produced mission-critical AFFF for use by the U.S. military, pursuant to contracts with the military for the purchase of such products, in accordance with requirements of a MilSpec, and courts regularly conclude that the military's issuance of detailed product specifications is itself sufficient control to enable federal officer removal. *See Sawyer*, 860 F.3d at 255 (defendant "acted under the Navy" in manufacturing products matching "military specifications"); *eringue v. Crane Co.*, 846 F.3d 785, 792 (5th Cir. 2017) (defendant "was 'acting under' the Navy" because "military specifications" showed that "the Navy exercised a sufficient degree of guidance and control" over defendant); *Ayo*, 2018 WL 4781145, at *9.

3M sufficiently alleged that it was "acting under" military direction when it manufactured AFFF conforming to detailed requirements imposed by the MilSpec, including the express requirement that AFFF contain PFAS chemicals (among other requirements regarding the design, performance, and environmental impact of AFFF). NOR ¶¶ 38–40. The military additionally tested 3M's AFFF products for conformity with the MilSpec before qualifying them for military use. *Id.* ¶ 40. 3M has alleged that its manufacture of MilSpec AFFF according to the military's detailed requirements helped to "fulfill a basic governmental task that the government otherwise would have had to perform." *Caver*, 845 F.3d at 1143; *see Ayo*, 2018 WL 4781145, at *9. 3M has therefore plausibly alleged the "acting under" element for federal officer removal.

*Second*, 3M has shown its actions were "for or relating to" an act under color of federal office. To satisfy this test, "there need be only a connection or association between the act in question and the federal office." *Sawyer*, 860 F.3d at 258 (cleaned up). In determining whether the requisite connection exists, a court must "credit [the removing party's] theory of the case," which need not be "an airtight case on the merits." *Acker*, 527 U.S. at 432.

3M has plausibly alleged the requisite connection here by alleging that the use of MilSpec AFFF it manufactured for the U.S. government contributed at least in part to Plaintiffs' alleged PFAS exposure for which they seek to recover. NOR ¶¶ 1–5; 23–36; CMO 36 at 2 ("3M and other defendants have consistently argued that PFAS from its Military AFFF production and its non-AFFF production were inextricably linked, a theory that, if credited, holds sufficient water to substantiate federal officer removal.") (internal quotations omitted). The parties therefore will need to litigate whether and how any portion of the alleged PFAS exposure resulted from 3M's manufacture of MilSpec AFFF, and a factfinder will need to apportion PFAS between MilSpec AFFF and any other sources. "The need to unravel such challenging questions in this case

establishes that 3M's federal work is inextricably related to the charged conduct." *Maryland*, 130 F.4th at 391.

*Third*, 3M has asserted a colorable federal defense. Only a colorable federal defense is required because a defendant "need not win his case before he can have it removed." *Willingham*, 395 U.S. at 407. Here, 3M adequately alleged a colorable federal government contractor defense by pleading each element of the defense under *Boyle v. United Technologies Corp.*, 487 U.S. 500, 512 (1988). The Notice of Removal alleges that (1) 3M made PFAS-containing AFFF pursuant to a MilSpec approved by the U.S. military, (2) 3M's AFFF conformed to the MilSpec, and (3) the military knew the potential hazards of PFAS-containing AFFF yet continued to buy and use the products. *See* NOR ¶¶ 44–52. Courts have held on numerous occasions that MilSpec AFFF manufacturers have a colorable federal defense based on such allegations. *See, e.g.*, *Nessel*, 2021 WL 744683, at *4; *In re AFFF*, 2019 WL 2807266, at *2–3; *Ayo*, 2018 WL 4781145, at *7–15; *In re AFFF*, Order at 4, No. 2:18-mn-2873-RMG, ECF No. 320 (D.S.C. September 27, 2019); *In re AFFF*, Order at 4–5, No. 2:18-mn-2873-RMG, ECF No. 325 (D.S.C. October 1, 2019). Moreover, the MDL Court has already determined that 3M is entitled to make "a full factual presentation at trial" and have its government contractor defense resolved "by a final jury verdict." *In re AFFF*, No. 2:18-mn-2873-RMG, 2022 WL 4291357, at *15 (D.S.C. Sept. 16, 2022); *see also id.* at *12. The MDL Court's determination (based on an extensive record developed in the MDL) that 3M's government contractor defense raises triable issues of fact necessarily means that the defense is at least colorable for purposes of removal based on federal officer jurisdiction. 3M is entitled to present these facts and have its federal defense decided in federal court.

3M has plausibly alleged the elements of federal officer removal under 28 U.S.C § 1442(a)(1). Plaintiffs' Motion should be denied.

**IV. This Court Should Deny Plaintiffs' Request For Fees And Costs.**

Plaintiffs request that this Court award it "all just costs and expenses, as this action was improperly removed to federal court in the absence of proper subject matter jurisdiction." Mot. at 1. Beyond this conclusory request, Plaintiffs do not explain why costs and fees should be awarded, and this Court should deny Plaintiffs' request for that reason alone.

Moreover, as demonstrated above, this Court has subject matter jurisdiction over Plaintiffs' claims. Courts may award fees if a defendant "lacked an objectively reasonable basis for seeking removal." *Western Virginia Regional Emergency Physicians, LLC v. Anthem Health Plans of Virginia, Inc.*, No. 3:23cv781, 2024 WL 4425686, at *2, 4 (E.D. Va. Oct. 4, 2024) (internal quotations omitted). Thus, courts have declined to award fees where even a single court decision had supported a defendant's position for removal. *See id.* (declining to award fees where "at least one United States District Court case" had supported the defendant's theory and where "no controlling authority foreclosed [the defendant's] argument"). Here 3M's removal was reasonable because, and at minimum, the MDL Court, which has overseen the MDL for years, concluded that personal injury plaintiffs cannot avoid federal jurisdiction and the AFFF MDL merely by omitting allegations of AFFF exposure. CMO 36 at 1–2. Indeed, not only did the MDL Court determine that 3M's theory in this case—that AFFF and non-AFFF PFAS exposure both contributed to Plaintiffs' injuries—provided "at the very least, a plausible basis for alleging federal jurisdiction sufficient to satisfy [3Ms] initial burden on a notice of removal," the MDL Court also expressly requested that cases involving allegations of exposure to PFAS from turnout gear be transferred to it. *See id.* at 2. Plaintiffs' request for fees and costs should be denied.

**CONCLUSION**

For the foregoing reasons, this Court should deny Plaintiffs' Motion to Remand.

DATED: November 10, 2025

DEFENDANT 3M COMPANY

/s/ Matthew J. Hundley
Matthew J. Hundley (VSB No. 76865)
Diana M. Miller (VSB No. 82430)
BUTLER SNOW LLP
919 E. Main Street, Suite 600
Richmond, Virginia 23219
Tel. 804.762.6030
Fax. 804.762.6031
Matthew.Hundley@butlersnow.com
Diana.Miller@butlersnow.com

*Counsel for Defendant 3M Company*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 10th day of November, 2025, I electronically filed the foregoing on behalf of the Defendant with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing to all counsel of record.

___/s/ Matthew J. Hundley__________
Matthew J. Hundley (VSB No. 76865)
Diana M. Miller (VSB No. 82430)
BUTLER SNOW LLP
919 E. Main Street, Suite 600
Richmond, Virginia 23219
Tel. 804.762.6030
Fax. 804.762.6031
Matthew.Hundley@butlersnow.com
Diana.Miller@butlersnow.com

*Counsel for Defendant 3M Company*

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Norfolk Division**

| | |
|---|---|
| Aden W. Scott III, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>3M COMPANY, et al.,<br><br>Defendants. | Case No. 2:25-cv-00617 |

**PLAINTIFFS' REPLY TO DEFENDANT 3M'S BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION TO REMAND**

COMES NOW Plaintiffs Aden W. Scott, III; Mark C. Davis; Edward A. Lane; Jeremy M. Pope; Casey Barden; John Hudnall; and Amy L Hutchenson, Executrix of the Estate of James S. Hutcheson, deceased, (collectively, the "Scott Plaintiffs" or "Plaintiffs), who respectfully file this Reply to Defendant 3M's Opposition to Plaintiffs' Motion to Remand ("Opposition"). Plaintiffs' Motion to Remand (ECF No. 10) and supporting memorandum (ECF No. 11) (collectively, "Plaintiffs' Motion to Remand") are incorporated by reference as if fully stated herein. Plaintiffs state in further support as follows:

**ARGUMENT**

**I. Defendant 3M Has Improperly Invoked Federal Subject Matter Jurisdiction: Defendant 3M Fails to Satisfy Any and All Elements of Federal Officer Jurisdiction.**

A less-traditional pathway into federal court is through the federal officer removal statute, which permits removal of a civil action commenced against an "officer (or any person acting under that officer) of the United States . . . for or relating to any act under color of such office." 28 U.S.C. § 1442(a)(1). To obtain federal officer jurisdiction, private defendants must show the

following: (1) that they are "acting under" a federal officer; (2) that they had a "colorable federal defense"; and (3) that the conduct at issue was carried out for, or in relation to, the asserted official authority of the federal government (a.k.a. "under color of [federal] office"). Sawyer v. Foster Wheeler LLC, 860 F.3d 249, 254 (4th Cir. 2017) (internal citations omitted). The Defendant(s) bear the burden of proving proper federal jurisdiction. Cnty Bd. of Arlington Cnty. v. Express Scripts Pharmacy, Inc., 996 F.3d 243, 251 (4th Cir. 2021).

Even a liberal application of the statute will not save Defendant 3M's arguments for removal. See Watson v. Phillip Morris Cos., 551 U.S. 142, 147 (2007) ("[A] liberal construction nonetheless can find limits in a text's language, context, history, and purposes."). Defendant 3M's *entire* argument for removal hinges upon their misinterpretation of the applicable "charged conduct" – and once the only leg they have to stand upon falls, the rest of their argument falls with it.

**a) Defendant's Intentionally Limited Interpretation of Plaintiffs' Complaint, and the "Charged Conduct" Therein, Fails to Save Their Argument for Removal.**

Under the third element of § 1442(a)(1) jurisdiction, Defendant 3M must demonstrate that the conduct complained-of was "connected," "associated," or "relat[ed] to" official federal authority. See Papp v. Fore-Kast Sales Co., 842 F.3d 805, 813 (3rd Cir. 2016); Sawyer v. Foster Wheeler LLC, 860 F.3d 249, 258 (4th Cir. 2017) (using the term "charged conduct" to refer to the same). In other words, Defendant 3M must show that the **acts they are being sued for** occurred because of what they were asked to do by the federal government. Issacson v. Dow Chem. Co., 517 F.3d 129, 137-38 (2d Cir. 2008). To avoid their failing argument for removal, Defendant 3M attempts to misconstrue and change the purpose of Plaintiffs' entire lawsuit – both misrepresenting the "charged conduct," and the applicable standard therein, *and* still failing to demonstrate the third prong of § 1442(a)(1) jurisdiction: the "nexus" requirement.

***a. Defining And Distinguishing the First Inquiry Under the Third Element of Federal Officer Removal: What is the "Charged Conduct"?***

As a preliminary note, in their Opposition, Defendant 3M repeatedly conflates two issues in attempting to refute Plaintiffs' Motion to Remand. As argued previously in Plaintiffs' Motion, Defendant 3M does not satisfy § 1442(a)(1)'s "nexus" requirement because their asserted federal authority has no relationship to the charged conduct – that is, at its broadest, the manufacture, distribution, marketing, and sale of PFAS-containing *turnout gear*. Defendant 3M, in an attempt to refute Plaintiffs' arguments, repeatedly relies upon Maryland v. 3M Co., 130 F.4th 380, 389 (2025) to argue that, in determining "whether the acts for which a defendant has been sued were related to its federal work, a court 'credit[s] the *Defendant*[']*s* theory of the case.'" Def. 3M Opp. Pl. Mot. Remand at 6 ("Opp.") (emphasis in original).

While it is certainly true that this Court is directed to credit a Defendant's theory when determining *whether* a connection exists, Defendant's use of this principle in refuting Plaintiffs' arguments on Remand is a red herring, diverting attention from the point actually made in Plaintiffs' Motion. *Before* a Court can determine whether a connection exists between the asserted authority and the "relevant conduct," **they must decide *what* the "relevant conduct" actually is.** Maryland, 130 F. 4th at 389. While the Fourth Circuit uses a variety of terms to refer to this element, "relevant conduct" means the same as "charged conduct," and asks this Court *what* the "act or acts" are that the Defendant "is being sued for." Id. See Sawyer, 860 F.3d at 258.

Now, Defendant 3M begins their Oppositional argument by first asserting that Plaintiffs' interpretation of the "charged conduct" is "contrary to compelling authority." Opp. at 6. While making such bold claims, they fail to indicate how or why Plaintiffs' argument is incorrect, instead citing, and improperly conflating, the principles outlined in Maryland (as discussed immediately *supra*). In fact, contrary to the assumption underlying Defendant's arguments, the issue of

determining *what* the "charged conduct" is has never been directly addressed by the courts. However, certain case law may provide sufficient guidance on how this term is understood and applied: In the First Circuit, for example, the Court defines the third requirement under § 1442(a)(1) as a "nexus" between "**the allegations in the complaint** and conduct undertaken at the behest of a federal officer." Maine v. BP P.L.C., No. 2:25-cv-00001, 2025 U.S. Dist. LEXIS 191151 at *10 (Maine Dist. Ct. Sep. 29, 2025) (quoting Moore v. Elec. Boat Corp., 25 F. 4th 30, 34 n.2 (1st Cir. 2022)) (emphasis added). See also Rhode Island v. Shell Oil Prods. Co., 979 F.3d 50, 60 (1st Cir. 2020) (remanded on other grounds) (using the same "allegations in the complaint" language to discuss the nexus requirement). Thus, in the First Circuit, the "charged conduct" is the "allegations in the complaint."

Meanwhile, in the Seventh Circuit, the Court of Appeals has held that the nexus element "requires that the **gravamen of the claim** against Defendants occur while they acted under color of federal authority." Chicago v. BP P.L.C., No. 24-cv-02496, 2025 U.S. Dist. LEXIS 93940, at *27 (Ill. N.D.C. May 16, 2025) (quoting Ruppel v. CBS Corp., 701 F.3d 1176, 1181 (7th Cir. 2012)) (emphasis added). By dictionary definition, then, the "charged conduct" is the "essence, or core, of the complaint."[1] A further discussion of this above-cited case is warranted.

In Chicago v. BP P.L.C., the City sued Defendants for their "disinformation campaign" about the effects of fossil fuels on climate change, arguing that the Defendants "misrepresented and concealed the hazards of fossil fuel products." Id. at *5. The City's Complaint contained numerous counts, to include negligent and strict liability, failure to warn (Counts I and II); general negligence (Count III); consumer fraud in violation of state law (Count IX); misrepresentations in

[1] See "Gravaman," Legal Dictionary, published June 26, 2017, https://legaldictionary.net/gravamen/.

connection with the sale or advertisement of merchandise under state law (Count X); and more. Id. at *5-6. Compare Pls.' Compl, ECF No. 1-01, at ¶¶ 126-202.

Following removal under § 1442(a)(1), the City sought remand on various grounds, including because "the City [did] not seek to hold Defendants liable for any act that Defendants allegedly took at the behest of a federal officer." Id. at *8. In response, to defend the nexus requirement, the Defendants argued that it was unnecessary for "the complained-of conduct itself [to have been] at the behest of a federal agency," as long as "*at least some* of the pollution arose from the federal acts." Id. at *27 (emphasis in original). Compare Opp. at 6-9 (arguing similar). Further, the Defendants argued, that the City could not "evade federal jurisdiction by focusing just on Defendants' alleged deception (the complained-of conduct), and not on the production, sale, and consumption of oil and gas producing emissions (the alleged mechanism of injury), as doing so would improperly 'elevate form over substance and allow parties to evade' federal court. Id. at *28 (citation omitted). Compare Opp. at 6-7. Similar then to Defendant 3M herein, the Chicago Defendants asserted that "gravamen" of Plaintiffs' Complaint was the pollution itself, not the alleged deceptive marketing and associated practices. See Opp. at 6-7 (arguing that the "gravamen" of Plaintiffs claims is simply "PFAS exposure.").

The Illinois Court disagreed with Defendants, finding the nexus requirement cannot be satisfied by "relation to the plaintiff's injuries rather than to the claims themselves." Id. at *30. See Anne Arundel Cnty v. BP P.L.C., 94 F.4th 343 (4th Cir. 2024). **"[T]he nexus element does not authorize Defendants to rewrite the [Plaintiffs'] claims into something they are not."** Id. Ultimately, then, the Court found that "the charged conduct [was] insufficiently connected to any acts taken by Defendants under federal authority to support federal officer removal." Id. at *31.

Chicago is merely one of many cases, across many circuits, to reach a similar finding: See, e.g., Martin v. LCMC Health Holdings, Inc., No. 23-411, 2023 U.S. Dist. LEXIS 122961, at *14-15 (E.D. La. Jul. 5, 2023) ("The Court joins the growing body of district courts in rejecting Defendants' theory of federal officer removal. The Court refrains from accepting Defendants' invitation to transform 'a minnow of a statute . . . into a federal jurisdictional whale.'") (citation omitted); Delaware ex. Rel Jennings v. BP America, Inc., 578 F. Supp. 3d 618, 636 n. 21 (Del. Dist. Ct. 2022) (noting that case law does not "authorize Defendants to freely rewrite the complaint and manufacture a cause of action explicitly disclaimed by Plaintiff and then ask the Court to accept their 'theory of the case' for purposes of removal."); Honolulu v. Sunoco LP, No. 20-cv-00163, 2021 U.S. Dist. LEXIS 27225, at *26-27 (Haw. Dist. Ct. Feb. 12, 2021) (rejecting Defendant's theory of the case as disconnected from Plaintiff's charged conduct, adding that, "[p]ut simply, if Defendants had it their way, they could assert *any* theory of the case, however untethered to the claims of Plaintiffs, because this Court must "credit" that theory.").

Defendant 3M attempts to use Maryland v. 3M Co. to further refute Plaintiffs' arguments about the "charged conduct." See Opp. at 6-7. In discussing Maryland, Defendant 3M incorrectly claims that "the Fourth Circuit rejected" arguments similar to Plaintiffs. In Maryland, the respective state-plaintiffs had each filed *two* separate lawsuits, each alleging contamination of their waterways. "The only meaningful difference in the complaints is that one was directed towards 3M's PFAS production through its manufacture of AFFF generally – Military AFFF and otherwise – while the other was directed towards 3M's production of other PFAS-containing products and specifically excluded AFFF." Id. at 385.[2]

[2] The South Carolina Complaints differed slightly from Maryland's, though insignificantly for the purposes of this argument. South Carolina's Complaints were still both directed at waterway contamination; one was directed at AFFF products and the other directed to "remediate pollution from 3M's non-AFFF PFAS production." Id. at 386.

Here, unlike Plaintiffs argument and unlike those cases cited above, the Maryland plaintiffs argued against the nexus requirement by *disclaiming* any connection to AFFF as source underlying their environmental contamination claims. Id. at 389. **In other words, the plaintiffs did not dispute that the "charged conduct" was PFAS-related environmental contamination – they disputed the *source* of the contamination by way of disclaimer.** The Court found the disclaimer *non-dispositive*. Id. Moreover, the Maryland court was exceptionally clear that, regardless of the non-dispositive effect of a disclaimer, Defendant 3M "still bears the burden of showing that it satisfied the requisite nexus." Id. at 390. This is quite different from an outright rejection of Plaintiffs' arguments in their Motion, as Defendant 3M posited, and certainly does not indicate that the Plaintiffs cannot argue for, or contribute to a court's decision about, the scope of the "charged conduct."

Taken together, then, one thing is evident: this Court must consider the *content of Plaintiffs' Complaint* to determine what the "charged conduct" is. This is incredibly pertinent when considering Plaintiff Pope and his claims herein – regardless of his alleged AFFF exposure through his firefighting work at an airport, his actual charged conduct has no relation to this alleged cross-contamination. The Defendant's arguments under Maryland do not change this principle. While Defendant 3M has certainly offered this Court pages-worth of argument about the connection between federal authority and their manufacture of *Milspec AFFF* – a separate, distinguishable, unrelated product – these arguments are all **moot** for failing to address the *actual charged conduct*.

***b. Having Defined and Distinguished the "Charged Conduct," Then, what is the "Charged" or Complained-of Conduct in Plaintiffs' Complaint?***

At the outset, Defendant 3M cites to one paragraph in Plaintiffs' Complaint to allege that Plaintiffs' claims are not about turnout gear – but about PFAS exposure generally. See Opp. at 6. According to Defendant, then, the "charged conduct" would just be PFAS manufacture, generally.

Contrary to the one paragraph cited by Defendant, Plaintiffs' Complaint is very plainly concerned with **violations of warranty, failure to warn, and consumer protection violations arising from *PFAS in turnout gear*** – not general PFAS exposure, such as those allegations brought in environmental contamination cases. Beginning with paragraph nine of Plaintiffs' Complaint, the **acts sued for** are made indisputably clear:

> Plaintiffs **bring[] this action for harms . . . resulting from exposure to per- and polyfluoroalkyl substances ("PFAS") that were manufactured, designed, sold, supplied, distributed and/or contained in protective clothing** specifically designed for firefighters ("**turnouts**") manufactured, designed, sold supplied and/or distributed by each of the Defendants, individually or through their predecessors or subsidiaries.

Compl ¶ 9 (emphasis added). While citing only paragraph eighteen of Plaintiffs' Complaint, Defendant 3M willingly ignores the ***preceding five paragraph***s:

> Unbeknownst to the Firefighter Plaintiffs and Decedents, **Defendants have manufactured, marketed, distributed, sold, or used PFAS and PFAS-containing materials in protective clothing** specifically designed for firefighters ("**turnouts**").
>
> For decades, Defendants were aware of the toxic nature of PFAS and the harmful impact these substances have on human health. Yet, **Defendants manufactured, designed, marketed, sold, supplied, or distributed PFAS-containing turnouts**, to firefighting training facilities and fire departments, including in the counties of Arlington, Henrico, and Accomack, and in the cities of Portsmouth, Norfolk, Hampton, and Virginia Beach. Defendants did so, moreover, **without ever informing firefighters** or the public that turnouts contained PFAS, and without warning firefighters or the public of the substantial and serious health injuries that can result from exposure to PFAS or PFAS-containing materials.
>
> **The Firefighter Plaintiffs and Decedents wore turnouts in the usual and normal course of performing their firefighting duties and training and were repeatedly exposed to PFAS in their turnouts**. The Firefighter Plaintiffs and Decedents did not know and, in the exercise of reasonable diligence, could not have known that these turnouts contained PFAS or PFAS-containing materials. The Firefighter Plaintiffs and Decedents did not know that PFAS were in their body and blood.
>
> At all relevant times and continuing to the present, **Defendants have represented that their turnouts are safe.**

> **The Firefighter Plaintiffs and Decedents used the turnouts as they were intended and in a foreseeable manner which exposed him to PFAS in the course of their firefighting activities**. This repeated and extensive exposure to PFAS resulted in the Firefighter Plaintiffs and Decedents developing various forms of cancer.

Compl. ¶¶ 13-17 (emphasis added). Plaintiffs continue on to reiterate that, "[a]s a result of exposure to PFAS **contained in [their] turnouts,"** they each independently developed various forms of cancer. Compl. ¶ 19-25. (emphasis added). The Complaint *continues*, to list each individual Defendant, including Defendant 3M, repeatedly stating each defendant "developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS **in turnouts**." Compl. ¶ 26 (emphasis added). See also Compl. ¶¶ 27-46 (the same for each individual defendant). At the outset of Plaintiffs' "substantive allegations," as they are directly labeled, Plaintiffs discuss their firefighting work and routine use of **turnouts**, followed by a subsection dedicated to "PFAS-Containing Turnout Gear." Compl. ¶¶ 52-71. In each and every Count to Plaintiffs' Complaint (Counts I-IV), Plaintiffs repeatedly reiterate in **almost every single paragraph** that the charged conduct has to do with **turnouts**. See Compl. ¶¶ 126-202. In total, Plaintiffs' Complaint uses the word "turnout" 215 times – more uses than there are paragraphs to the Complaint itself. **There are zero allegations from any Plaintiff claiming exposure to PFAS from *any* source other than their turnout gear**. At its *broadest* scope, then, the "gravamen" of Plaintiffs' Complaint, the "act or acts" that Defendant 3M "is being sued for," is the manufacture, distribution, marketing, and sale of PFAS-containing turnout gear.

Moreover, and arguably more importantly, the four specific Counts in Plaintiffs' Complaint focus on the **defendants' marketing, labeling, promotion, and the like,** largely concerned with failure to warn of the appropriate dangers and/or misrepresenting the turnout gear to be safer than it was – all allegations both unrelated to the traditional general PFAS exposure claim *and*

*unaddressed in Defendant's Notice of Removal*. See, e.g., Chicago v. BP LLC, U.S. Dist. LEXIS 93940 at *30-31. See also *supra* (cases cited). If looking only at the allegations made within the Counts of Plaintiffs' Complaint,[3] then:

(a) Count I of Plaintiffs' Complaint is for a Breach of Implied Warranties, alleging, in part, that:

a. "Each Defendant . . . ha[s] engaged in the business of **manufacturing, distributing, supplying, testing, labeling, promoting, or advertising of turnouts** containing PFAS or PFAS-containing materials therein, and through that conduct, have knowingly placed PFAS-containing products into the stream of commerce with full knowledge that they were sold to firefighters. . . ." Compl. ¶ 128.

b. "[K]nowing of the dangerous and hazardous properties of turnouts, Defendants could have **manufactured, marketed, distributed, and sold alternative designs or formulations of turnouts** that did not contain PFAS." Compl. ¶ 130.

c. The "turnouts **designed, manufactured, marketed, tested, advertised, [*sic*] promoted, sold, and distributed** by the Defendants were **dangerous and defective in design or formulation**." Compl. ¶ 134.

d. "Through the use of **advertising and marketing,** Defendants, . . . directed the attention of the public, including Plaintiff, to their products by means of implied representations, statements, and descriptions that the PFAS-containing turnouts they were manufacturing, selling, distributing, supplying, and/or promoting were safe for use and free from hazards." Compl. ¶ 143.

e. "In using the PFAS-containing turnouts . . . the Plaintiff relied upon the skill and judgment of the Defendants, upon **implied warranties of merchantability and fitness for a particular purpose** that the PFAS-containing products were safe and fit for their intended and foreseeable functions. . . ." Compl. ¶ 144.

(b) Count II of Plaintiffs' Complaint is for Breach of Express Warranties, alleging, in part, that:

a. The **turnouts manufactured, marketed, and sold** by the Defendants were dangerous and defective because the foreseeable risk of harm could have been reduced or eliminated by the **adoption of a reasonable, alternative design** that was not unreasonably dangerous." Compl. ¶ 156.

[3] These are only selected excerpts and do not reflect all relevant portions of the Counts, which Plaintiff encourages this Honorable Court to review and consider.

b. Plaintiff continues on to allege a list of ways in which the Defendant **failed to warn** Plaintiff of the hazards to his health. Compl. ¶ 158(a)-(d).

c. "At all relevant times, **Defendants' turnouts did not contain an adequate warning or caution statement**, which was necessary." Compl. ¶ 160.

d. "**As a result of their inadequate warnings**, Defendants' turnouts were defective and unreasonably dangerous when they left the possession and/or control of Defendants. . . . **The lack of adequate and sufficient warnings was a substantial factor in causing**" the Plaintiffs' harms. Compl. ¶¶ 164-65.

e. "Through the use of such **advertising and marketing**, Defendants, . . . directed the attention of the public, including the Plaintiff, to their products by means of expressed and implied representations, statements, and descriptions that the PFAS-containing products they were manufacturing, selling, distributing, supply, and/or promoting were safe for use and free from hazards or dangerous properties. . . ." Compl. ¶ 166.

f. "Defendants **breached express warranties** in that the PFAS-containing **turnouts designed, manufactured, sold, distributed, supplied, and/or advertised** were defective and unreasonably dangerous. . . ." Compl. ¶ 168.

(c) Count III of Plaintiffs' Complaint is a general negligence claim(s), alleging, in part, that:

a. "Defendants had a **duty to exercise reasonable care in the design, research, testing, manufacture, marketing, formulation, supply, promotion, sale, labeling, training of users, production of information materials, use and/or distribution of turnouts** into the stream of commerce. . . ." Compl. ¶ 174.

b. "Defendants had a **duty to warn** of the hazards associated with PFAS and PFAS-containing materials and were in the best position to provide **adequate instructions, proper labeling, and sufficient warnings** about the turnouts. However **Defendants knowingly elected not to do so**." Compl. ¶ 176.

c. "Defendants **negligently and deceptively underreported, underestimated, [and] downplayed the serious health dangers** of the PFAS-containing turnouts." Compl. ¶ 179.

d. "Defendants knew or should have known that the manner in which they were **manufacturing, marketing, distributing, selling PFAS-containing turnouts** and other PFAS-containing materials therein would result in harm. . . ." Compl. ¶ 182.

(d) Count IV of Plaintiffs' Complaint concerns Violations of the Virginia Consumer Protection Act, Va. Code § 59.1-196, *et seq.*, alleging, in part, that:

a. "Defendants . . . violated Sections 59.1-200(A)(5)(6) and (14) of the VCPA by **[m]isrepresenting that goods or services have certain quantities,**

**characteristics, ingredients, uses, or benefits**, . . . ; **[m]isrepresenting that goods or services are of a particular standard, quality, grade, style, or model**; and [u]sing any other **deception, fraud, false pretense, false promise, or misrepresentation** with a consumer transaction." Compl. ¶ 196(a)-(c).

b. "Defendants made **various material misrepresentations** to the general pubic **regarding the attributes of turnouts and the dangers**, or lack thereof, of PFAS chemicals for the purpose of inducing members of the general public to purchase their goods and rely on the safety of their goods." Compl. ¶ 197.

c. "Defendants knew or should have known that the Firefighter Plaintiffs and Decedents **would rely, and did rely, on the material misrepresentations** concerning the safety and quality of their turnouts." Compl. ¶ 198.

While the exercise of walking through the actual allegations and counts contained in Plaintiffs' Complaint may seem arduous, it is critically important when Defendant 3M has sought to argue that the "charged conduct" is mere PFAS exposure generally – a strawman argument, at best. It is also critically important to distinguish the relevant argument about Plaintiff Pope, as, regardless of his potential for AFFF exposure while performing firefighting services at the airport, *such connection does not concern the charged conduct*. Similar to the litany of cases cited *supra*, the actual substantive counts in Plaintiffs' Complaint, *those acts upon which Plaintiffs seek relief*, focus on warranty claims, negligent marketing practices, and consumer protection violations. Thus, at its *narrowest*, the "gravamen" of Plaintiffs' Complaint concerns the deceptive marketing and distribution of the *turnout gear*, including the breaches of warranties therein.

Understanding, then, the "charged conduct" in Plaintiffs' Complaint, Plaintiffs direct this Court to Defendant 3M's attempts to distinguish Anne Arundel, 94 F. 4th 343 (4th Cir. 2024). Similar to Chicago, in Anne Arundel, the plaintiffs had filed suit based on the defendants "use and promotion of fossil fuel products while 'knowing,' 'conceal[ing],' and 'obscur[ing]' the connection between those products and climate change." Anne Arundel, 94 F. 4th. at 346-47. The plaintiffs further alleged that the defendants "public deception campaigns" and "failure to pursue less hazardous alternative products available," led to greater environmental harm. Id. In rejecting

the defendants' theory of removal, the Anne Arundel court found that it is "'act' for which the defendant is being sued – not the plaintiff's entire civil action in a general sense – that must relate to the asserted federal authority." Id. at 348. Ultimately, the Court held that "[b]ecause the activities cited by the companies involve fossil fuel production rather than concealment or misrepresentation of information about fossil fuel products, those activities fail to show the required relatedness." Id. at 349.

While Defendant 3M attempts to distinguish Anne Arundel by pointing to the fact that Plaintiffs' Complaint still involves "production-related activities," which is *true*, insofar as the manufacture and distribution of *turnout gear* is implicated in Plaintiffs' counts to their Complaint (breach of warranty, failure to warn, consumer protection violations, etcetera), Defendant loudly fails to address, or distance themselves, from the obvious similarities between Plaintiffs' claims and Anne Arundel,[4] all of which call for remand.

Of final, additional note, while repeatedly failing to reconcile, or even acknowledge, the obvious factual differences between Maryland and Plaintiffs' case, Defendant 3M attempts to assert that their theory for removal fits "squarely" within the charged conduct, citing to "several pages" of Plaintiffs' Complaint which discuss "the toxic nature of PFAS generally." Opp. at 8. This argument offers no support to their claim, as "[w]hen read as a whole, the Complaint clearly seeks to challenge the" manufacturing, distribution, marketing, and sale of turnout gear "without warning and abetted by a sophisticated disinformation campaign." Baltimore v. BP P.L.C., 31 F. 4th 178, 233 (4th Cir. 2022); compare Compl. ¶¶ 106-170. "Of course, there are many references

[4] To avoid repetition, Plaintiffs direct this Court to Plaintiffs' Motion to Remand for those arguments concerning application of Anne Arundel's holding, prohibiting the defendant from obtaining removal when their argument relies upon the nexus between the *injury*, instead of the complained-of conduct. Of note, Defendant's attempt to distance themselves from Anne's holding by citing to the 2011 statutory amendments, see Opp. at 8, are irrelevant and moot. Anne Arundel was decided in 2024 – thirteen years after these amendments – and bears no relation to them.

to [the toxic nature of PFAS] in the Complaint, which spans [48] pages. But, by and large, these references only serve to tell a broader story. . . ." Id. ("Although this story is necessary to establish the avenue of Baltimore's climate-change-related injuries, it is not the source of tort liability.").

Taken all together, then, under the allegations and counts in Plaintiffs' Complaint, the "act or acts" that Defendant 3M "is being sued for" are the improper manufacture, distribution, marketing, and sale of PFAS-containing turnout gear, namely Defendants' "campaign of deception and misrepresentation" about said PFAS-containing turnout gear. Chicago, No. 24-cv-02496, at *25. Thus, Defendant 3M then, in their Notice of Removal, must have demonstrated both (a) what the asserted federal authority is *and* (b) how this "act or acts" of turnout gear manufacture, distribution, marketing, and sale, done deceptively and in violation of express and implied warranties, is "connected," "associated," or "relat[ed] to" said federal authority. Papp, 842 F.3d at 813. Defendant 3M cannot make that relation ***nor have they ever argued one.***

Here, at most, Defendant's argument relies upon an improperly narrow interpretation of Plaintiffs' Complaint, thereby forcing their argument to fail when one considers the actual conduct charged. If this Court does not accept Defendant's intentionally limited reading of Plaintiffs' claims, Defendant's argument for federal officer jurisdiction must fail, as they have raised no other grounds to defend the "nexus" requirement.

**b) The Effect and Relevancy of Disclaimers under Maryland v. 3M Co.**

In attempting to distance themselves from the Fourth Circuit's ruling, that "[i]f, on the other hand, **a plaintiff concedes that [the two] difficult questions are unnecessary for the purposes of establishing liability, it may remain in state court[,]"** id. at 392 (emphasis added), Defendant first argues that accepting Plaintiffs' disclaimer would "require this Court to reject, rather than credit, 3M's allegations and theory of removal." Opp. at 10. This Court is not bound to accept 3M's theory of removal, see *supra*, even when giving them a credit. Many courts across

the country have similarly found that concessions of this nature can be, and are, effective. Connecticut v. EIDP, Inc., 2024 U.S. Dist. LEXIS 227700 at *12-13 (Connecticut Dist. Ct. Dec. 17, 2024) (citing New Hampshire v. 3M Company, 665 F. Supp. 3d 215 (2023); Illinois ex rel. Raoul v. 3M Company, 693 F. Supp. 3d 948 (2023) (also cited to by Maryland court to support their finding about disclaimers); Maine v. 3M Co., 2023 U.S. Dist. LEXIS 128740, 2023 WL 4758816 (D. Me. July 26, 2023); In re Aqueous Film-Forming Foams Prod. Liab. Litig., 2024 U.S. Dist. LEXIS 64206, 2024 WL 1470056 (D.S.C. Feb. 29, 2024)).

Defendant continues on to argue that, from their perspective, the Plaintiffs have never fully disclaimed AFFF-exposure under Raoul. It's critical to note that the factual scenarios presented in Maryland and Raoul necessitate different requirements. In Illinos ex rel. Raoul v. 3M Co., 111 F. 4th 846, 848 (7th Cir. 2024), Illinois sued 3M for violations of their state environmental protection, wildlife, and aquatic life codes. In doing so, Illinois prefaced its *environmental contamination* claims on allegations about water contamination arising from a specific 3M facility located along the waterway (the Cordova facility). Notably, just twenty-five miles downstream, still along this same waterway, sat a U.S. Army base, where MilSpec AFFF products were used and stored.

In arguing removal, 3M presumed that "the PFAS [environmental] contamination the State alleges could either have come from the Cordova Facility or from AFFF out of the U.S. Army's Rock Island Arsenal." Id. To avoid the issue of apportionment, Illinois conceded that they were *not* seeking relief for mixed PFAS contamination – "in other words, PFAS contamination arising from both the Cordova facility and from AFFF from the Rock Island Arsenal." Id. at 349. In applying this case, the Fourth Circuit in Maryland noted that, a concession *was* necessary to avoid federal jurisdiction when "the States envision recovering for mixed PFAS contamination from

numerous geographic locations . . . . [finding] 3M's Military AFFF production [to be] inextricably related to the States' general allegations of PFAS contamination." Maryland, 130 F. 4th. at 392.

Both Raoul and Maryland are concerned with allocating and apportioning causation from mixed sources of PFAS contamination *when the plaintiffs have pled **general environmental contamination*** arising from multiple non-AFFF sources.[5] There is sure difference between Plaintiffs' allegations concerning consumer protection violations and state-based claims for general contamination to an entire waterway and associated ecosystem. The need for a disclaimer, "100%" or otherwise, is readily apparent when one is claiming multiple, mixed sources of contamination, one of which *could* be AFFF-contamination known to already exist in some or part of that same claimed waterway. As discussed in the Plaintiffs' original Remand Motion, under the allegations and claims presented, apportionment will simply not arise. Allegations for breach of warranty, express or implied, consumer protection violations, and negligence in the marketing, labeling, warnings, and distribution of a *specific* clothing product simply do not call for a "challenging causation question." Maryland, 130 F. 4th. at 391.

Defendant's final point defends and again cites to the non-binding *judicial case management order* upon which they have heavily relied.[6] While Plaintiffs respect the MDL Court's findings from their unique perspective, the MDL Court has never had a case like Plaintiffs' in front of it – *because the turnout gear cases have never been transferred in*. Thus, setting aside

---

[5] In Maryland, for example, the plaintiffs explicitly pled contamination from *various* non-AFFF PFAS-containing products, thus requiring inherent discussions of causal apportionment. See Maryland, 130 F. 4th. at 385.

[6] Defendant claims that Plaintiffs "misread[]" CMO 36 when previously asserting that its finding was contrary to Fourth Circuit precedent. No such "misreading" occurred, as the plain language of CMO 36 states, "It has come to this Court's attention that certain plaintiffs alleging PFAS-related injuries have sought to avoid the MDL and/or federal jurisdiction by denying, disclaiming, or omitting allegations concerning exposure to AFFF. As the Fourth Circuit made clear in *State of Maryland v. 3M et al.*, 130 F.4th 380 (4th Cir. 2025), **such efforts are contrary to law."** (emphasis added). The Fourth Circuit, along with the Seventh, has patently found AFFF disclaimers to be effective, appropriate, and legal.

the fact that the Order itself is non-binding (and issued without reference to any scientific or medical backing), it also is predicated on a limited base of knowledge arising from environmental contamination cases that are incredibly distinct. It simply is irrelevant to an analysis of federal officer jurisdiction.

**b) The remaining elements of § 1442(a)(1) jurisdiction have not been met.**

To avoid repetition, Plaintiffs direct this Court to the arguments previously asserted in their Motion to Remand. Plaintiffs reiterate that, merely because this Court must credit the Defendant's theory of removal, that does not thereby make the *Defendant* the master of Plaintiffs' Complaint, capable of deciding what the "charged conduct" is so as to make their argument fit. See generally Opp. at 12-13. If that were true, the Defendants in Anne Arundel (or any number of cases cited *supra*) would have prevailed merely because they presented some argument tying their general connection with the federal government to the case at bar. Just as Defendant posited about Plaintiffs in their Opposition, Defendant's "arguments depend on this court accepting [Defendant's] contentions concerning the charged conduct and are contrary to controlling authority." Opp. at 12.

Plaintiffs' Complaint concerns breach of warranties (express and implied), violations of the consumer protection act, and negligence in the *design, marketing, warnings, etcetera* provided on the *turnout gear*. Even in the negligence count, the Complaint repeatedly focuses on the "negligent" and "deceptive" information provided about the dangers present in the *turnouts*. See Compl. ¶¶ 171-189. This is patently different from either general allegations of harm from PFAS exposure, as the Defendant has now inaccurately decided Plaintiffs' Complaint charges, and/or allegations concerning environmental contamination, indirectly or directly related to MilSpec AFFF.

Plaintiffs' case is distinct from the case law favoring federal officer removal, which involve boilers manufactured for Navy ships, see Sawyer v. Foster Wheeler LLC, 860 F.3d 249, 258 (4th Cir. 2017); airplanes manufactured for the Armed Forces, see Papp, 842 F.3d at 814; or turbines and generators manufactured pursuant to contracts with the Navy, see Hurley v. CBS Corp., 648 Fed. Appx. 299, 303 (4th Cir. Ct. App. 2016). As discussed in Plaintiffs' Motion to Remand, the "gravamen" of Plaintiffs' Complaint has no relationship to MilSpec AFFF. Defendant's arguments, both in their original Notice and in their Opposition, fail to address any arguments for jurisdiction beyond those related to MilSpec AFFF.

As to the first and second prong of § 1442(a)(1), Defendant has not asserted how their production of turnout gear, or related materials, was delegated to them by a federal authority or otherwise undertaken to "assist" the federal government. They've further never asserted how their labeling, marking, warning, and other related advertising of their turnout gear was undertaken to "help carry out" the duties of a federal officer – in fact, even in the Opposition brief, they've not made *any* allegations related to the actual *charged conduct*. Similarly, they fail to address how they meet the second prong in light of the arguments made in Plaintiffs' brief, that is, how a colorable federal defense applies with regard to the manufacture, distribution, marketing, labeling, advertising, warnings, etcetera provided for and in connection with *turnout gear*.

With regard to the "acting under" requirement, the previously discussed Chicago case is on point:

> Here, the City's Complaint does not take aim at Defendants' *production* of fossil fuels during World War II or the Korean War for that matter. Instead, the Complaint takes issue with Defendants' alleged *campaign of deception and misrepresentation* in the 1980s of the dangers of fossil fuel vis-à-vis the environment. The fact that Defendants acted under the federal government by operating and managing government-owned and/or government-funded petroleum production facilities is of no import. Unlike the claims in *Baker*, this case is about

> Defendants' alleged misrepresentations; not their work with or on behalf of the government that led to or contributed to fossil fuel emissions. . . .
>
> As discussed in more detail below, the Court agrees with the Fourth Circuit's analysis that Defendants' activities involving "fossil fuel production rather than concealment or misrepresentation of information about fossil fuel products," cannot support the acting under element because "those activities fail to show the required relatedness," and the defendants did "not argue the federal government required them to market or describe their products in a certain way." *Id.* Similarly, Defendants in this case do not argue that the government required them to market their products in any specific way. **For the foregoing reasons, the Court agrees with the City that Defendants fail to satisfy the acting under element of federal officer removal.**

Chicago, No. 24-cv-02496, at *26.

To accept Defendant 3M's line of reasoning would be to open up the federal courts to a plethora of cases unrelated to "cognizable federal interest[s]." See Gov't of P.R. v. Express Scripts, Inc., 119 F.4th 174, 184-85 (1st Cir. 2024) (quoting Camacho v. Autoridad de Telefonos de Puerto Rico, 868 F.2d 482, 487 (1st Cir. Ct. App. 1989). If true, any company who can allege any connection to the federal government will be able to claim federal officer jurisdiction. This reasoning attempts to butcher a standard currently in place and would extend far beyond Congress's intent when enacting § 1442(a)(1). See W. Va. ex rel. McCuskey v. Eli Lilly & Co., No. 5:24-CV-143, 2024 U.S. Dist. LEXIS 160669 (W. Va. Dist. Ct. Sep. 6, 2024) (quoting Watson, 551 U.S. at 142-43).

As both the first and second prongs of § 1442(a)(1) necessarily fail upon this Court's rejection of the nexus requirement, all three elements of federal officer jurisdiction are lacking. As such, this case must be remanded to the appropriate state court.

## II. This Court Should Grant Plaintiffs' Request for Any Just Costs and Expenses Incurred.

"An order remanding the case may require payment of just costs and any actual expenses, including attorney fees, incurred as a result of the removal." 28 U.S.C. § 1447(c). A district court

has broad discretion to determine whether an award of attorneys' fees is justified. Morgan Guar. Tr. Co. of New York v. Republic of Palau, 971 F.2d 917, 924 (2d Cir. 1992) ("The statute as a whole, particularly the reference that an order remanding the case '*may* require payment' of costs and fees, affords a great deal of discretion and flexibility to the district courts in fashioning awards of costs and fees."). The Supreme Court has said that the "standard for awarding fees should turn on the reasonableness of the removal," and "[a]bsent unusual circumstances, courts may award attorney's fees under § 1447(c) only where the removing party lacked an objectively reasonable basis for seeking removal." Martin v. Franklin Cap. Corp., 546 U.S. 132, 141 (2005).

Here, Plaintiffs seek just cost and fees as Defendant 3M's removal was seemingly sought for strategic reasons only, without an "objectively reasonable basis" for removal. It is evident, based on the Defendant's reliance on CMO 36, that removal was sought for no purpose other than a last-ditch effort to force Plaintiffs into the MDL. This has cost extensive time and effort, not just to litigate remand, but to address Defendant's Motion to Stay and related Motion to Transfer – all on the back of an unreasonable removal. Plaintiffs respectfully request the award of just costs and fees, as this Court deems appropriate.

## CONCLUSION

WHEREFORE, for the foregoing reasons, Plaintiffs respectfully requests this Honorable Court grant Plaintiffs' Motion to Remand and remand this action back to the Circuit Court for the City of Virginia Beach and to order the payment of any just costs and expenses incurred by Plaintiffs.

**Respectfully yours,**
**ADEN W. SCOTT, III,**
**MARK C. DAVIS,**
**EDWARD A. LANE,**
**JEREMY M. POPE,**
**CASEY BARDEN,**

**JOHN HUDNALL,**
**and**
**AMY L. HUTCHESON, Executrix of the Estate of JAMES S. HUTCHESON, deceased,**

**Plaintiffs**

s/ Kevin Biniazan
Kevin Biniazan | VSB No. 92109
Jeffrey A. Breit | VSB No. 18876
Don Scott | VSB No. 88725
Lauren Martin | VSB No. 93653
Alexis Bale | VSB No. 100318
BREIT BINIAZAN, PC
Towne Pavilion Center II
600 22nd Street, Suite 402
Virginia Beach, VA 23451
Telephone | 757.622.6000
Facsimile | 757.299.8028
Email | kevin@bbtrial.com
Email | jeffrey@bbtrial.com
Email | don@bbtrial.com
Email | lmartin@bbtrial.com
Email | abale@bbtrial.com

*Counsel for Plaintiff*

# C E R T I F I C A T E

I hereby certify that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will then send notification of electronic filing (NEF) to counsel of record.

Date: November 17, 2025

s/ Kevin Biniazan
Kevin Biniazan | VSB No. 92109
Jeffrey A. Breit | VSB No. 18876
Lauren Martin | VSB No. 93653
BREIT BINIAZAN, PC
Towne Pavilion Center II
600 22nd Street, Suite 402
Virginia Beach, VA 23451
Telephone | 757.622.6000
Facsimile | 757.299.8028
Email | kevin@bbtrial.com
Email | jeffrey@bbtrial.com
Email | lmartin@bbtrial.com

*Counsel for Plaintiff*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**NORFOLK DIVISION**

| | |
|---|---|
| Aiden W. Scott, III, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>3M Company, et al.,<br><br>Defendants. | No. 2:25-cv-00617-AWA-LRL |

**MOTION FOR LEAVE TO SUBMIT SUPPLEMENTAL AUTHORITY**

Defendant 3M Company, pursuant to Local Rule 7(F)(1) and in further support of its Opposition to Plaintiffs' Motion to Remand [ECF No. 12], respectfully requests leave to submit supplemental authority regarding *Chevron USA, Inc. v. Plaquemines Parish*, 146 S. Ct. 1052 (2026) (attached). That case further supports denying Plaintiffs' motion to remand.

In *Chevron*, several local governments sued in state court for environmental damage, claiming Chevron failed to obtain necessary permits under a law that "took effect in 1980" and exempted activities "'legally commenced'" before that year. 146 S. Ct. at 1059. Chevron removed under 28 U.S.C. § 1442(a), alleging that the plaintiffs' expert report revealed that the case implicated activities undertaken pursuant to federal direction during World War II. Notably, the plaintiffs "limit[ed] the scope of th[eir] claims" in hopes of avoiding federal jurisdiction, expressly disclaiming any "claims . . . preempted by federal law." Compl. ¶ 33, *Plaquemines Parish v. Total Petrochemicals & Refining USA, Inc.*, No. 2:18-cv-05256 (E.D. La. May 23, 2018), ECF No. 1-8.

A divided Fifth Circuit panel rejected Chevron's removal effort, but the Supreme Court unanimously reversed. Focusing on Chevron's "plausible factual allegations," the Court held that

the "case fit[] comfortably" within section 1442. *Chevron*, 146 S. Ct. at 1061. Specifically, the Court credited Chevron's theory that the "suit implicate[d] Chevron's wartime efforts" to assist the government and held that the suit therefore "relate[d] to" those efforts. *Id.* The Fifth Circuit's contrary conclusion, the Court explained, rested on an unduly narrow interpretation of "[t]he phrase 'relating to'"—a phrase that "sweeps broadly." *Id.* at 1060 (quoting 28 U.S.C. § 1442(a)). The Court also rejected the argument that "the removal statute requires that the defendant was 'acting under' a federal officer in taking the specific actions challenged in the suit." *Id.* at 1062. The statute "contemplates removal of suits against officers or their agents for acts that were not done under color of their offices, so long as the suits 'relat[e] to' such acts." *Id.* at 1063.

*Chevron* supports 3M's position in multiple respects. First, *Chevron* entirely undermines Plaintiffs' effort to artificially narrow the charged conduct through artful pleading and disclaimers of preempted conduct. Plaintiffs attempt to avoid removal by arguing that the "charged conduct" against 3M is only "the manufacture and distribution of PFAS-containing turnout gear." ECF No. 11 at 8. But the Court rejected a similar gambit in *Chevron*. There, too, the plaintiffs maintained that their allegations "[we]re strictly limited" to Chevron's post-1980 permitting violations; their complaint never mentioned Chevron's WWII-era work for the U.S. military. Brief for Parish of Plaquemines at 14, No. 24-813 (U.S. Nov. 13, 2025). Indeed, removal in *Chevron* was based on an expert report filed years after the operative complaint. The Supreme Court nevertheless concluded that the suit "implicates Chevron's wartime production of crude oil" based on *Chevron's* theory in its removal papers that the production was legally commenced before 1980. *Chevron*, 146 S. Ct. at 1060. Similarly, what matters here is 3M's theory of removal and plausible

allegations that Plaintiffs' PFAS exposure was caused at least in part by its manufacture of MilSpec AFFF for the U.S. Government. *See* ECF No. 1 ¶¶ 28–36; ECF No. 12 at 2–3.*

Second, *Chevron* makes clear that § 1442(a)(1) requires only "some relation" between "the charged conduct and asserted official authority"—*i.e.*, "a connection that is not 'tenuous, remote, or peripheral.'" 146 S. Ct. at 1060 & n.3, 1061. Plaintiffs argue that the "'focus' of Plaintiffs' Complaint has no relationship, connection, or correlation to MilSpec AFFF." ECF No. 11 at 22. But *Chevron* reiterates that "a removing defendant need not show that his federal duties specifically required or strictly caused the challenged conduct." 146 S. Ct. at 1060.

Third, *Chevron* reaffirms that courts must "credit plausible factual allegations by the removing party" in assessing whether the requisite connection exists. 146 S. Ct. at 1061. That refutes Plaintiffs' assertions to this Court that the Court may deny removal based on Plaintiffs' own view of the facts and potential sources of contamination. *See*, *e.g.*, ECF No. 13 at 14.

Just like *Chevron*, "[t]his suit implicates acts by [the defendant] that are closely connected to [its] performance of" a contract to produce a specialized product for the U.S. military. 146 S. Ct. at 1062. Just like *Chevron*, this case belongs in federal court.

* *See also West Virginia ex rel. McCuskey*, 2026 WL 1078572, at *5 (S.D.W. Va. Apr. 21, 2026) ("[E]stablishing the nexus element is a 'fairly low' bar because 'a removing defendant need not establish an airtight case on the merits in order to show the required . . . connection'" (quoting *West Virginia ex rel. Hunt v. CaremarkPCS Health, L.L.C.*, 140 F.4th 188, 199 (4th Cir. 2025)).

Dated: May 29, 2026

Respectfully submitted,

*/s/ Matthew J. Hundley*

Matthew J. Hundley (VSB No. 76865)
Diana M. Miller (VSB No. 82430)
BUTLER SNOW LLP
919 E. Main Street, Suite 600
Richmond, Virginia 23219
Tel. 804.762.6030
Fax. 804.762.6031
Matthew.Hundley@butlersnow.com
Diana.Miller@butlersnow.com

*Counsel for Defendant 3M Company*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 29th day of May, 2026, I electronically filed the foregoing on behalf of the Defendant with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing to all counsel of record.

___/s/ Matthew J. Hundley__________
Matthew J. Hundley (VSB No. 76865)
Diana M. Miller (VSB No. 82430)
BUTLER SNOW LLP
919 E. Main Street, Suite 600
Richmond, Virginia 23219
Tel. 804.762.6030
Fax. 804.762.6031
Matthew.Hundley@butlersnow.com
Diana.Miller@butlersnow.com

*Counsel for Defendant 3M Company*

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Norfolk Division**

| | |
|---|---|
| Aden W. Scott III, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>3M COMPANY, et al.,<br><br>Defendants. | Case No. 2:25-cv-00617 |

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT 3M'S MOTION FOR LEAVE TO SUBMIT SUPPLEMENTAL AUTHORITY**

Plaintiffs Aden W. Scott, III; Mark C. Davis; Edward A. Lane; Jeremy M. Pope; Casey Barden; John Hudnall; and Amy L Hutchenson, Executrix of the Estate of James S. Hutcheson, deceased, (collectively, the "Scott Plaintiffs" or "Plaintiffs) respectfully submit this response in opposition to Defendant 3M Company's ("3M") Motion for Leave to Submit Supplemental Authority, namely, Chevron USA, Inc. v. Plaquemines Parish, 146 S. Ct. 1052 (2026).

Under Local Rule 7(F)(1), after the closure of the standard briefing schedule, no further written briefs may be filed without first obtaining leave of Court. Thus, allowing supplemental briefing is within the court's discretion. See also Myers v. Mercedes-Benz USA, LLC, No. 3:23cv755, 2024 U.S. Dist. LEXIS 146160, at *17 (E.D. Va. Aug. 15, 2024) ("A court possesses discretion to permit the introduction of supplemental authority after the completion of the standard briefing schedule."). Courts can exercise such discretion if the proposed supplemental authority "stands relevant to the Court's analysis on issues in a pending case." Id.

However, the filing of a supplemental authority is distinct from a surreply—in fact, this very Court[1] has struck supplemental authority filings when, "[r]ather than submitting intervening legal authority, . . . [the] notice [was] in effect a sur-reply attaching additional evidence and making additional arguments related to the Motions." Fernaays v. Isle of Wight Cnty., No. 2:21cv99, 2023 U.S. Dist. LEXIS 247886 (E.D. Va. Nov. 27, 2023). If a party wishes to file a surreply, the Court must "consider whether prejudice will result from the court considering a new argument without the opposing party's having an opportunity to respond." Adams v. Applies Bus. Servs., No. 2:18cv559, 2019 U.S. Dist. LEXIS 226355, at *2 (E.D. Va. Aug. 30, 2019). A party may *not* submit additional briefing simply to further support arguments previously made. Id.

Defendant 3M's Motion for Leave to Submit Supplemental Authority is, in effect, a surreply, improperly circumventing the discretionary leave process established by Local Rule 7(F)(1). In submitting this brief, in no uncertain terms, Defendant seeks only to make additional arguments in support of their opposition to Plaintiffs' Motion to Remand. This is evident on the face of the brief itself, as Defendant plainly states: "*Chevron* supports 3M's position in multiple respects." ECF No. 19 at 2. Defendant continues on to *argue* that "*Chevron* undermines Plaintiffs' . . . attempt to avoid removal," repeatedly utilizing Chevron to plainly argue in further support of their already-briefed position. ECF No. 19 at 2. In making these arguments, Defendant cites not only their previous briefing, *but also additional case citations other than Chevron*. ECF No. 19 at 3, n. 1. These arguments are reserved for *after* the Court grants leave, not in support thereof.

If Defendant's underlying intent was not already obvious from their initial arguments, it is indisputably evidenced in their conclusion, calling the Court to an ultimate decision on the issue:

---

[1] Your Honorable Judge Arenda L. Wright Allen authored the Fernaays v. Isle of Wight Cnty. Opinion relied on herein.

"Just like *Chevron*, this case belongs in federal court." ECF No. 19 at 3. This sentiment is appropriate for a response brief or surreply on the issues—not a Motion for Leave to Submit Supplemental Authority. If Defendant would *like* leave to file a surreply, they must comply with Rule 7(F)(1)'s requirements, including the established prejudice standard, instead of just submitting further legal arguments under the guise of a Motion for Leave. If Defendant would like to file a surreply on the Chevron case, Plaintiffs would request appropriate time to brief the issue of prejudice.

On those grounds alone, Defendant's Motion, having introduced improper new argument, thus becoming a "sur-reply attaching additional evidence and making additional arguments," ought to be denied. See Fernaays, No. 2:21cv99, at *11 (denying Plaintiffs' Notice of Supplemental Authority for failing to first properly seek leave). Further, **Plaintiffs would respectfully request that Defendant's Motion be struck altogether**, as it is an unauthorized supplemental brief for which Plaintiffs are prejudiced in their inability to address or respond to the legal arguments made therein.

As this Response would not be the proper vehicle, Plaintiffs decline to address Defendant's new legal arguments herein. However, Plaintiffs must note there are facially obvious, notable, and significant differences between the case at bar and the Chevron matter—such that Plaintiffs would argue these distinctions actually further demonstrate the why remand *is* appropriate. To not be able to address Defendant's new arguments would prejudice Plaintiffs. Thus, alternatively, if this Court interprets Defendant's Motion as appropriately seeking leave to submit supplemental authority or supplemental briefing, and is inclined to grant Defendant's Motion thereto, Plaintiffs request similar leave to file a brief in response to Defendant's supplemental briefing, thus allowing Plaintiffs to properly address the legal arguments raised therein before this Court.

## CONCLUSION

WHEREFORE, Plaintiffs Aden W. Scott, III; Mark C. Davis; Edward A. Lane; Jeremy M. Pope; Casey Barden; John Hudnall; and Amy L Hutchenson, Executrix of the Estate of James S. Hutcheson, deceased, respectfully submit this Response in Opposition to Defendant 3M's Motion for Leave to Submit Supplemental Authority. More specifically, Plaintiffs ask this Honorable Court to DENY Defendant 3M's Motion for Leave and GRANT Plaintiffs' request that such Motion be stricken altogether. Alternatively, Plaintiffs ask for similar leave to file additional briefing in response to Defendant 3M's new legal arguments made under the Chevron case.

**Respectfully yours,**

Date: June 12, 2026

**ADEN W. SCOTT, III,**
**MARK C. DAVIS,**
**EDWARD A. LANE,**
**JEREMY M. POPE,**
**CASEY BARDEN,**
**JOHN HUDNALL,**
**and**
**AMY L. HUTCHESON, Executrix of the Estate of JAMES S. HUTCHESON, deceased,**

**Plaintiffs**

s/ Kevin Biniazan

Kevin Biniazan | VSB No. 92109
Jeffrey A. Breit | VSB No. 18876
Don Scott | VSB No. 88725
Lauren Martin | VSB No. 93653
Alexis Bale | VSB No. 100318
BREIT BINIAZAN, PC
Towne Pavilion Center II
600 22nd Street, Suite 402
Virginia Beach, VA 23451
Telephone | 757.622.6000
Facsimile | 757.299.8028

Email | kevin@bbtrial.com
Email | jeffrey@bbtrial.com
Email | don@bbtrial.com
Email | lmartin@bbtrial.com
Email | abale@bbtrial.com

*Counsel for Plaintiffs*

## CERTIFICATE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will then send notification of electronic filing (NEF) to counsel of record.

Date: June 12, 2026

s/ Kevin Biniazan
Kevin Biniazan | VSB No. 92109
Jeffrey A. Breit | VSB No. 18876
Don Scott | VSB No. 88725
Lauren Martin | VSB No. 93653
Alexis Bale | VSB No. 100318
BREIT BINIAZAN, PC
Towne Pavilion Center II
600 22nd Street, Suite 402
Virginia Beach, VA 23451
Telephone | 757.622.6000
Facsimile | 757.299.8028
Email | kevin@bbtrial.com
Email | jeffrey@bbtrial.com
Email | don@bbtrial.com
Email | lmartin@bbtrial.com
Email | abale@bbtrial.com

*Counsel for Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**NORFOLK DIVISION**

| | |
|---|---|
| Aden W. Scott III, et al.,<br><br>Plaintiffs,<br>v.<br><br>3M Company, et al.,<br><br><br>Defendants. | No. 2:25-cv-00617-AWA-LRL |

**NOTICE OF APPEAL**

Pursuant to 28 U.S.C. §§ 1291 and 1447(d) and Rules 3 and 4 of the Federal Rules of Appellate Procedure, 3M Company, a defendant in the above-named case, hereby gives notice that it appeals to the United States Court of Appeals for the Fourth Circuit from the District Court's Order entered on July 7, 2026 [ECF No. 21], granting Plaintiff's Motion to Remand [ECF No. 10] and remanding all claims against defendant 3M Company to the Circuit Court for the City of Virginia Beach.

DATED: July 7, 2026

DEFENDANT 3M COMPANY

*/s/ Matthew J. Hundley*

Matthew J. Hundley (VSB No. 76865)
Diana M. Miller (VSB No. 82430)
BUTLER SNOW LLP
919 E. Main Street, Suite 600
Richmond, Virginia 23219
Tel. 804.762.6030
Fax. 804.762.6031
Matthew.Hundley@butlersnow.com
Diana.Miller@butlersnow.com

*Counsel for Defendant 3M Company*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 7th day of July, 2026, I electronically filed the foregoing on behalf of the Defendant 3M Company with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing to all counsel of record.

___*/s/ Matthew J. Hundley*__________
Matthew J. Hundley (VSB No. 76865)
Diana M. Miller (VSB No. 82430)
BUTLER SNOW LLP
919 E. Main Street, Suite 600
Richmond, Virginia 23219
Tel. 804.762.6030
Fax. 804.762.6031
Matthew.Hundley@butlersnow.com
Diana.Miller@butlersnow.com

*Counsel for Defendant 3M Company*